## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| **PATRIOT NATIONAL, INC.,** *et al.,*[1] | Case No. 18-10189 (KG) |
| **Debtors.** | (Jointly Administered) |

## SECOND AMENDED DISCLOSURE STATEMENT OF
## PATRIOT NATIONAL, INC., AND ITS AFFILIATED DEBTORS

**THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED BY THE COURT.**

Kathryn A. Coleman
Christopher Gartman
Dustin P. Smith
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482

*Attorneys for Debtors and Debtors in Possession*

Laura Davis Jones
James E. O'Neill
Peter J. Keane
PACHULSKI STANG
ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)

*Attorneys for Debtors and Debtors in Possession*

---

1. The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are: Patriot National, Inc. (1376); Patriot Services, LLC (1695); TriGen Insurance Solutions, Inc. (2501); Patriot Captive Management, LLC (2341); Patriot Underwriters, Inc. (0045); TriGen Hospitality Group, Inc. (6557); Patriot Risk Consultants, LLC (0844); Patriot Audit Services, LLC (5793); Patriot Claim Services, Inc. (9147); Patriot Risk Services, Inc. (7189); Corporate Claims Management, Inc. (6760); CWIBenefits, Inc. (0204); Forza Lien, LLC (7153); Contego Investigative Services, Inc. (0330); Contego Services Group, LLC (0012); Patriot Care Management, LLC (2808); Radar Post-Closing Holding Company, Inc. (2049); Patriot Technology Solutions, LLC (6855); and Decision UR, LLC (1826). The Debtors' headquarters are located at 401 East Las Olas Boulevard, Suite 1650, Fort Lauderdale, Florida 33301.

<u>**IMPORTANT INFORMATION FOR YOU TO READ**</u>

**THE DEADLINE TO VOTE ON THE PLAN IS FRIDAY, APRIL 13, 2018 AT 4:00 P.M., PREVAILING EASTERN TIME.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE NOTICING AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**This Disclosure Statement provides information regarding the Debtors' Plan, which the Debtors seek to have confirmed by the Bankruptcy Court. A copy of the Plan is attached hereto as <u>Exhibit A</u>. Unless otherwise noted, all capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Plan.**

**You are encouraged to read this Disclosure Statement (including Section V hereof entitled "<u>Plan-Related Risk Factors</u>") and the Plan in their entirety before submitting your ballot to vote on the Plan.**

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.**

**Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.**

**The Debtors are providing the information in this Disclosure Statement to Holders of Claims and Equity Interests for purposes of soliciting votes to accept or reject the Debtors' Plan. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern. Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose. Before deciding whether to vote for or against the Plan, each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the Plan-Related Risk Factors described in Section V.**

**The Debtors urge each Holder of a Claim or Equity Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.**

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, certain events leading up to and occurring in the Debtors' Chapter 11 Cases, and certain documents related to the Plan, attached hereto and/or incorporated by reference herein. Although the Debtors believe that these summaries are fair and accurate, they are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors' management, except where otherwise specifically noted. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

The Debtors have prepared this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, Bankruptcy Rule 3016(b), and Local Bankruptcy Rule 3017, and this Disclosure Statement is not necessarily prepared in accordance with federal or state securities laws or other similar laws.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtors' books and records and on various assumptions regarding the Debtors' businesses. Although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, the Debtors make no representations or warranties as to the accuracy of the financial information contained in this Disclosure Statement or assumptions regarding the Debtors' businesses and their future results and operations. The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.

This Disclosure Statement does not constitute, and should not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward looking statements, whether as a result of new information, future events, or otherwise. Holders of Claims and Equity Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed. Information contained herein is subject to completion, modification, or amendment. The Debtors reserve the right to file an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms

of the Plan.

The Debtors have not authorized any entity to give any information about or concerning the Plan other than that contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

If the Bankruptcy Court confirms the Plan and the Effective Date occurs, the terms of the Plan and the restructuring transactions contemplated by the Plan will bind the Debtors, any Person acquiring property under the Plan, all Holders of Claims and Equity Interests (including those Holders of Claims and Equity Interests that do not submit ballots to accept or reject the Plan or that are not entitled to vote on the Plan), and any other Person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact Prime Clerk LLC ("Prime Clerk") by (a) calling the Debtors' restructuring hotline at 855-631-5360 (Toll-Free) or 347-897-3454 (if calling from outside the US or Canada); (b) emailing patnatballots@primeclerk.com; (c) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/PatNat; and/or (d) writing to Patriot National Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, New York 10022.

# TABLE OF CONTENTS

Page

I.     EXECUTIVE SUMMARY ....................................................................................1

    **A.**    Introduction....................................................................................................1

    **B.**    Key Constituents' Support for the Plan ........................................................2

    **C.**    Plan Overview................................................................................................2

    **D.**    Treatment of Claims and Equity Interest under the Plan...............................3

    **E.**    Voting and Confirmation of the Plan.............................................................6

        **1.**    Voting Procedures and Requirements.................................................6

        **2.**    Confirmation Hearing ........................................................................7

II.    BACKGROUND TO THESE CHAPTER 11 CASES....................................................8

    **A.**    Overview of Debtors' Business Structure.......................................................8

    **B.**    Corporate History...........................................................................................8

    **C.**    Prepetition Organizational Structure, Capitalization, and Indebtedness ................9

        **1.**    Credit Facilities under the Financing Agreement .....................................10

        **2.**    Unsecured Debt....................................................................................11

        **3.**    Equity ................................................................................................11

    **D.**    Prepetition Litigation ...................................................................................11

    **E.**    Certain Creditors' Collection Efforts and Litigation ...........................................13

    **F.**    Events Leading to the Chapter 11 Filing ...................................................14

        **1.**    Patriot Reliance on GIC as a Source of Revenue .......................................14

        **2.**    Mariano Creates Ashmere; the 2015 PIPE Transaction ...........................14

        **3.**    Initial Efforts to Sell Patriot.........................................................14

        **4.**    Mr. Mariano's Resignation ........................................................15

        **5.**    Renewed Efforts to Sell Patriot.......................................................15

|  | **6.** | Severe Liquidity Constraints and Rapid Deterioration of Value | 16 |

**6.** Severe Liquidity Constraints and Rapid Deterioration of Value ...............16

**7.** The Restructuring Support Agreement .......................................................17

**8.** Litigation Claims .....................................................................................17

**9.** Cerberus Business Finance, LLC ("Cerberus") .........................................19

    **a.** Relationship Between Patriot and Cerberus. .................................19

    **b.** Claims Against Cerberus .................................................................20

    **c.** Proposed Settlement and Release ...................................................21

**III.** THE CHAPTER 11 CASES .................................................................................25

**A.** Commencement of the Bankruptcy Cases ...........................................................25

**B.** Procedural Motion ..............................................................................................25

**C.** Trading Order .....................................................................................................25

**D.** Debtor in Possession Financing ........................................................................26

**E.** Mediation Motion ..............................................................................................26

**F.** Appointment of Creditors' Committee ...............................................................26

**G.** Ullico Filings .....................................................................................................26

**IV.** SUMMARY OF THE PLAN ................................................................................27

**A.** General Basis of the Plan ...................................................................................27

**B.** Proposed Treatment of Each Class of Claims and Equity Interest ....................27

**1.** Unclassified Claims ...............................................................................28

    **a.** Administrative Claims .....................................................................28

        (i) Administrative Expense Claims..........................................28

        (ii) Administrative Claims Bar Date .......................................28

    **b.** Professional Compensation ............................................................29

        (i) Final Fee Applications ......................................................29

(ii)    Substantial Contribution Compensation and Expenses ...................................................................29

c.    Priority Tax Claims ...................................................................29

d.    DIP Claims ...................................................................30

e.    United States Trustee Statutory Fees ...................................................................30

2.    Classified Claims and Equity Interests ...................................................................30

a.    Class 1A: Secured First Lien Lender Claims ...................................................................30

b.    Class 1B: First Lien Lender Deficiency Claims ...................................................................30

c.    Class 2: Other Secured Claims ...................................................................31

d.    Class 3: Priority Claims ...................................................................31

e.    Class 4: Continuing Vendor Claims and Continuing Retail Agent Claims ...................................................................31

f.    Class 5: General Unsecured Claims ...................................................................32

g.    Class 6: 510(b) Claims ...................................................................33

h.    Class 7: Intercompany Claims ...................................................................33

i.    Class 8: Equity Interests ...................................................................33

C.    Means for Implementation of the Plan ...................................................................34

1.    Issuance of New Equity Interests ...................................................................34

2.    Exit Financing and the New Term Loan Facility ...................................................................34

3.    Funding of Distributions under the Plan ...................................................................36

4.    Litigation Trust ...................................................................36

a.    Formation of Litigation Trust ...................................................................36

b.    Litigation Trust Oversight Committee ...................................................................37

c.    Appointment of the Litigation Trustee ...................................................................38

d.    Powers of Litigation Trustee ...................................................................38

e.     Litigation Trust Facility ................................................................39

f.     Litigation Trust Distributions ......................................................39

g.     Closing the Chapter 11 Cases ....................................................39

h.     Dissolution of the Litigation Trust.............................................40

5.     Plan Administrator .......................................................................40

6.     Corporate Existence ......................................................................40

7.     Restructuring Transactions ...........................................................41

8.     Preservation of Causes of Action..................................................42

9.     Dissolution of Committee .............................................................42

10.     Cancellation of Old Equity Interests and Other Agreements....................43

11.     Consummation of Equity Purchase Agreement .........................................43

12.     Corporate Action and Effectuation of Documents....................................44

13.     Exemption from Certain Transfer Taxes .......................................44

14.     Plan Supplement ............................................................................44

15.     Substantive Consolidation for Plan Purposes Only ..................................45

D.     Treatment of Executory Contracts and Unexpired Leases .....................................45

1.     Rejection of Executory Contracts and Unexpired Leases .........................45

2.     Bar Date for Claims Based on Rejection of Executory Contracts or Unexpired Leases.......................................................................................45

3.     Assumption and Assignment of Executory Contracts and Unexpired Leases........................................................................................46

a.     Objections to Assumption and Assignment of Executory Contracts and Unexpired Leases......................................................46

4.     Payment Related to Assumption of Executory Contracts and Unexpired Leases.......................................................................................47

5.     Extension of Time to Assume or Reject ..................................................48

**6.** Insurance Policies and Agreements .........................................................48

    **a.** Assumed Insurance Policies and Agreements ...............................48

    **b.** Reservation of Rights .......................................................48

**7.** Reservation of Rights.........................................................................48

**E.** Distributions on Allowed Claims ...........................................................49

    **1.** Distribution on Allowed Claims Generally .........................................49

    **2.** Procedures for Making Distributions on Allowed Claims.......................49

        **a.** Delivery of Distributions in General...............................49

        **b.** Undeliverable or Unclaimed Distributions ....................................49

        **c.** Minimum Distributions................................................................50

        **d.** Finality of Distributions................................................................50

        **e.** Consolidation for Distribution Purposes Only.............................50

        **f.** Application of Distribution Record Date......................................50

        **g.** Surrender of Old Securities.........................................................50

        **h.** Withholding and Reporting Requirements ...................................51

        **i.** Setoffs ........................................................................................51

        **j.** Prepayment ................................................................................51

        **k.** No Fractional Shares of New Equity Interests.............................51

        **l.** No Distribution in Excess of Allowed Amount of Claims ...........52

    **3.** Limitation on Amendments to Claims......................................................52

    **4.** Claims Payable by Third Parties.............................................................52

        **a.** Claims Paid by Third Parties ......................................................52

        **b.** Claims Payable by Third Parties.................................................52

        **c.** Applicability of Insurance Policies...............................................53

**F.**     Resolution of Contingent, Unliquidated, or Disputed Claims ............................53

    **1.**     No Distribution on Disputed Claims........................................53

    **2.**     Disputed Claims Reserve ........................................................53

    **3.**     Claims Administration Responsibilities ..................................53

    **4.**     Time to File Objections to Claims ..........................................54

    **5.**     Estimation of Claims..............................................................54

    **6.**     Disallowance of Claims Held by Persons Subject to Avoidance or Recovery Actions ..................................................................54

    **7.**     Adjustment to Claims Without Objection................................54

    **8.**     Disallowance of Claims ..........................................................55

**G.**     Effect of Confirmation of Plan ............................................................55

    **1.**     Vesting of Assets.....................................................................55

    **2.**     Compromise and Settlement ...................................................55

    **3.**     Binding Effect.........................................................................56

    **4.**     Subordinated Claims ...............................................................56

    **5.**     Discharge of Claims and Termination of Equity Interests........56

    **6.**     Release of Liens......................................................................57

    **7.**     Debtor Releases ......................................................................57

    **8.**     Releases by Holders of Claims and Equity Interest................58

    **9.**     Exculpation ............................................................................60

    **10.**    Injunction ...............................................................................60

    **11.**    No Release of Any Claims Held by the United States..............61

**H.**     Conditions Precedent to Confirmation of Plan and Effective Date .....................62

    **1.**     Conditions Precedent to Confirmation of the Plan....................62

**2.** Conditions Precedent to the Effective Date.................................62

**3.** Waiver of Conditions Precedent .......................................................63

**4.** Operations of the Debtors Between the Confirmation Date and the Effective Date .........................................................................................64

**5.** Effective Date .....................................................................................64

**I.** Retention of Jurisdiction ............................................................................64

**1.** Scope of Jurisdiction..........................................................................64

**2.** Failure to Exercise Jurisdiction........................................................66

**J.** Miscellaneous Provisions...........................................................................66

**1.** Payment of Statutory Fees ................................................................66

**2.** Successors and Assigns and Binding Effect .....................................66

**3.** Modifications and Amendments ........................................................66

**4.** Substantial Consummation of the Plan .............................................67

**5.** Severability of Plan Provisions.........................................................67

**6.** Revocation, Withdrawal, or Non-Consummation ............................67

**7.** Effectuating Documents and Further Transactions...........................67

**8.** Governing Law ..................................................................................68

**9.** Time ...................................................................................................68

**10.** Dates of Actions to Implement the Plan ...........................................68

**11.** Immediate Binding Effect..................................................................68

**12.** Entire Agreement ..............................................................................68

**13.** Exhibits to Plan .................................................................................68

**14.** Notices ...............................................................................................68

**15.** Conflicts.............................................................................................71

V.   PLAN-RELATED RISK FACTORS ..................................................................72

    **A.**    Risks Relating to Confirmation of the Plan ........................................72

        **1.**    Parties in Interest May Object to the Plan's Classification of Claims and Equity Interests ..........................................72

        **2.**    Failure to Satisfy Vote Requirements ........................................72

        **3.**    The Debtors May Not Be Able to Secure Confirmation of the Plan .........72

        **4.**    The Debtors May Object to the Amount or Classification of a Claim ..........................................................73

        **5.**    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan ........................................73

        **6.**    Failure to Obtain Exit Financing........................................73

        **7.**    The Restructuring Support Agreement May Terminate ...........................74

        **8.**    Release, Injunction, and Exculpation Provisions May Not Be Approved........................................................74

    **B.**    Risks Relating to Recoveries under the Plan ........................................74

        **1.**    The Recovery to Holders of Allowed Claims Cannot Be Stated with Absolute Certainty ........................................74

        **2.**    Risk of Non-Occurrence of the Effective Date........................................75

    **C.**    Risks Relating to the Debtors' Businesses........................................75

        **1.**    Prolonged Continuation of the Chapter 11 Cases Is Likely to Harm the Debtors' Business ........................................75

        **2.**    Insurance Industry Trends........................................75

        **3.**    Premium Rate Trends ........................................76

        **4.**    Outsourcing Trends........................................76

        **5.**    Worker Compensation Claims Decline ........................................76

        **6.**    Geographic Concentration ........................................77

        **7.**    Relationship with Independent Retail Agents........................................78

**8.** Changes in the Healthcare Industry ......................................................78

**9.** Regulatory Concerns ........................................................................79

**10.** System Concerns ............................................................................80

**D.** Disclosure Statement Disclaimer .......................................................80

**1.** No Representations Made Outside this Disclosure Statement Are Authorized .......................................................................................80

**2.** The Debtors Relied on Certain Exemptions from Registration Under the Securities Act ..................................................................81

**3.** The Information Herein Was Provided by the Debtors and Relied Upon by Their Advisors ..................................................................81

**4.** No Legal or Tax Advice Is Provided to You by this Disclosure Statement .......................................................................................82

**5.** No Admissions Are Made by This Disclosure Statement ........................82

**VI.** FINANCIAL INFORMATION AND PROJECTIONS ....................................83

**A.** Condensed Projected Financial Information.........................................83

**VII.** VOTING PROCEDURES AND REQUIREMENTS ......................................85

**A.** Procedures for Voting on the Plan ....................................................85

**1.** Voting Procedures and Requirements.................................................85

**2.** Who May Vote? ..............................................................................85

**3.** Impaired Classes Eligible to Vote.....................................................85

**4.** Unimpaired Classes Presumed to Accept Not Eligible to Vote................85

**5.** Classes Deemed to Reject or Otherwise Not Eligible to Vote.................85

**6.** How to Vote? .................................................................................85

**7.** Vote Required for Acceptance by a Class ...........................................86

**8.** Withdrawal of Ballot.......................................................................86

**9.** Waivers of Defects, Irregularities, Etc................................................87

| | | | |
|---|---|---|---|
| | **10.** | Extension of Voting Deadline / Termination of Solicitation | 87 |
| **B.** | | Confirmation of the Plan | 87 |
| | **1.** | The Confirmation Hearing | 87 |
| | **2.** | Requirements for Confirmation of the Plan | 88 |
| | **3.** | General Requirements for Confirmation of the Plan | 88 |
| | **4.** | Confirmation in the Event a Class Fails to Accept the Plan | 90 |
| | **5.** | Acceptance of the Plan | 90 |
| | **6.** | Section 1129(b) Requirements | 90 |
| | **7.** | Best Interests Test | 91 |
| | **8.** | Feasibility of the Plan | 93 |
| **C.** | | Alternatives to Confirmation and Consummation of the Plan | 94 |
| | **1.** | Liquidation Under Chapter 7 | 94 |
| | **2.** | Alternative Chapter 11 Plan | 94 |
| **VIII.** | | SECURITIES LAWS MATTERS | 95 |
| **A.** | | Exemption from Registration Requirements | 95 |
| **IX.** | | CERTAIN FEDERAL TAX CONSEQUENCES OF THE PLAN | 98 |
| **A.** | | Certain U.S. Federal Income Tax Consequences to the Holders of Certain Claims and Equity Interests | 99 |
| | **1.** | Consequences to Holders of Certain Claims | 99 |
| | | **a.** General Tax Consequences | 99 |
| | | **b.** Tax Treatment of Litigation Trust | 100 |
| | | **c.** Accrued but Unpaid Interest or OID | 101 |
| | | **d.** Market Discount | 101 |
| | | **e.** Bad Debt Deduction | 102 |

**f.** Limitation on Use of Capital Losses ..............................................102

**2.** Consequences to Holders of Class 4 Claims ...........................................102

**3.** Consequences to Holders of Old Equity Interests in Patriot ..................103

**4.** Information Reporting and Backup Withholding ...................................103

**B.** Certain U.S. Federal Income Tax Consequences to Reorganized Debtors..........103

**1.** Cancellation of Debt and Reduction of Tax Attributes .........................103

**2.** Limitation of New Operating Loss Carry Forwards and Other Tax Attributes...............................................................................104

**a.** General Section 382 Annual Limitation .....................................105

**b.** Special Bankruptcy Exceptions .................................................105

**3.** Section 269 of the Internal Revenue Code .............................................106

X. CONCLUSION AND RECOMMENDATION...............................................................107

## EXHIBITS

**Exhibit A:**     **Plan of Reorganization**

**Exhibit B:**     **Disclosure Statement Order**

**Exhibit C:**     **Organizational Chart**

**Exhibit D:**     **Liquidation Analysis**

**Exhibit E:**     **Valuation Analysis**

**Exhibit F:**     **Financial Projections**

# I. EXECUTIVE SUMMARY

## A. INTRODUCTION

Patriot National, Inc. ("PNI"), together with its affiliates identified on the title page above, as debtors and debtors in possession (collectively, the "Debtors," and along with their non-Debtor affiliates, "Patriot" or the "Company"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for District of Delaware on January 30, 2018 (the "Petition Date"). The Debtors' Chapter 11 Cases are jointly administered under lead case name Patriot National, Inc. and lead case number 18-10189.

Before soliciting acceptances of a proposed chapter 11 plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization.

Accordingly, the Debtors submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Equity Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Debtors' Amended Joint Chapter 11 Plan of Reorganization* (the "Plan") [Docket No. [__]], dated March 9, 2018, as amended, supplemented, or modified from time to time in accordance with its terms. A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors.

On [_____], 2018, the Bankruptcy Court entered an order [Docket No. [___]] (the "Disclosure Statement Order") (a) approving this Disclosure Statement as containing adequate information, (b) approving, among other things, the dates, procedures, and forms applicable to the process of soliciting votes on and providing notice of the Plan and certain vote tabulation procedures, (c) establishing the deadline for filing objections to the Plan, and (d) scheduling the Confirmation Hearing. The Disclosure Statement Order is attached hereto as **Exhibit B**.

A hearing to consider confirmation of the Plan is scheduled to be held before the Honorable Kevin Gross at [10:00 a.m.], prevailing Eastern Time, on Tuesday, April 24, 2018 at the Bankruptcy Court, 824 North Market Street, 6th Floor, Wilmington, DE 19801. Additional information with respect to confirmation is provided in Section VIII of this Disclosure Statement.

This Disclosure Statement includes information about, without limitation, (i) the Debtors' business, prepetition operations, financial history, and events leading up to these Chapter 11 Cases, (ii) the significant events that occurred thus far in these Chapter 11 Cases, (iii) the anticipated recoveries of creditors under the Plan, (iv) the procedures by which the Debtors intend to solicit and tabulate votes on the Plan, (v) the Plan confirmation process, (vi) certain risk factors to be considered before voting on the Plan, and (vii) discussions relating to certain securities registration and tax consequences of the Plan. The descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan being proposed by the Debtors relate to the Plan filed with the Bankruptcy Court on March 9, 2018.

This executive summary is only a general overview of this Disclosure Statement and the material terms of, and transactions proposed by, the Plan. The Executive Summary is

qualified in its entirety by reference to the more detailed discussions appearing elsewhere in this Disclosure Statement and the exhibits attached to this Disclosure Statement (including the Plan) and the Plan Supplement. The Debtors urge all parties to read this Executive Summary in conjunction with the entire Disclosure Statement, the Plan, and the Plan Supplement.

**B.      KEY CONSTITUENTS' SUPPORT FOR THE PLAN**

The Plan is supported by 100% percent of the Debtors' First Lien Lenders (the "Consenting Lenders") who possess security interests on substantially all of the Debtors' assets. Prior to the Petition Date, the Debtors engaged in extensive, good-faith negotiations with the Consenting Lenders to develop a comprehensive financing, restructuring, and recapitalization plan to be implemented through these Chapter 11 Cases. That agreement was memorialized in the Restructuring Support Agreement dated November 27, 2017 between the Debtors, the First Lien Agents, and the First Lien Lenders (the "RSA"), The RSA provided the framework for a prompt resolution of these Chapter 11 Cases under the terms set forth in the Plan, in order to allow the Debtors' operating businesses to emerge from bankruptcy as a going concern.

The Debtors and the Consenting Lenders believe that transactions reflected in the Plan and related documents will provide the Debtors with liquidity to achieve the financial restructuring contemplated by the Plan, implement the Debtors' long-term business plan, and lead to an overall healthier, restructured company, which will benefit all creditors doing business with the Reorganized Debtors. The Debtors and Consenting Lenders believe that these, among many others, are substantial reasons to vote to **ACCEPT** the Plan.

**THE DEBTORS AND THE CONSENTING LENDERS SUPPORT THE PLAN AND BELIEVE THAT THE COMPROMISES, SETTLEMENTS, AND RELEASES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. FOR THESE REASONS AND OTHERS DESCRIBED HEREIN, THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

**C.      PLAN OVERVIEW**

The following is a brief overview of certain material provisions of the Plan. This overview is qualified by reference to the provisions of the Plan, and the exhibits thereto, as amended from time to time. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control. The Plan will be a joint plan for the reorganization of PNI and each of its direct and indirect subsidiaries that are Debtors. The Debtors will be consolidated for voting purposes and for the purposes of determining the Allowed amount of Claims to be used in calculating distributions to be made pursuant to the Plan.

Pursuant to the Plan, all of the issued and outstanding equity interests in PNI and each of its direct and indirect subsidiaries (the "Subsidiary Debtors") will be extinguished, and the First Lien Lenders (or their designees) will receive 100% of newly issued equity interests in

Reorganized PNI and each of the Reorganized Subsidiary Debtors on account of a portion of their claims arising under their applicable financing agreements as further described below.

Additionally, the Plan provides for the creation of a Litigation Trust and for the transfer free and clear into the Litigation Trust of all of the Debtors' Litigation Claims, which include avoidance actions, commercial tort claims, including claims against certain of the Debtors' current and former officers and directors, claims against certain of the Debtors' former professionals, and other claims against third parties held by the Debtors. The proceeds from the settlement or successful prosecution of the causes of action transferred to the Litigation Trust will be distributed pursuant to the Litigation Proceeds Waterfall as set forth in the Plan and further described herein. As an overview, the Cash proceeds of the Litigation Claims will first be used to pay Litigation Trust Expenses, then to repay amounts borrowed under the Litigation Trust Facility and then to repay indebtedness incurred under the DIP Facility or Exit Facility, or proceeds of collateral of the First Lien Lenders utilized, in connection with the distributions made to Holders of Allowed Administrative Expense Claims, Priority Tax Claims, and Priority Claims. Remaining Cash proceeds from the Litigation Claim will then be split, with 80% being distributed ratably to holders of Allowed First Lien Lender Deficiency Claims and 20% being distributed ratably to holders of Allowed General Unsecured Claims. Allowed Priority Claims and Allowed Other Secured Claims will either be paid in full, reinstated, or otherwise rendered unimpaired. Allowed Continuing Vendor Claims and Allowed Continuing Retail Agent Claims will be paid in full in the ordinary course of business, or if such amounts are overdue on the Effective Date of the Plan, in two equal installments with the first such installment occurring on the Effective Date and the second occurring six months after the Effective Date. The Plan provides for Allowed DIP Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims and U.S. Trustee Fee Claims to receive 100% recoveries or such other treatment as is agreed to in writing among such Holder, the Debtors and the First Lien Agents.

On the Effective Date, Reorganized Debtors will enter into a new credit facility (the "Exit Facility") with commitments sufficient (after giving effect to Available Cash) to (a) repay in full all amounts outstanding under the DIP Facility, (b) make the cash distributions contemplated by the Plan, (c) provide working capital for the ongoing business operations of the Reorganized Debtors, and (d) pay all related transaction costs and expenses. The Exit Facility shall have a first priority lien upon and security interest in substantially all of the assets of the Reorganized Debtors. The Plan also provides for the Reorganized Debtors to enter into a New Term Loan Facility on the Effective Date. The indebtedness under the New Term Loan Facility will be distributed to the First Lien Lenders under the Plan. The New Term Loan Facility shall also have a lien upon and security interest in substantially all of the assets of the Reorganized Debtors

## D.     TREATMENT OF CLAIMS AND EQUITY INTEREST UNDER THE PLAN

The classification of Claims and Equity Interests, the estimated aggregate amount of Claims in each Class and the amount and nature of distributions to holders of Claims or Equity Interests in each Class are summarized in the table below. In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Expense Claims, Priority Tax Claims and U.S. Trustee Fees have not been classified. For a discussion of certain additional

matters related to DIP Claims, Administrative Claims and Priority Tax Claims, see *infra* Section IV.B.1.a.

        Each amount designated in the table below as "Estimated Percentage Recovery" for each Class is the quotient of the estimated New Equity Interest or Cash to be distributed to holders of Allowed Claims in such Class, divided by the estimated aggregate amount of Allowed Claims in such Class. Each of the estimated Cash or New Equity Interest and the estimated aggregate amount of Allowed Claims has been made in ranges with both low and high estimates. In determining such amount, the Debtors have assumed that the Plan is consummated as described herein.

        These calculations do not include any value attributed to Causes of Action that will be transferred to the Litigation Trust under the Plan. The Debtors have not commenced a review of all potential Causes of Action and, therefore, they are not in a position to provide an estimated value for such actions. The value of such actions, however, could be material.

        For a discussion of various factors that could materially affect the amount of Cash, New Equity Interests, and other Litigation Trust Assets to be distributed pursuant to the Plan, see *infra* Section V. In addition, the Debtors' estimates for recoveries by holders of Allowed Claims are based on the Debtors' current view of the likely amount of Allowed Administrative Claims incurred by the Debtors through confirmation of the Plan. There can be no guarantee that the Debtors' estimates of Administrative Claims will prove to be accurate.

| Class | Treatment | Status/Entitled to Vote | Estimated Aggregate Amount of Claims | Estimated Recovery Percentage or Interest |
|---|---|---|---|---|
| Class 1A: Secured First Lien Lender Claims | Holders of Allowed Secured First Lien Lender Claims will receive their Pro Rata Share of (i) the New Equity Interests and (ii) the New Term Loan Facility. | Impaired and entitled to vote. | $70.8 million - $81.5 million | 100% |
| Class 1B: First Lien Lender Deficiency Claims | Holders of Allowed First Lien Lender Deficiency Claims will receive their Pro Rata share of the Litigation Trust Interests in the Litigation Trust distributable to Holders of First Lien Lender Deficiency Claims and representing a right to receive distributions from the Litigation Trust in accordance with the Litigation Proceeds Waterfall. | Impaired and entitled to vote. | $141.8 million - $152.5 million | Proceeds from Litigation Trust Interest. |

| Class | Treatment | Status/Entitled to Vote | Estimated Aggregate Amount of Claims | Estimated Recovery Percentage or Interest |
|---|---|---|---|---|
| Class 2: Other Secured Claims | Holders of Allowed Secured Claims will receive either (i) Cash equal to the amount of such Allowed Other Secured Claim, (ii) reinstatement of such Allowed Other Secured Claim; or (iii) the property securing such Allowed Other Secured Claim, with any deficiency to result in a Class 5 General Unsecured Claim. | Unimpaired and not entitled to vote. | $0.3 million | 100% |
| Class 3: Priority Claims | Holders of Allowed Priority Claims will receive, either (i) Cash equal to the unpaid portion of such Allowed Priority Claim or (ii) such different treatment as to which such Holder, the Debtors and the First Lien Agents shall have agreed upon in writing. | Unimpaired and not entitled to vote. | $0.8 million | 100% |
| Class 4: Continuing Vendor Claims and Continuing Retail Agents Claims | Holders of Allowed Continuing Vendor Claims and Allowed Continuing Retail Agent Claims will be paid in full in Cash either (i) in the ordinary course of business in accordance with any invoice, contract or other agreement governing the terms of such payment or, (ii) if such amounts are overdue as of the Effective Date, in two equal installments with the first such installment being made on the Effective Date and the second being made on the date that is the six month anniversary of the Effective Date assuming compliance by the Holder with its Continuing Vendor Agreement or Continuing Retail Agent Agreement, as applicable. | Impaired and entitled to vote. | N/A | 100% |

| Class | Treatment | Status/Entitled to Vote | Estimated Aggregate Amount of Claims | Estimated Recovery Percentage or Interest |
|---|---|---|---|---|
| Class 5 General Unsecured Claims | Holders of Allowed General Unsecured Claims will be entitled to receive their Pro Rata Share of the Litigation Trust Interests in the Litigation Trust distributable to Holders of Allowed General Unsecured Claims and representing a right to receive distributions from the Litigation Trust in accordance with the Litigation Proceeds Waterfall. | Impaired and entitled to vote. | $24.5 million[2] | Proceeds from Litigation Trust Interest. |
| Class 6: 510(b) Claims | Holders of Allowed 510(b) Claims shall not receive or retain any distribution under the Plan, and all such 510(b) Claims shall be eliminated and extinguished. | Impaired and deemed to reject. | N/A | 0%. |
| Class 7: Intercompany Claims | Holders of existing Intercompany Claims between and among the Debtors shall not receive any distribution or retain any property under the Plan, and all such Intercompany Claims shall be cancelled. | Impaired and deemed to reject. | $176.2 million | 0% |
| Class 8: Equity Claims | Holders of Equity Interests in PNI and each of the Subsidiary Debtors will not receive or retain any property on account of Old Equity Interests and their Old Equity Interests shall be eliminated and extinguished. | Impaired and deemed to reject. | N/A | 0% |

## E.     VOTING AND CONFIRMATION OF THE PLAN

### 1.     Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in a debtor that are "impaired" under the terms of a plan of liquidation or reorganization are entitled to vote to accept or reject a plan.  A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity.  Classes of Claims and Equity Interests that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes of Claims and Equity Interests that will not receive distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.  The

---

2.    The estimated aggregate amount of General Unsecured Claims does not include any amount on account of unliquidated litigation claims against the Debtors.  While the Debtors dispute these unliquidated claims, the total amount of General Unsecured Claims could be higher.

classification of Claims and Equity Interests is summarized, together with an indication of whether each Class of Claims or Equity Interests is impaired or unimpaired, in Section IV of this Disclosure Statement.

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may temporarily allow a Claim for voting or other purposes. As set forth in the Disclosure Statement Order, voting tabulation procedures have been established that include certain vote tabulation rules that temporarily allow or disallow certain Claims for voting purposes only.

**Voting on the Plan by each holder of a Claim in Classes 1A, 1B, 4, and 5 is important. Please carefully follow all of the instructions contained on the ballot or ballots provided to you. All ballots must be completed and returned in accordance with the instructions provided.**

**To be counted, your ballot or ballots must be received by Prime Clerk, the Debtors' voting agent (the "Voting Agent"), by 4:00 p.m., prevailing Eastern Time, on Friday, April 13, 2018 in accordance with the Instructions set forth on the applicable ballot. It is of the utmost importance that you vote promptly to accept the Plan.**

**If you are entitled to vote and you did not receive a ballot, received a damaged ballot or lost your ballot, please call the Debtors' Voting Agent, Prime Clerk, at (855) 631-5360 (Toll-Free) or (347) 897-3454 (if calling from outside the US or Canada). Also, this Disclosure Statement, the Plan and all of the related exhibits and schedules, including ballots, are available, without charge, to any party in interest at https://cases.primeclerk.com/PatNat.**

Votes cannot be transmitted orally, by email or by facsimile. Accordingly, you are urged to return your ballot in accordance with the instructions set forth on the ballot, so that it is received by the Debtors' Voting Agent before the Voting Deadline.

2.      **Confirmation Hearing**

Pursuant to section 1128 of the Bankruptcy Code, the hearing to consider confirmation of the Plan will be held on Tuesday, April 24, 2018 commencing at [10:00 a.m.], prevailing Eastern Time, before the Honorable Kevin Gross, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, DE 19801. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before Friday, April 13, 2018, at 4:00 p.m., prevailing Eastern Time, in the manner described below in Section VIII of this Disclosure Statement. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the confirmation hearing or at any subsequent adjourned confirmation hearing.

## II.     BACKGROUND TO THESE CHAPTER 11 CASES

### A.     OVERVIEW OF DEBTORS' BUSINESS STRUCTURE

Patriot National, Inc. ("PNI") – a public holding company that owns 100% of Patriot Services, LLC ("Patriot Services") and indirectly 100% of the equity of each other Debtor other than CSG and Decision[3] – employs all or substantially all of the Debtors' employees and leases many of the various offices from which their businesses are conducted.  Through Patriot Services and its respective subsidiaries, Patriot principally offers two types of services to its insurance carrier clients: front-end services, such as brokerage, underwriting and policyholder services (collectively, the "Front-End Services"), and back-end services, such as claims adjudication and administration (collectively, the "Back-End Services").  Patriot provides its services either on an individual basis, as bundles of two or more services tailored to a client's specific needs, or on a turnkey basis where it provides a comprehensive set of Front-End Services and Back-End Services.  Patriot also offers specialty services including technology outsourcing and other IT services, as well as employment pre-screening and background checks. As a service company, Patriot does not assume any underwriting or insurance risk.  Its revenue is primarily fee-based, most of which is contractually committed or anticipated to be regularly recurring.

Patriot provides its Front-End Services primarily through Subsidiary Debtors TriGen, Captive, Underwriters, Hospitality, Risk Consultants, and PAS, as well as non-debtor foreign subsidiaries Patriot Captive Management (Caymans) Ltd. and Patriot Captive Management (Bahamas) Ltd.[4]  Patriot provides its Back-End Services primarily through Subsidiary Debtors PCS, Risk Services, CCM, CWI, Forza, CIS, CSG, and Care Management. In addition to its Front-End Services and Back-End Services, Patriot provides technology solutions to its clients through Subsidiary Debtors PTS and Decision, along with non-debtor foreign subsidiaries PN India Holdings and Mehta & Pazol Consulting Services PVT, LTD.[5] Subsidiary Debtor Radar is a non-operating holding company for a former subsidiary, Global HR Research, Inc. ("Global HR"), which retains certain earn-out rights in respect of the prior sale of Global HR.  As of January 30, 2018, Patriot employed approximately 540 people, including 72 people at its headquarters in Fort Lauderdale, Florida.

### B.     CORPORATE HISTORY

Patriot traces its origins to a workers' compensation insurance business started in 2003 when Steven Mariano, Patriot's former CEO, acquired Guarantee Insurance Company ("GIC").  The business then underwent an operational restructuring in November 2013, whereby the insurance risk-taking operations of Guarantee Insurance Group (the parent company of GIC)

---

3.   A corporate organization chart is attached as Exhibit C.

4.   Patriot Captive Management (Caymans) Ltd. and Patriot Captive Management (Bahamas) Ltd. provide captive insurance services in the Caymans and Bahamas, respectively.

5.   PN India Holdings is a Mauritius-based holding company that owns Mehta & Pazol Consulting Services PVT, LTD, which performs software development services in India.

were separated from Patriot's insurance services business.  In connection with that operational restructuring, PNI (f/k/a Old Guard Risk Services, Inc.) was incorporated in Delaware in November 2013.  About nine months later, Patriot acquired certain contracts to provide marketing, underwriting and policyholder services to certain of its insurance carrier clients, as well as related assets and liabilities, from a subsidiary of Guarantee Insurance Group.  Patriot also acquired a contract to provide a limited subset of its brokerage and policyholder services to GIC, and subsequently entered into a new agreement to provide all brokerage and policyholder services to GIC.

Patriot completed an initial public offering (the "IPO") in January 2015.  When Patriot went public in January 2015, its sole business was to provide services in connection with workers' compensation insurance policies issued by its insurance carrier customers.  In accordance with its vision to grow its business, in its first six months as a public company Patriot acquired several new businesses that provided additional services to its clients.  For example, it purchased Decision, which provides web-based utilization review software for the workers' compensation industry; Vikaran Solutions, LLC (subsequently merged into PTS), which provides software services to insurance carriers; CCM, which services general and professional liability insurers; Infinity Insurance Solutions, LLC (subsequently merged into Underwriters), which provides premium audit services for insurance companies; InsureLinx, Inc. (subsequently merged into PTS), which provides software for the automatic collection of premiums out of payroll; and CWI, which provides claims administration for self-insured health insurance.

In August 2015, Patriot acquired Global HR, which provided customized pre-employment screening, including background checks, verification, and drug screening services to major corporations.[6]  At the time of the acquisition, Patriot believed that Global HR's business would provide Patriot a platform and entry into human capital management, furthering its goal to expand the range of services it could provide to employers.  Although Global HR continued to grow after being acquired by Patriot, the synergies Patriot anticipated did not materialize.  As a result, the board of directors of PNI (the "Patriot Board") decided to explore strategic alternatives to maximize shareholder value, and in the third quarter of 2016 requested that Evercore Group L.L.C. ("Evercore") – which had previously been engaged in November 2015 as an investment banker for Patriot – conduct a sale of Global HR.  That process resulted in a sale (announced on April 3, 2017) for $20 million in cash and earnouts (the rights to which are held by Radar) that could generate an additional $10 million.

## C.  PREPETITION ORGANIZATIONAL STRUCTURE, CAPITALIZATION, AND INDEBTEDNESS

As set forth in the organizational chart attached hereto as Exhibit C, PNI currently owns, directly or indirectly, each of the Subsidiary Debtors, other than small percentages of CSG and Decision.

Patriot's prepetition capital structure includes:

---

6.  Patriot acquired Global HR from an entity indirectly controlled by Austin Shanfelter, a former director of PNI. The aggregate purchase price paid by Patriot was $24 million in cash and $18 million in stock.

1.    **Credit Facilities under the Financing Agreement**

Patriot is a borrower under that certain Financing Agreement, dated as of November 9, 2016, by and among (i) PNI, as borrower, (ii) Patriot Services, TriGen, Captive, Underwriters, Hospitality, Risk Consultants, PAS, PCS, Risk Services, CCM, CWI, Forza, CIS, CSG, Care Management, Radar, PTS, and Decision, as guarantors (collectively, the "Guarantors"), (iii)  the lenders from time to time party thereto (the "Lenders"), and (iv) Cerberus Business Finance, LLC ("Cerberus"), as Collateral Agent and Administrative Agent (in such capacities, the "Agents") (as amended, modified, or otherwise supplemented from time to time prior to the date hereof, the "Financing Agreement").

The Financing Agreement provided for a $30.0 million revolving credit facility (the "Revolving Credit Facility") and a $250.0 million term loan facility (the "Term Loan Facility," and together with the Revolving Credit Facility, the "Credit Facility").  The Credit Facility had a maturity of five years, and borrowings thereunder bear interest, at PNI's option, at LIBOR plus a margin ranging from 700 basis points to 725 basis points or at a base rate plus a margin ranging from 525 basis points to 550 basis points.  Given the occurrence and continuance of events of default, the obligations under the Financing Agreement have been accruing interest at the default rate (*i.e.*, 2.00% in excess of the otherwise applicable rate) since July 15, 2017.

All obligations under the Financing Agreement are guaranteed by the Guarantors and secured by a first-priority perfected security interest in substantially all of PNI's and the Guarantors' tangible and intangible assets, whether now owned or hereafter acquired, including a pledge of 100% of the equity interests of each Guarantor.

On November 9, 2017, the Agents issued a Notice of Default with respect to the Financing Agreement.  Specifically, the Debtors were in default of the Financing Agreement due to their failure to deliver timely financial statements, non-payment of interest due November 1, 2017, and failure to comply with certain financial covenants.  On November 17, 2017, the Debtors obtained and entered into a Forbearance Agreement (the "Forbearance Agreement") with the Lenders and the Agents.  Pursuant to the Forbearance Agreement and subsequent amendments thereto, the Agents and the Lenders agreed not to accelerate the maturity of the loans nor exercise their related rights and remedies in relation to the defaults under the Financing Agreement until the Petition Date, subject to certain limitations and conditions (the "Forbearance Period").  Following the execution of the Forbearance Agreement, the Lenders made a total of approximately $5 million in Collateral Agent Advances (as defined in the Financing Agreement) and allowed the Debtors to use approximately $6.3 million in proceeds from tax refunds (which was the Lenders' collateral) to fund operations.  Thus, as of the Petition Date, the total amount due under the Financing Agreement was in excess of $223 million.  The DIP Motion (as defined below) contemplates the repayment of the Collateral Agent Advances (plus all fees, expenses, and accrued and unpaid interest, including default interest, thereon) from loans made under the DIP Facility.

Upon termination or expiration of the Forbearance Period, the Agents and/or the Lenders would have been entitled to exercise any of their respective rights and remedies under the Forbearance Agreement and/or the Financing Agreement (together with other related loan documents, the "Loan Documents"), or applicable law, including, without limitation, enforcing

any and all of the liens on, and security interests in, the collateral described in the Loan Documents and accelerating the maturity of the loan under the Financing Agreement.

### 2. Unsecured Debt

The Debtors also have unsecured debt in the approximate amount of $24.5 million, consisting primarily of former employee severance claims, unpaid fees for professional and other services, trade debt, lease obligations and contractual earn-out obligations, and certain litigation claims (discussed below) that, if ultimately liquidated nevertheless would be subject to subordination under Section 510(b) of the Bankruptcy Code. The unsecured debt includes severance obligations owed to three former officers and directors of the Debtors including: (i) severance obligations owed to Steven Mariano of $4,000,000, (ii) severance obligations owed to Thomas Shields of $458,300, and (iii) severance obligations owed to Todd Wilson of $790,000. All three of these severance obligations are listed as Disputed in the Debtors' Schedules. The unsecured debt described in this section does not include any amount on account of the unliquidated litigation claims against the Debtors. While the Debtors dispute these unliquidated claims, the total amount of unsecured debt could be higher.

### 3. Equity

As of the Petition Date, PNI had a total of 26,939,888 shares of common stock issued, of which 26,798,886 shares were freely tradable without restriction or further registration under the Securities Act unless held by affiliates, and 141,002 shares were "restricted securities" within the meaning of SEC Rule 144 and were subject to certain restrictions on resale. PNI also could be required to issue up to 3,250,000 additional shares of common stock upon exercise of new series A warrants, and up to 4,889,165 shares of common stock upon exercise of new series B warrants. Although 100,000 shares of preferred stock are authorized, no shares of preferred stock are issued and outstanding. PNI's common stock was listed on the New York Stock Exchange under the symbol "PN." However, trading in PNI's stock has been suspended since November 28, 2017, when it received a delisting notice from the New York Stock Exchange.

## D. PREPETITION LITIGATION

As of the Petition Date, the Debtors were involved in several significant litigation matters (the "Prepetition Litigations"), many relating to its prepetition equity financing activities discussed below. These matters include, among others, the following:

- *Hudson Bay Master Fund Ltd. v. Patriot National, Inc., et al.*, No. 1:16-cv-02767-GBD (S.D.N.Y.). On April 13, 2016, Hudson Bay Master Fund Ltd. ("Hudson Bay") filed suit in the United States District Court for the Southern District of New York against PNI, Mr. Mariano, and American Stock Transfer Company, LLC as a nominal defendant. Hudson Bay alleges that PNI and Mr. Mariano are in breach of various contracts regarding delivery of price adjustment warrants, and that Mr. Mariano interfered with those same contracts between PNI and Hudson Bay. Hudson Bay seeks specific performance of the contracts, monetary damages, and attorney's fees.

- *CVI Investments, Inc. v. Patriot National, Inc.*, No. 1:16-cv-02787-GBD-RLE (S.D.N.Y.) (the "CVI Action"). On April 14, 2016, CVI Investments Inc. ("CVI") filed a suit against PNI similar to the Hudson Bay action, alleging breach of contract regarding price adjustment warrants. The CVI suit similarly seeks specific performance of the contracts, monetary damages, and attorney's fees, as well as injunctive relief.

- *Henry Wasik, et al. v. Steven M. Mariano, et al.*, No. 12953 (Del. Ch.) (the "Wasik Action"). This action seeks individually and on behalf of a class, and derivatively on behalf of PNI, to assert claims against numerous defendants (including certain present and former officers and directors of PNI, certain entities allegedly affiliated with Mr. Mariano, and other parties having dealings with Patriot during the relevant time period) for breach of fiduciary duty, corporate waste, aiding and abetting breach of fiduciary duty, breach of contract, and unjust enrichment. The Wasik Action also asserts claims against Cerberus for allegedly aiding and abetting the alleged breach of fiduciary duty by certain present and former officers and directors of PNI.

- *Hudson Bay Master Fund Ltd. v. John R. Del Pizzo, et al.*, No. 1:17-cv-06204-GBD-OTW (S.D.N.Y.) (the "Hudson Bay Action"). This six-count complaint asserts both direct and derivative claims against certain present and former officers and directors of PNI for breach of fiduciary duty and corporate waste, and direct claims for violations of the Securities Act of 1934 (the "Exchange Act") or for common-law torts.

- *Adam Kayce v. Patriot National, Inc. and Steven Mariano*, No. 1:17-cv-07164-ER (S.D.N.Y.). This two-count complaint pleads one count against PNI and Mr. Mariano for an alleged violation of section 10(b) of the Exchange Act and SEC Rule 10b-5, and one count against Mr. Mariano for violation of section 20(a) of the Exchange Act, and seeks certification of a class.

- *Anthony L. Gingello v. Patriot National, Inc., et al.*, No. 1:17-cv-01866-ER (S.D.N.Y.). This one-count complaint seeks relief against PNI for an alleged violation of section 10(b) of the Exchange Act and SEC Rule 10b-5, and seeks certification of a class.

- *Henry Wasik v. Patriot National, Inc.*, No. 2017-0581-AGB (Del. Ch.). This one-count complaint against PNI seeks entry of an order requiring PNI to hold an annual meeting of stockholders for 2017.

- *Aric McIntire, et al. v. Steven M. Mariano, et al.*, No. 0:18-cv-60075-BB (S.D. Fla.). This class action complaint seeks relief against former officers and directors of PNI and other parties, including underwriters and auditors, for alleged violations of the Securities Act of 1933 and the Exchange Act based on alleged material misstatements or omissions in PNI's SEC filings, as well as for alleged violations of section 10(b) of the Exchange Act and SEC Rule 10b-5, and seeks certification of a class.

- *Aspen Specialty Insurance Company v. Hospitality Supportive Systems, LLC, et al.*, No. 2:16-cv-01133-JD (E.D. Pa.). This complaint against defendants including PNI, Underwriters, TriGen, and Hospitality seeks, inter alia, rescission of liability insurance policies issued by Aspen Specialty Insurance Company in connection with an insurance purchasing group program managed by non-Debtor defendant, Hospitality Supportive Systems, LLC and associated damages arising from alleged misrepresentations by the Defendants.

The first eight Prepetition Litigations described above have been stayed pursuant to the Meditation Order described in Section III.E.

## E.    CERTAIN CREDITORS' COLLECTION EFFORTS AND LITIGATION

Subsequent to entry into the RSA and prior to the Petition Date, the Debtors were subject to creditors' collection efforts and ongoing litigation with respect to several litigations.

On May 4, 2017, Kasowitz Benson Torres LLP ("Kasowitz") commenced a lawsuit, *Kasowitz Benson Torres LLP v. Patriot National, Inc.*, No. 154162/2017 (N.Y. Sup.), asserting claims for breach of contract, quantum meruit and account stated with respect to allegations that PNI failed to pay for certain professional legal services rendered by Kasowitz. On December 22, 2017, the court entered an order granting summary judgment in favor of Kasowitz. Kasowitz has subsequently commenced a proceeding to have the judgment recognized in Florida. Furthermore, on or about January 26, 2018, Kasowitz served upon certain counsel representing Patriot information subpoenas with restraining notices directed at the counsel themselves in furtherance of Kasowitz' collection efforts.

Litigation has also proceeded in several lawsuits against the Debtors based upon allegations that the Debtors have defaulted on obligations to former employees under various severance agreements or have failed to provide adequate notice of terminations pursuant to the WARN Act. On December 29, 2017, the Debtors filed a motion to set aside a default judgment in a lawsuit captioned *Ermatinger v. Patriot National, Inc.*, No. CACE17021316 (Fla. Cir. Ct.), which asserts that PNI is in default with respect to obligations under a severance agreement. On January 3, 2018, a lawsuit captioned *Kelly v. Patriot National, Inc.*, No. CACE18000215 (Fla. Cir. Ct.), was commenced against PNI, alleging breach of a severance agreement. On January 12, 2018, a pretrial order was entered scheduling a trial in a lawsuit captioned *Wilson v. Patriot National, Inc.*, No. 0:17-cv-62177-BB (S.D. Fla.), which asserts that PNI is in breach of its obligations pursuant to a severance agreement.

Additionally, on December 14, 2017, Michelle Cole and Andrea Scarlett, former employees of PNI, filed a putative class action in the United States District Court for the Southern District of Florida against PNI and GIC, *Michelle L. Cole, et al. v. Patriot National Inc., et al.*, No. 0:17-cv-62461-JEM (S.D. Fla.), alleging they and similarly-situated employees were terminated without cause in violation of the WARN Act. The plaintiffs seek recovery of their wages and other employee benefits for 60 working days following their termination. On January 30, 2018, the plaintiffs voluntarily dismissed their claims against GIC, without prejudice. On February 1, 2018, the plaintiffs commenced an adversary proceeding alleging

violation of the WARN Act against PNI in the Bankruptcy Court, *Michelle L. Cole, et al. v. Patriot National, Inc.*, Adv. Pro. No. 18-50278.

On January 10, 2018, PNI was named as defendant in a lawsuit, *Jamboree Center 3 LLC v. Patriot National, Inc.*, No. 30-2018-00966233 (Cal. Sup.), which was commenced by a lessor and seeks to evict PNI from certain commercial real estate.

## F.    EVENTS LEADING TO THE CHAPTER 11 FILING

### 1.    Patriot Reliance on GIC as a Source of Revenue

Since its operational restructuring in November 2013 and through its IPO in January 2015, Patriot continued to depend on GIC as its largest customer and a significant source of revenue. GIC, however, suffered net underwriting losses and its financial difficulties caused it to delay or defer payments, thereby accruing large payables, to Patriot. Further, as GIC is a significant shareholder of PNI,[7] declines in PNI's stock price would cause declines in GIC's capital, which was necessary to underwrite insurance policies. The decline in PNI equity values thus in turn put GIC in further financial distress, which resulted in additional payment delays by GIC to Patriot (including accrued accounts receivable in excess of $42 million), which caused further financial distress to Patriot.

### 2.    Mariano Creates Ashmere; the 2015 PIPE Transaction

In light of GIC's financial distress, in the summer of 2015, Mariano raised fresh capital to invest in Ashmere – a new private insurer that could underwrite insurance policies that Patriot could service – thus relieving some of the financial distress on GIC and lessening Patriot's dependence on GIC as its primary customer. Patriot also explored various options to raise money to address its financial challenges that largely resulted from GIC's impaired financial condition. In late 2015, PNI pursued a private investment in public equity ("PIPE") transaction with certain hedge funds that was announced on December 14, 2015.[8] After that announcement, however, PNI's stock price declined precipitously. Once again, the cycle emerged whereby the decline in PNI's stock price caused a further decline in GIC's capital, which put additional stress on GIC, which in turn caused more delays in payment to Patriot, further impairing Patriot's own position and working capital.

### 3.    Initial Efforts to Sell Patriot

By the summer of 2016, the Patriot Board determined to sell Patriot through a sale process managed by Evercore and Aon Securities, Inc. ("Aon"; and together with Evercore, the "Investment Bankers"). In June 2016, Ebix, Inc. made an unsolicited offer to purchase Patriot for $475 million. The Patriot Board pursued this and other opportunities until it concluded, based on the recommendation of the special committee of independent directors, that further

---

7.   As of October 25, 2017, GIC owned approximately 7% of PNI's common stock, and Guarantee Insurance Group (which owns 100% of GIC) owned approximately 14.6% of PNI's common stock.

8.   The PIPE transaction is the basis for the Hudson Bay Action and the CVI Action described above.

pursuing the Ebix, Inc. proposal was not in Patriot's best interests, in part because the proposal included certain conditions that would be impossible to satisfy. By November 2016, Patriot had discussions with other potential acquirers. However, none of those negotiations materialized into an executable transaction. Shortly thereafter, Patriot entered into the Financing Agreement with the Lenders on November 9, 2016 to address Patriot's liquidity needs arising from its reduced cash flow and revenue.

### 4. Mr. Mariano's Resignation

On July 10, 2017, Mr. Mariano tendered his resignation as President, Chief Executive Officer, director and Chairman of the Patriot Board.[9] On July 12, 2017, the Patriot Board accepted his resignation. As part of his separation from Patriot, Mr. Mariano entered into a separation agreement on July 12, 2017, which provided, subject to his compliance with the terms and conditions thereof, for him to receive (i) a cash payment of $6 million, plus an additional aggregate of $4 million to be paid in four annual installments beginning August 1, 2018 (which payments will accelerate upon a change in control); and (ii) continuation of group health plan coverage until the earlier of July 13, 2019, or the time he obtains group health plan coverage with a new employer. The severance payments are subject to claw back by Patriot under certain circumstances. Mr. Mariano also provided a general waiver and release of claims against Patriot, and is subject to certain cooperation and restrictive covenants. Patriot similarly released claims against Mr. Mariano. Patriot believes that the separation agreement with Mr. Mariano, and the payments and releases to Mr. Mariano thereunder, are subject to avoidance as fraudulent conveyances and the Debtors intend to promptly pursue such relief. Patriot also believes that the employment agreement Mr. Mariano entered into in June 2017, just weeks before the separation agreement, may similarly be subject to avoidance as a fraudulent transfer.

Following Mr. Mariano's resignation, on July 13, 2017, the Patriot Board appointed John J. Rearer as Chief Executive Officer of PNI. Mr. Rearer previously served as CEO of Underwriters, where he was responsible for underwriting, sales and marketing.

### 5. Renewed Efforts to Sell Patriot

Due in part to the distraction caused by the Prepetition Litigations, as well as the escalating uncertainty with respect to GIC's financial stability, Patriot renewed its efforts to sell its business. Through its Investment Bankers, Patriot reached out to more than 130 potentially interested purchasers, signed nearly 50 confidentiality agreements, had extensive due diligence conducted by approximately 9 interested purchasers, and ultimately received three letters of intent. Through as late as November 2017, Patriot was in negotiations with at least two interested purchasers to enter into an asset purchase agreement or other form of transaction through which one of those purchasers would acquire the business operations of Patriot.

Due to GIC's escalating financial distress and ultimately the commencement of the GIC Receivership Proceedings described below, Patriot's cash flow and revenue rapidly

---

9. Prior to his resignation, on June 23, 2017, Mr. Mariano and PNI entered into a new employment agreement, which provided, among other things, that Mr. Mariano would serve as Chief Executive Officer, President and Chief Operating Officer of PNI.

declined, resulting in severe liquidity constraints.  As a result, neither of the two remaining purchasers was willing to proceed with a proposed transaction.  Further, no executable offer was received from either of the two purchasers.

6.    **Severe Liquidity Constraints and Rapid Deterioration of Value**

On or about November 13, 2017, GIC's board of directors voted to consent to entry of an Order of Rehabilitation or Liquidation for GIC, and on November 17, 2017, Florida Office of Insurance Regulation ("OIR") Commissioner David Altmaier, advised GIC that OIR determined that one or more grounds existed for the initiation by the Florida Department of Financial Services ("DFS") of delinquency proceedings against GIC pursuant to Chapter 631, Florida Statutes.   In response to OIR's notification, on November 21, 2017 the Florida Department of Financial Services ("DFS") petitioned the Circuit Court of the Second Judicial Circuit in and for Leon County, Florida (the "State Court"), for an order appointing DFS as receiver for GIC, in the action styled *State of Florida ex rel., Dep't of Fin. Servs. v. Guarantee Insurance Co.*, Case No. 2017-CA-2421 (the "GIC Receivership Proceedings").  On November 27, 2017, the State Court in the GIC Receivership Proceedings entered a *Consent Order Appointing the Florida Department of Financial Services as Receiver of Guarantee Insurance Company for Purposes of Liquidation, Injunction, and Notice of Automatic Stay* (the "GIC Receivership Order").  Following entry of the GIC Receivership Order, 2017, DFS took over control of GIC.

For a period of several months prior to the GIC Receivership Proceedings, GIC had been operating under the supervision of the OIR.  During this period, due to OIR's directive to preserve capital for payment of policy related obligations, GIC's cash payments to Patriot had fallen off sharply, substantially depleting Patriot's cash balances and operating capital.  As mandated by the GIC Receivership Order, GIC's insurance policies were canceled in late December and were rewritten on other insurance companies.  The DFS, as receiver for GIC, will service the "run-off" of the GIC policies in-house and through contracts with other third party administrators.  These services were previously rendered by Patriot.  This series of events caused a significant loss of revenue, an impairment of Patriot's cash flow, and an immediate deterioration in Patriot's enterprise value.

In an effort to maintain an ongoing servicing relationship even in light of GIC's then-impending receivership, Patriot's general counsel and chief restructuring officer met with OIR and DFS on November 20, 2017, seeking to obtain both payment for past services rendered to GIC and an agreement that would allow Patriot to provide and receive payment for future services while GIC is in receivership. Based on that meeting, Patriot believes that any agreement reached with the regulators would result in some future work in respect of GIC but no payment on account of the more than $42 million owed for past services.  Thus, with the loss of its largest customer and elimination of the major component of its cash flow, both liquidity and enterprise value were adversely impacted.

Given the circumstances, the Patriot Board determined to engage in negotiations with the Agents and Lenders regarding a recapitalization and restructuring transaction for Patriot and its subsidiaries to maximize and preserve going concern value.  Accordingly, on or about November 28, 2017, the Debtors entered into the RSA, which sets forth the terms of a

consensual restructuring pursuant to a chapter 11 plan. In addition, to meet immediate cash needs, Patriot requested, and the Agents and the Lenders agreed to provide, Collateral Agent Advances pursuant to the terms of the Forbearance Agreement to avoid a catastrophic impairment to its business and the potential elimination of its remaining enterprise value.

**7.    The Restructuring Support Agreement**

Following on the withdrawal of interest by the two potential purchasers, the commencement of the GIC Receivership Proceedings, and the execution of the Forbearance Agreement, on or about November 27, 2017, the Debtors entered into the RSA with the Lenders, which sets forth the terms of a consensual restructuring pursuant to a chapter 11 plan. In furtherance thereof, on or about February 1, 2018, the Debtors entered that certain Senior Secured Super-Priority Debtor-in-Possession Financing Agreement (the "DIP Agreement") with the Lenders to provide the DIP Facility.

The RSA provides for the reorganization of the Debtors through a change in control transaction whereby the Lenders will become the ultimate common equity owners of the reorganized Debtors. The RSA also provides for the cancellation of all existing equity interests in the Debtors. Significantly, with the support of the Consenting Lenders, the Debtors anticipate that certain vendors and third party insurance agents will receive payment in full on account of their claims, subject to certain conditions, through the relief requested in various First Day Motions and/or the Plan. This will minimize disruption to the Debtors' business on account of these Chapter 11 Cases, send a strong positive message to the Debtors' business partners and the workers' compensation insurance market generally, and prepare the Debtors for success upon emergence from chapter 11.

Importantly, the RSA provides for certain milestones designed to ensure that the Debtors move expeditiously towards confirmation of the Plan. Specifically, the milestones contemplate emergence from the Chapter 11 Cases within 120 days of the Petition Date.

The Debtors believe that the terms of the RSA, which are built into the Plan, are fair, equitable, and maximize the value of the Debtors' estates, providing the best available recovery for the Debtors' stakeholders.

**8.    Litigation Claims**

As detailed in Section IV.C.4 below, the Plan provides for the vesting of all of the Litigation Claims held by the Debtors' estates into the Litigation Trust. Litigation Claims are defined to include all Causes of Action belonging to the Debtors' estate including all Claims, actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, debts, damages, dues, sums of money, accounts, reckonings, deficiencies, bonds, bills, disbursements, expenses, losses, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross-claims (including those of the Debtors and/or the Estates), including, without limitation, any claims, causes of action, objections, rights, remedies arising under chapter 5 of the Bankruptcy Code pursuant to, among others, sections 502, 510,

542 through 545 and 547 through 553 or 558 thereof, whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, and whether held in a personal or representative capacity, that are or may be pending as of the date of the Plan or instituted thereafter against any Person, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise, and whether asserted or unasserted as of the date of the Plan.

The Litigation Claims include, but are not limited to, all potential Causes of Action that the Debtors may have against certain of their current and former officers and directors, attorneys, accountants, Mr. Mariano and other third parties arising from (i) the events leading to the commencement of these Chapter 11 Cases as described herein, (ii) the events leading to the commencement of the GIC Receivership Proceedings, (iii) the events leading to the IPO, (iv) the corporate acquisitions made by the Debtors following the IPO, (v) the Debtors' financial reporting prior to the commencement of these Chapter 11 Cases, and (vi) breaches of fiduciary duties prior to the commencement of these Chapter 11 Cases.[10]

The Debtors believe that certain current and former officers and directors of the Debtors are responsible for wrongful acts, including but not limited to breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, and tortious interference with contract. The potential claims are based on the officers' and directors' failure to diversify the Debtors' customer base away from entities controlled by Mr. Mariano (including GIC and Ashmere) and their causing and/or permitting waste and other dissipation of corporate assets. The Debtors also believe that certain current and former officers and directors failed to maintain appropriate internal controls over financial reporting and failed to ensure timely delivery of financial statements and other mandated disclosures.

After sufficient investigation, the Debtors believe there are viable causes of action against Mr. Mariano, including with respect to Mr. Mariano's separation from the Debtors in July 2017. As part of a separation agreement executed in July 2017, the Debtors transferred $6,000,000 to Mr. Mariano and granted a broad release of claims in favor of Mr. Mariano without consideration. The Debtors intend to challenge the validity of the $6,000,000 transfer to Mr. Mariano and the release of claims contained in the separation agreement as well as the validity of Mr. Mariano June 2017 employment agreement (described above) as part of the bankruptcy proceeding.

The Debtors are also aware of facts and circumstances that may give rise to viable causes of action against former attorneys and accountants of the Debtors, including, without limitation, BDO USA, LLP, Simpson Thacher & Bartlett LLP, and Kasowitz Benson Torres LLP. The Debtors believe viable causes of action may exist against BDO USA, LLP based on BDO USA, LLP's accounting practices with respect to PNI and GIC during the statutory audit for 2016 and in previous years. The Debtors also believe that viable causes of action may exist

---

10. On December 13, 2017, PNI entered into a tolling agreement with Simpson Thacher & Bartlett LLP to preserve certain claims related to (i) acts and omissions relating to services provided by Simpson Thacher & Bartlett LLP to or for the benefit of Patriot, including without limitation any claims arising out of or related to the action styled *Steven Mariano v. Simpson Thacher & Bartlett, LLP [sic] et al.*, pending in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, Case No. CACE-17-021733; and (ii) receipt of transfers from Patriot.

against Simpson Thacher & Bartlett LLP and Kasowitz Benson Torres LLP, including claims for fraud, professional malpractice and negligence, breach of fiduciary duty, and breach of contract, in connection with those parties' former representations of the Debtors.

Further, numerous claims asserted in the Wasik Action and other litigations may give rise to viable causes of action against the current and former officers and directors of the Debtors, and the Debtors expect that the Litigation Trustee will perform a thorough analysis of these claims and pursue them as appropriate.

The Litigation Claims also include any actions to avoid or recover transfers made by the Debtors in the relevant periods prior to the Petition Date. The Debtors have not conducted an analysis of the potential recovery available through such avoidance actions and are unable to quantify the potential recoveries at this time. However, the Debtors expect that the Litigation Trustee will conduct a thorough analysis of these claims and pursue them as appropriate.

The Debtors believe that the successful prosecution of the Litigation Claims could result in significant potential recoveries for the Debtors' estates and creditors.[11] The Debtors have approximately $30 million and $70 million of Director and Officer insurance coverage remaining under the 2016 and 2017 policies, respectively. The Debtors have not undertaken an analysis of these policies or the claims that they may cover, but the proceeds of those policies may provide meaningful recoveries to the Debtors' creditors and other stakeholders. Additionally, the Debtors' insurers have agreed to participate in the Bankruptcy Court approved mediation described in Section III.E and the policies issued by these insurers will be part of the mediation as well.

As discussed more fully below, the Debtors do not believe that there are any viable causes of action against Cerberus, and intend to provide the releases to Cerberus as set forth in the Final DIP Order and in the Plan. The Committee has not concluded its analysis of potential estate claims against Cerberus and cannot, at this juncture, conclude that the release of such claims is supported by adequate consideration.

### 9. Cerberus Business Finance, LLC ("Cerberus")

#### a. *Relationship Between Patriot and Cerberus.*

As discussed in Section II.F.3 above, by the summer of 2016 the Patriot Board had determined to sell Patriot through a sale process managed by the Investment Bankers. Simultaneously with the sale process, however, Patriot retained Houlihan Lokey Capital, Inc. ("Houlihan") to assist Patriot in identifying potential financing alternatives to (a) refinance Patriot's obligations under its then existing financing facility agented by BMO Harris Bank, N.A. (the "BMO Facility"), (b) provide liquidity to fund a dividend to all shareholders (the "Proposed Dividend") and a proposed stock buyback program (the "Proposed Stock Buyback Program"), and (c) provide Patriot with incremental liquidity for working capital and other purposes.

---

11. Prior to the Petition Date, Mr. Mariano commenced certain action against third parties which the Debtors believe are properly classified as property of the Debtors' estates. The Debtors intend to take appropriate action to preserve these causes of action for the benefit of their estates and creditors.

Prior to August, 2016, Cerberus had no relationship with any of the Debtors or their officers or directors, including Mr. Mariano. Cerberus was approached by Houlihan (who also approached numerous other potential lenders) with respect to the potential financing, and was advised of the general terms of the loan facility Patriot was seeking (including the proposed use of proceeds). In late September, 2016, Cerberus submitted a preliminary term sheet to Patriot, and thereafter performed customary due diligence. On or about November 9, 2016 the Financing Facility closed with Cerberus as the administrative and collateral agent, and affiliates of Cerberus and TCW Direct Lending, LLC as the lenders (the "Lenders"). Pursuant to the Financing Facility, the Debtors drew the full amount of the $250 million Term Loan Facility, the proceeds of which were (a) used to repay approximately $136.5 million in obligations under the BMO Facility, (b) transferred to Patriot's accounts (approximately $101.8 million), and (c) used to pay costs and expenses associated with the Financing Facility transaction. The $30 million Revolving Credit Facility was available but undrawn at closing. The Financing Facility permitted the use of up to $100 million of proceeds from the loans to be used to fund the Proposed Dividend and/or Proposed Stock Buyback Program.[12] Cerberus did not (and does not) own or hold, directly or indirectly, any interest in Patriot other than the loans held by its affiliates under the Financing Facility.

### b.    Claims Against Cerberus

On November 30, 2016, shortly after the Financing Facility was consummated, the Wasik Action plaintiffs filed a complaint in the Delaware Court of Chancery asserting claims against Mr. Mariano and various other officers and directors of Patriot for, among other things, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, waste, breach of contract and unjust enrichment. After engaging in discovery related to a motion for preliminary injunction, the Wasik Action plaintiffs sought and received permission from the Court of Chancery to file an amended complaint and, later, a second amended complaint. Once amended, the operative complaint asserted additional claims against various other parties, including Cerberus, for aiding and abetting breach of fiduciary duty. The Wasik Action plaintiffs also sought and received a temporary restraining order prohibiting Patriot from pursuing the Proposed Dividend and the Proposed Stock Buyback Program. As a result, Patriot received and retained the full proceeds from the $250 million Term Loan Facility, which it used to repay existing indebtedness, fees and expenses associated with the closing of the Financing Facility, and for working capital and other corporate purposes.

The allegations in the Wasik Action complaint asserting claims against Cerberus are set forth in Counts II and V, and are derivative claims that are property of the Debtors' estates. Those Counts allege the following:

> Count II -- "Cerberus knowingly aided and abetted the [Board's] breaches of fiduciary duties by knowingly assisting Mariano and the rest of the PN directors and officers in their attempt to provide Mariano with additional money to

---

12. As described more fully below, on November 30, 2016 the plaintiffs in the Wasik Action sought and obtained a temporary restraining order prohibiting Patriot from proceeding with the Proposed Dividend and Proposed Stock Buyback Program. As a result, all of the proceeds drawn under the Financing Facility and transferred to Patriot at closing remained with Patriot and were available for general corporate purposes.

repurchase shares via the Expanded Repurchase Program, to the detriment of the Company's minority stockholders. By aiding and abetting those defendants, Cerberus has received over $5 million in fees and stands to earn millions of dollars more in connection with the Cerberus Credit Agreement …".

Count V – "Cerberus knowingly aided and abetted the [Board's] breaches of fiduciary duties by knowingly assisting Mariano and the rest of the PNI officers and directors in their attempt to provide Mariano with tens of millions of dollars in liquidity that he needed via the Dividend and with additional money to repurchase shares via the Expanded Repurchase Program, to the detriment of the Company. Cerberus also approved PN paying the Transaction Bonuses and Mariano's $6 million initial severance payment. By aiding and abetting the Individual Defendants, Cerberus stands to earn millions of dollars via the Cerberus Credit Agreement, and possibly seize control of PN if it continues to have Events of Default."

On September 1, 2017, Cerberus filed its motion to dismiss Counts II and V of the complaint based on, among other things, plaintiffs' failure to allege knowing participation by Cerberus in the director defendants' breaches of fiduciary duty. On September 17, 2017 plaintiffs filed their response to the motion to dismiss, and on October 6, 2017 Cerberus filed its reply. Oral argument on the motion to dismiss was scheduled for January, 2018, but was adjourned due to the Chapter 11 filings and the imposition of the automatic stay.

### c. Proposed Settlement and Release

The Plan contemplates that any and all claims that the Debtors have or may have against Cerberus will be released upon the Effective Date as part of a global settlement and compromise pursuant to which the Debtors and their creditors are receiving significant consideration. The Debtors, in the exercise of their reasonable business judgment, have concluded (for the reasons set forth below, among others) that this settlement and compromise is in the best interests of the Debtors, their estates and creditors.

First, the Debtors have already released the claims against Cerberus and thus prior to the prosecution of any claim against Cerberus a final judgment would have to be obtained voiding such release or otherwise rendering it unenforceable. Pursuant to that certain Forbearance Agreement dated November 17, 2017 (as amended by Amendment No. 1 to Forbearance Agreement dated December 3, 2017, Amendment No. 2 to Forbearance Agreement dated December 7, 2017, and Amendment No. 3 to Forbearance Agreement dated January 5, 2018, the "Forbearance Agreement"), in exchange for the Lenders' agreement to fund Collateral Agent Advances and allow Patriot to use proceeds of the Lenders' collateral (including "new money" loans of approximately $5 million and proceeds of tax refunds in the amount of approximately $6.3 million) the Debtors agreed to the following release:

EACH LOAN PARTY HEREBY ACKNOWLEDGES THAT AS OF THE DATE HEREOF, IT HAS NO DEFENSE, RECOUPMENT, COUNTERCLAIM, OFFSET, CROSS-COMPLAINT, CLAIM OR DEMAND OF ANY KIND OR NATURE WHATSOEVER THAT CAN BE ASSERTED TO REDUCE OR

ELIMINATE ALL, OR ANY PART OF, ITS LIABILITY TO REPAY THE OBLIGATIONS ARISING UNDER THE CREDIT AGREEMENT OR ANY OTHER LOAN DOCUMENT OR TO SEEK AFFIRMATIVE RELIEF OR DAMAGES OF ANY KIND OR NATURE FROM THE ADMINISTRATIVE AGENT OR THE LENDERS (OR ANY OF THEM). EACH LOAN PARTY HEREBY VOLUNTARILY AND KNOWINGLY RELEASES AND FOREVER DISCHARGES THE ADMINISTRATIVE AGENT AND THE LENDERS, THEIR RESPECTIVE PREDECESSORS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ATTORNEYS, ACCOUNTANTS, CONSULTANTS, REPRESENTATIVES, OWNERS, AFFILIATES, SUCCESSORS, TRANSFEREES AND ASSIGNS (COLLECTIVELY, THE "<u>RELEASED PARTIES</u>"), FROM ALL POSSIBLE CLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES, AND LIABILITIES WHATSOEVER, KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT, OR CONDITIONAL, AT LAW OR IN EQUITY, ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE THIS AGREEMENT IS EXECUTED, WHICH SUCH LOAN PARTY MAY NOW OR HEREAFTER HAVE AGAINST ANY RELEASED PARTY, IF ANY, AND IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS, OR OTHERWISE, AND ARISING FROM OR ARISING IN CONNECTION WITH OR RELATING TO ANY "LOANS" OR THE "OBLIGATIONS", INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE HIGHEST LAWFUL RATE APPLICABLE, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER THE CREDIT AGREEMENT OR OTHER LOAN DOCUMENTS, AND/OR NEGOTIATION OF, OR EXECUTION OF, THIS AGREEMENT (COLLECTIVELY, THE "<u>RELEASED CLAIMS</u>"). <u>IT IS AGREED THAT THE SCOPE OF THIS RELEASE UNDER THIS PARAGRAPH SHALL INCLUDE ALL CLAIMS, DEMANDS OR CAUSES OF ACTION ARISING IN WHOLE OR PART FROM THE NEGLIGENCE OR STRICT LIABILITY OF THE ADMINISTRATIVE AGENT, ANY LENDER OR ANY OTHER RELEASED PARTY</u>. EACH LOAN PARTY HEREBY COVENANTS AND AGREES NEVER TO INSTITUTE ANY ACTION OR SUIT AT LAW OR IN EQUITY, NOR INSTITUTE, PROSECUTE, OR IN ANY WAY AID IN THE INSTITUTION OR PROSECUTION OF, ANY CLAIM, ACTION OR CAUSE OF ACTION, RIGHTS TO RECOVER DEBTS OR DEMANDS OF ANY NATURE AGAINST ANY OF THE RELEASED PARTIES ARISING OUT OF OR RELATED TO A RELEASED CLAIM.  EACH LOAN PARTY AGREES TO INDEMNIFY AND HOLD THE ADMINISTRATIVE AGENT AND EACH LENDER HARMLESS FROM ANY AND ALL MATTERS RELEASED PURSUANT TO THIS PARAGRAPH. EACH LOAN PARTY ACKNOWLEDGES THAT THE AGREEMENTS IN THIS PARAGRAPH ARE INTENDED TO BE IN FULL SATISFACTION OF ALL OR ANY ALLEGED

INJURIES OR DAMAGES TO SUCH LOAN PARTY, ITS SUCCESSORS, AGENTS, ATTORNEYS, OFFICERS, DIRECTORS, ASSIGNS AND PERSONAL AND LEGAL REPRESENTATIVES ARISING IN CONNECTION WITH SUCH MATTERS RELEASED PURSUANT TO THE OTHER PROVISIONS OF THIS PARAGRAPH. EACH LOAN PARTY REPRESENTS AND WARRANTS TO THE ADMINISTRATIVE AGENT AND THE LENDERS THAT IT HAS NOT PURPORTED TO TRANSFER, ASSIGN OR OTHERWISE CONVEY ANY RIGHT, TITLE OR INTEREST OF A LOAN PARTY IN ANY RELEASED MATTER TO ANY OTHER PERSON AND THAT THE FOREGOING CONSTITUTES A FULL AND COMPLETE RELEASE OF EACH LOAN PARTY'S CLAIMS WITH RESPECT TO ALL SUCH MATTERS. THE PROVISIONS OF THIS <u>SECTION 7.10</u> AND THE REPRESENTATIONS, WARRANTIES, RELEASES, WAIVERS, ACQUITTANCES, DISCHARGES, COVENANTS, AGREEMENTS AND INDEMNIFICATIONS CONTAINED HEREIN (A) CONSTITUTE A MATERIAL CONSIDERATION FOR AND INDUCEMENT TO THE ADMINISTRATIVE AGENT AND THE LENDERS ENTERING INTO THIS AGREEMENT, (B) DO NOT CONSTITUTE AN ADMISSION OF OR BASIS FOR ESTABLISHING ANY DUTY, OBLIGATION OR LIABILITY OF THE ADMINISTRATIVE AGENT OR ANY LENDER TO A LOAN PARTY OR ANY OTHER PERSON, (C) DO NOT CONSTITUTE AN ADMISSION OF OR BASIS FOR ESTABLISHING ANY LIABILITY, WRONGDOING; OR VIOLATION OF ANY OBLIGATION, DUTY OR AGREEMENT OF THE ADMINISTRATIVE AGENT OR A LENDER TO A LOAN PARTY OR ANY OTHER PERSON, AND (D) SHALL NOT BE USED AS EVIDENCE AGAINST THE ADMINISTRATIVE AGENT, THE L/C ISSUER OR A LENDER BY A LOAN PARTY OR ANY OTHER PERSON FOR ANY PURPOSE.

(emphasis original). The release granted by the Debtors to Cerberus and the Lenders was re-affirmed in each of the three amendments to the initial Forbearance Agreement.

In addition to the Collateral Agent Advances and use of collateral proceeds provided by Cerberus and the Lenders, the releases provided to Cerberus and the Lenders in the Forbearance Agreement (and those proposed to be granted pursuant to the Plan) were (and are) supported by other good and valuable consideration.

First, in an effort to stabilize the Debtors in the wake of the GIC Receivership Order and the virtually overnight loss of not less than 60% of the Debtors' revenues, Cerberus and the Lenders entered into the RSA providing for the restructuring of the Debtors through pre-arranged Chapter 11 cases to be funded by debtor in possession financing provided by the Lenders. Upon announcement of the RSA, Cerberus engaged with management of the Debtors to address growing concerns of customers, insurers, regulators and employees to give assurances to those parties that, as a result of the restructuring, the Debtors would be properly financed and in a position to perform under their contractual arrangements.

Second, pursuant to the Plan, Cerberus and the Lenders have agreed to convert a portion of their debt to equity and new second lien notes, and provide exit financing so that the Debtors can pay all administrative expense and priority claims and continue to operate their businesses (including the employment of over 400 people). In doing so, based upon the Debtors estimate of enterprise value, Cerberus and the Lenders may suffer a loss of not less than $150 million, which will only be mitigated to the extent of recoveries on claims prosecuted by the Litigation Trust (on a *pari passu* basis with the holders of General Unsecured Claims, pursuant to the Litigation Proceeds Waterfall). Notwithstanding the foregoing, as additional consideration to the Debtors and their other creditors, Cerberus and the Lenders have agreed to cap their share of recoveries from the Litigation Trust at a ratio of 4 to 1 in relation to General Unsecured Creditors, even though their deficiency claim is currently expected to be approximately 5 to 6 times the aggregate amount of General Unsecured Claims.

The Debtors (though their independent director) have reviewed the claims against Cerberus alleged in the Wasik Action, including the complaint, the motion to dismiss and related pleadings. Based upon that review, as well as the Company's own knowledge of the events surrounding the Financing Facility, the Debtors have concluded that claims against Cerberus are weak and have a low probability of success even if the previously granted release were to be voided or rendered unenforceable and the claims litigated.

Based upon the foregoing, the Debtors believe that Cerberus and the Lenders have provided (and under the Plan will further provide) significant consideration to the Debtors and their estates that support the settlement, compromise and releases embodied in the Plan.

# III.    THE CHAPTER 11 CASES

## A.    COMMENCEMENT OF THE BANKRUPTCY CASES

On January 30, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The Chapter 11 Cases were assigned to U.S. Bankruptcy Judge Kevin Gross.

## B.    PROCEDURAL MOTION

On the Petition Date, the Debtors filed a number of motions seeking typical "first-day" relief in chapter 11 cases (collectively, the "First Day Motions") as well as a declaration in support thereof.  The purpose of these motions was to stabilize the Debtors' business in the initial days of these Chapter 11 Cases, and permit the Debtors to continue operating in the ordinary course of business with minimal disruption to their operations.

In particular, the First Day Motions sought authority to: (1) administer the Chapter 11 Cases jointly for procedural purposes; (2) file a consolidated list of creditors; (3) continue use of the Debtors' cash management system; (4) establish adequate assurance procedures with respect to the Debtors' utility providers; (5) pay certain pre-petition taxes; (6) appoint a claims noticing agent; (7) pay certain prepetition claims held by the Debtors' critical vendors; (8) pay certain pre-petition employee wages, benefits and related items; (9) continue insurance coverage, (10) reject certain leases, and (11) enter into the DIP Facility and allow the Debtors to use Cash Collateral.

## C.    TRADING ORDER

The Debtors' net operating loss ("NOL") carryforwards and certain other tax attributes are valuable assets of their estates because a corporation can carry forward NOLs to offset future income, thereby reducing its tax liability in future periods.  The Debtors have certain attributes for U.S. federal income tax purposes, which are expected to include approximately $70,000,000-$100,000,000 in estimated, consolidated NOL carryforwards as of the end of the Debtors' 2017 taxable year.  Patriot believes that, even after taking account of any cancellation of debt impact under the Plan, the NOL carryforwards, if any, and other tax attributes may result in significant future tax savings, which would enhance the Debtors' cash position and significantly contribute to their successful reorganization.

The ability of the Debtors to use their NOL carryforwards and other tax attributes is subject to certain statutory limitations.  For example, section 382 (in conjunction with section 383) of the Internal Revenue Code limits a corporation's ability to use its NOLs and certain other tax attributes after the corporation undergoes a specified change of ownership.  However, although an ownership change of the Debtors is expected to occur upon implementation of the Plan, the limitations imposed by section 382 of the Internal Revenue Code upon a change of ownership pursuant to a confirmed plan are significantly more relaxed than those otherwise applicable, due to the special provisions of sections 382(l)(5) and section 382(l)(6) of the Internal Revenue Code.

Accordingly, in order to protect the value of their NOL carryforwards and other tax attributes, the Debtors requested an order of the Bankruptcy Court providing for restrictions on transactions involving acquisitions or dispositions of PNI's equity interests by persons owning equity interests in excess of 4.75 percent of PNI's outstanding shares.

## D.      DEBTOR IN POSSESSION FINANCING

On the Petition Date, the Debtors filed a motion (the "DIP Motion") requesting authority to obtain postpetition financing (the "DIP Facility") from certain of their existing lenders (the "DIP Lenders").  The DIP Financing Motion requested authority to enter into the senior secured DIP Facility (consisting of a multi-draw term loan facility of up to $15.5 million and to continue using Cash Collateral pursuant to the terms of the Interim DIP Order. On March 6, 2018, the Bankruptcy Court entered an order granting the DIP Motion on a final basis.

## E.      MEDIATION MOTION

On February 7, 2018, the Debtors filed a motion (the "Mediation Motion") seeking an order (i) compelling parties to mediate certain claims asserted by the Debtors' shareholders and creditors prior to the commencement of the Chapter 11 Cases and (ii) temporarily staying related litigation for ninety (90) days pending the outcome of mediation. On February 28, 2018, the Bankruptcy Court entered an order granting the Mediation Motion. Accordingly, the first eight actions described in Section II.D are stayed through May 29, 2018 and parties are directed to participate in mediation with respect to all claims asserted in those actions, including those that may be covered by the Debtors' directors and officers insurance policies.

## F.      APPOINTMENT OF CREDITORS' COMMITTEE

On July 7, 2016, the Office of the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors (the "Committee").  The current members of the Committee are Jessica Barad, a former employee holding a contingent and disputed claim for wages allegedly due under the WARN Act, and MCMC LLC., a trade creditor.

## G.      ULLICO FILINGS

The Honorable Trinidad Navarro, Insurance Commissioner of the State of Delaware, in his capacity as the Receiver (the "Receiver") of Ullico Casualty Company in Liquidation ("Ullico Casualty"), has asserted in numerous filings in these chapter 11 cases (see D.I. 138, 139, 140, 286, and 305) that, prior to the Petition Date, assets belonging to Ullico Casualty may have been transferred from non-debtor entities to the Debtors.  The Debtors dispute the Receiver's contentions and have no basis to believe that any Debtor entity possesses property of Ullico Casualty.  Nevertheless, and without waiver of any rights, claims or defenses, the Debtors are reasonably cooperating with the Receiver's information requests.

# IV. SUMMARY OF THE PLAN

**THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL SUCH TERMS AND PROVISIONS, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION IV AND THE PLAN (INCLUDING ATTACHMENTS), THE LATTER SHALL GOVERN**

## A. GENERAL BASIS OF THE PLAN

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan, though proposed jointly, constitutes a separate chapter 11 plan of reorganization proposed by each Debtor. Therefore, the classifications set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor.

The terms of the Debtors' Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan, and pay their continuing obligations in the ordinary course of business. Under the Plan, Claims against and Equity Interests in the Debtors are divided into separate Classes according to their relative seniority, legal nature, and other criteria, and the Plan proposes recoveries for Holders of Claims against and Equity Interests in the Debtors in such Classes, if any. The Debtors believe that the Plan maximizes value for all stakeholders.

## B. PROPOSED TREATMENT OF EACH CLASS OF CLAIMS AND EQUITY INTEREST

As set forth in Article II of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Equity Interests (other than Administrative Expense Claims, Priority Tax Claims, DIP Claims, and U.S. Trustee Fee Claims, which are unclassified Claims under the Plan) are classified into Classes for all purposes, including voting, Confirmation, and distributions pursuant to the Plan. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or

Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.      **Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Expense Claims, DIP Claims, Priority Tax Claims, or U.S Trustee Fee Claims and, thus, Article III of the Plan does not include such Claims in the Classes of Claims set forth therein. Instead, Article III of the Plan provides for the satisfaction of these unclassified Claims. The treatment and the projected recoveries under the Plan of these unclassified Claims, which are not entitled to vote on the Plan, are described in summary form below for illustrative purposes only.

| Unclassified Claim | Plan Treatment | Estimated Percent Recovery Under the Plan |
|---|---|---|
| Administrative Expense Claims | Unimpaired | 100% |
| DIP Claims | Unimpaired | 100% |
| Priority Tax Claims | Unimpaired | 100% |
| U.S. Trustee Fee Claims | Unimpaired | 100% |

*a.      Administrative Claims*

(i)     Administrative Expense Claims

With respect to each Allowed Administrative Expense Claim, except as otherwise provided for in Article XI.A.1 of the Plan or unless the Holder of such Allowed Administrative Expense Claim agrees in writing to a different treatment with the Debtors and First Lien Agents, the Holder of each such Allowed Administrative Expense Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Expense Claim, Cash equal to the unpaid portion of such Allowed Administrative Expense Claim (a) if the Administrative Expense Claim is Allowed before the Effective Date, on the Effective Date, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Expense Claim is due, or as soon as practicable thereafter); or (b) if the Administrative Expense Claim is Allowed on or after the Effective Date, on the date such Administrative Claim is Allowed, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon as practicable thereafter); *provided, however*, that Allowed Administrative Expense Claims other than Professional Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

(ii)    Administrative Claims Bar Date

Except as otherwise provided in Article XI.A.2 of the Plan or in the Bar Date Order or other orders of the Bankruptcy Court, unless previously filed or Allowed, each holder

of an Administrative Expense Claim that arose or accrued on or after the Petition Date through the Effective Date must file a request for payment of such Administrative Expense Claim pursuant to the procedures specified in the Confirmation Order and notice of entry of the Confirmation Order no later than 30 days after the Effective Date (the "Administrative Expense Claim Bar Date").  Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Expense Claims against the Debtors, the Reorganized Debtors, or the Liquidating Trust, and such Administrative Expense Claims shall be deemed waived and released as of the Effective Date. Objections to Administrative Expense Claims must be filed and served on the Plan Administrator, his or her counsel, and the Person submitting such Administrative Expense Claim no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the Administrative Expense Claim Bar Date.

### b.      Professional Compensation

#### (i)      Final Fee Applications

All final Requests for Payment of Professional Fee Claims must be filed and served on the Plan Administrator, his or her counsel, and other necessary parties in interest no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to such Requests for Payment must be filed and served on the Plan Administrator, his or her counsel, and the requesting Professional or other Person no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable Request for Payment was served.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.  The Plan Administrator shall pay all Allowed Professional Fee Claims within 10 days of the Bankruptcy Court's approval thereof.

#### (ii)      Substantial Contribution Compensation and Expenses

Except as otherwise specifically provided in the Plan, any entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code must file an application and serve such application on the Plan Administrator, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before the Administrative Expense Claim Bar Date.

### c.      Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as determined by the Debtors and the First Lien Agents, either (a) on the Effective Date, Cash equal to the due and unpaid portion of such Allowed Priority Tax Claim, (b) treatment in a manner consistent with Bankruptcy Code Section 1129(a)(9)(C), or (c) such different treatment as to which such Holder, the Debtors and the First Lien Agents shall have agreed upon in writing.

### d. DIP Claims

The Holders of the Allowed DIP Claims shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed DIP Claim on the Effective Date (a) Cash equal to the unpaid portion of such Allowed DIP Claims or (b) such different treatment as to which such Holder, the Debtors and the First Lien Agents shall have agreed upon in writing.

### e. United States Trustee Statutory Fees

On the Effective Date or as soon as practicable thereafter, the Litigation Trust shall pay all U.S. Trustee Fees that are due and owing as of the Effective Date. For the avoidance of doubt, nothing in the Plan shall release the Reorganized Debtors or the Litigation Trust from the obligation to pay all U.S. Trustee Fees arising from and after the Effective Date before a Final Order is entered by the Bankruptcy Court concluding or closing the Chapter 11 Cases.

## 2. Classified Claims and Equity Interests

### a. Class 1A: Secured First Lien Lender Claims

*Classification*: Class 1A contains all Secured First Lien Lender Claims, which are Secured Claims arising from the First Lien Credit Agreement. The Secured First Lien Lender Claims shall constitute Allowed Claims for purposes of the Plan. All Holders of Secured First Lien Lender Claims have committed to vote to accept the Plan upon the terms and conditions set forth in the RSA.

*Treatment*: On the Effective Date, each Holder of an Allowed Secured First Lien Lender Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Secured First Lien Lender Claim its Pro Rata share of: (i) the New Equity Interests in accordance with the Equity Purchase Agreement and (ii) the New Term Loan Facility.

*Impairment and Voting*: Impaired. Each Holder of a Secured First Lien Lender Claim will be entitled to vote to accept or reject the Plan.

### b. Class 1B: First Lien Lender Deficiency Claims

*Classification:* Class 1B consists of all First Lien Lender Deficiency Claims, which are the portion of the First Lien Lender Claims that do not constitute Secured First Lien Lender Claims. The First Lien Lender Deficiency Claims shall constitute Allowed Claims for purposes of the Plan. All Holders of First Lien Lender Deficiency Claims have committed to vote to accept the Plan upon the terms and conditions set forth in the RSA.

*Treatment:* From and after the Effective Date, each Holder of an Allowed First Lien Lender Deficiency Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed First Lien Lender Deficiency Claim its Pro Rata share of the Litigation Trust Interests in the Litigation Trust distributable to Holders of First Lien Lender

Deficiency Claims representing a right to receive distributions from the Litigation Trust in accordance with the Litigation Proceeds Waterfall.

*Impairment and Voting*: Impaired. Each Holder of a First Lien Lender Deficiency Claim will be entitled to vote to accept or reject the Plan.

### c. Class 2: Other Secured Claims

*Classification*: Class 2 contains all Secured Claims against any of the Debtors, other than Secured First Lien Lender Claims and DIP Claims.

*Treatment*: On the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, at the option of the Debtors and the First Lien Agents: (1) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the later of the (x) the Effective Date and (y) the date that such Other Secured Claim becomes Allowed; (2) reinstatement of such Other Secured Claim; or (3) the property securing such Allowed Other Secured Claim, with any deficiency to result in a Class 5 General Unsecured Claim.

*Impairment and Voting*: Unimpaired. Each Holder of an Allowed Other Secured Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Other Secured Claim will not be entitled to vote to accept or reject the Plan.

### d. Class 3: Priority Claims

*Classification*: Class 3 contains all other Priority Claims other than Administrative Expense Claims, Priority Tax Claims and US Trustee Fee Claims, entitled to priority in right of payment pursuant to section 507(a) of the Bankruptcy Code.

*Treatment*: On the Effective Date (or such later date on which such Priority Claim is Allowed), each Holder of an Allowed Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Claim, either (a) Cash equal to the unpaid portion of such Allowed Priority Claim or (b) such different treatment as to which such Holder, the Debtors and the First Lien Agents shall have agreed upon in writing.

*Impairment and Voting*: Unimpaired. Each Holder of an Allowed Other Secured Claim will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Priority Claim will not be entitled to vote to accept or reject the Plan.

### e. Class 4: Continuing Vendor Claims and Continuing Retail Agent Claims

*Classification*: Class 4 contains all Continuing Vendor Claims and Continuing Retail Agent Claims. Continuing Retail Agent Claims to include the claims of those retail agents, which have

not already been paid in full pursuant to the Critical Vendor Order or by the assumption of an Executory Contract between the Debtor and such Retail Agent, (a) deemed critical by the Debtors and the First Lien Agents to the continuing business and operations of the Reorganized Debtors and (b) who have entered into a Continuing Retail Agent Agreement with the Debtors. Continuing Vendor Claims to include the claims of those vendors, which have not already been paid in full pursuant to the Critical Vendor Order or by the assumption of an Executory Contract between the Debtor and such vendor, (a) deemed critical by the Debtors and First Lien Agents to the continuing business and operations of the Reorganized Debtors and (b) who have entered into a Continuing Vendor Agreement with the Debtors.

*Treatment*: Holders of Continuing Vendor Claims and Continuing Retail Agent Claims will be paid in full in Cash either (a) in the ordinary course of business in accordance with any invoice, contract or other agreement governing the terms of such payment, or (b) if such amounts are overdue as of the Effective Date, in two equal installments with the first such installment being made on the Effective Date and the second being made on the date that is the six month anniversary of the Effective Date assuming compliance by the Holder of the Continuing Vendor Claim or Continuing Retail Agent Claim with its Continuing Vendor Agreement or Continuing Retail Agent Agreement, as applicable. If the Holder of a Continuing Vendor Claim or Continuing Retail Agent Claim fails to comply with its applicable Continuing Vendor Agreement or Continuing Retail Agent Agreement, distributions, if any, will be governed by the terms of the applicable Continuing Vendor Agreement or Continuing Retail Agent Agreement.

*Impairment and Voting*: Impaired. Each Holder of a Continuing Vendor Claim or Continuing Retail Agent Claim will be entitled to vote to accept or reject the Plan.

### f. Class 5: General Unsecured Claims

*Classification*: Class 5 contains all contains all General Unsecured Claims against the Debtors. General Unsecured Claims include prepetition Claims that are not Administrative Claims, Priority Tax Claims, Other Priority Claims, Secured First Lien Lender Claims, Other Secured Claims, First Lien Lender Deficiency Claims, 510(b) Claims, or Intercompany Claims. General Unsecured Claims also include any unsecured Claims under section 506(a)(1), unsecured damage claims arising from the Debtors' rejection of executory contracts and unexpired leases, and other unsecured claims that arose (or are deemed to have arisen) prior to the Petition Date.

*Treatment*: Each Holder of an Allowed General Unsecured Claim against any of the Debtors shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such General Unsecured Claim, its Pro Rata share of the Litigation Trust Interests in the Litigation Trust distributable to Holders of Allowed General Unsecured Claims representing a right to receive distributions from the Litigation Trust in accordance with the Litigation Proceeds Waterfall.

*Impairment and Voting*: Impaired. Each Holder of a General Unsecured Claim will be entitled to vote to accept or reject the Plan.

### g. Class 6: 510(b) Claims

*Classification*: Class 6 contains all Section 510(b) Claims. Section 510(b) Claims are all Claims (i) arising from the rescission of a purchase or sale of shares, notes, or any other securities of any of the Debtors or an Affiliate of any of the Debtors, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws, misrepresentations or any similar Claims related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, (iv) for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the offer or sale of securities, or (v) for attorneys' fees, other charges or costs incurred on account of any of the foregoing Claims or Causes of Action.

*Treatment*: Each Holder of a 510(b) Claim shall not receive or retain any distribution under the Plan on account of such 510(b) Claim, and all such 510(b) Claims shall be eliminated and discharged.

*Impairment and Voting*: Impaired. Each Holder of an Allowed 510(b) Claim will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of a 510(b) Claim will not be entitled to vote to accept or reject the Plan.

### h. Class 7: Intercompany Claims

*Classification*: Class 7 contains all Intercompany Claims. Intercompany Claims are all Claims against a Debtor held by a Debtor or a non-Debtor Affiliate.

*Treatment*: Each Holder of an Intercompany Claim shall not receive or retain any distribution under the Plan on account of such Intercompany Claim, and all such Intercompany Claims shall be eliminated and extinguished, *provided however*, that the Reorganized Debtors may determine to preserve Intercompany Claims to the extent extinguishment would result in adverse tax consequences.

*Impairment and Voting*: Impaired. Each Holder of an Intercompany Claim will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Intercompany Claim will not be entitled to vote to accept or reject the Plan.

### i. Class 8: Equity Interests

*Classification*: Class 8 consist of all Old Equity Interests, including any common equity or membership interests in any of the Debtors outstanding prior to the Effective Date, including, without limitation, any stock option or other right to purchase the common stock of any of the Debtors, together with any warrant, conversion right, restricted stock unit, right of first refusal, subscription, commitment, agreement, or other right to acquire or receive any such common stock in any of the Debtors.

*Treatment*: Holders of Old Equity Interests in each of the Debtors shall not receive or retain any distribution under the Plan on account of their Old Equity Interests, and all Old Equity Interests shall be cancelled as set forth in Article V.E of the Plan.

*Impairment and Voting*: Impaired. Each Holder of an Equity Interest will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of an Existing Equity Interest will not be entitled to vote to accept or reject the Plan.

## C.     MEANS FOR IMPLEMENTATION OF THE PLAN

### 1.     Issuance of New Equity Interests

On the Effective Date, each of the Reorganized Debtors shall issue or execute and deliver to the Holders of Allowed Secured First Lien Lender Claims (or their designee) its respective New Equity Interests in accordance with the Equity Purchase Agreement and the applicable Reorganized Debtor Governing Documents. All such New Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued, and, if applicable, fully paid and non-assessable.

The issuance or execution and delivery of the New Equity Interests, the Equity Purchase Agreement, and the Reorganized Debtor Governing Documents, as applicable, and the distribution thereof under this Plan shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code section 1145(a) and/or any other applicable exemptions.

Without limiting the effect of Bankruptcy Code section 1145, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan shall become and shall remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by such applicable agreement).

The Reorganized Debtors shall not be (i) obligated to list the New Equity Interests on a national securities exchange, (ii) reporting companies under the Securities Exchange Act, (iii) required to file reports with the Securities and Exchange Commission or any other Person or party, or (iv) required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date.

### 2.     Exit Financing and the New Term Loan Facility

On the Effective Date, the Reorganized Debtors will enter into the Exit Facility with the Exit Lenders. The Exit Facility shall be secured by a valid, enforceable, fully perfected first priority lien on and security interest in substantially all of the assets of the Reorganized Debtors. Proceeds of the Exit Facility will be used to fund certain Cash distributions under the Plan (including repayment of the DIP Facility), and will also be used to fund the ongoing business operations of the Reorganized Debtors.

On the Effective Date, the Reorganized Debtors will enter into the New Term Loan Facility which shall be issued Pro Rata to Holders of Secured First Lien Lender Claims. The New Term Loan Facility shall be secured by a valid, enforceable, fully perfected lien on and security interest in substantially all of the assets of the Reorganized Debtors.

Confirmation of the Plan shall be deemed to constitute approval of the Exit Facility and the New Term Loan Facility and the Exit Facility Documents and the New Term Loan Facility Documents (including all transactions contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations under the Exit Facility Documents and the New Term Loan Facility Documents and such other documents as may be reasonably required or appropriate, in each case, in accordance with the Exit Facility Documents and the New Term Loan Facility Documents.

On the Effective Date, the Exit Facility Documents and the New Term Loan Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facility Documents and the New Term Loan Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, and shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the liens and security interests to be granted in accordance with the Exit Facility Documents and the New Term Loan Facility Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents and the New Term Loan Facility Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Facility Documents and the New Term Loan Facility Documents, and shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors granting such liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties. To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take

any and all steps requested by the Debtors, the Reorganized Debtors, or any administrative agent under the Exit Facility Documents and the New Term Loan Facility Documents that are necessary to cancel and/or extinguish such liens and/or security interests.

### 3. Funding of Distributions under the Plan

The Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be funded from three sources: (i) Available Cash, (ii) the proceeds of the Exit Facility, and (iii) the proceeds from the Litigation Trust pursuant to the Litigation Proceeds Waterfall.

In making such Cash payments, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court, to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

### 4. Litigation Trust

#### a. *Formation of Litigation Trust*

On the Effective Date, the Litigation Trust will be established pursuant to the Litigation Trust Agreement for the purpose of prosecuting the Litigation Claims. The Litigation Trust is intended to qualify as a liquidating trust pursuant to Treasury Regulation § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

On the Effective Date, the Litigation Claims shall vest automatically in the Litigation Trust. The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief. The transfer of the Litigation Claims to the Litigation Trust shall be made for the benefit and on behalf of the Litigation Trust Beneficiaries. The assets comprising the Litigation Trust Assets (including the Litigation Trust Claims) will be treated for tax purposes as being transferred by the Debtors to the Litigation Trust Beneficiaries pursuant to the Plan in exchange for their Allowed Claims (or a portion thereof) and then by the Litigation Trust Beneficiaries to the Litigation Trust in exchange for the Litigation Trust Interests in the Litigation Trust. The Litigation Trust Beneficiaries shall be treated as the grantors and owners of the Litigation Trust. Upon the transfer of the Litigation Trust Assets, the Litigation Trust shall succeed to all of the Debtors' rights, title and interest in the Litigation Trust Assets, and the Debtors will have no further interest in or with respect to the Litigation Trust Assets (other than on account of the Litigation Trust Interests).

In connection with the prosecution of the Litigation Claims, any attorney-client privilege, work-product privilege, joint interest privilege or other privilege or immunity attaching to any documents or communications (in any form, including, without limitation, written, electronic or oral) shall be transferred to and shall vest in the Litigation Trust. The Litigation Trust's receipt of such privileges associated with the Litigation Claims shall not operate as a waiver of those privileges possessed or retained by the Debtors, nor shall it operate to eliminate the rights of any co-defendant to any applicable joint privilege. The Litigation Trust shall also be vested with the Debtors' rights, as such rights existed prior to the Effective Date, to conduct discovery and oral examinations of any party under Bankruptcy Rule 2004. The Litigation Trust, however, shall not be considered a successor of any Debtor and shall not assume any obligations of the Debtors other than expressly provided for herein.

Except as otherwise ordered by the Bankruptcy Court, the Litigation Trust Expenses on or after the Effective Date shall be paid in accordance with the Litigation Trust Agreement without further order of the Bankruptcy Court.

The Litigation Trust shall file annual reports regarding the liquidation or other administration of property comprising the Litigation Trust Assets, the distributions made by it and other matters required to be included in such report in accordance with the Litigation Trust Agreement.

The Litigation Trust Interests are not intended to constitute "securities." To the extent the Litigation Trust Interests are deemed to be "securities," the issuance of such interests shall be exempt from registration under the Securities Act and any applicable state and local laws requiring registration of securities pursuant to section 1145 of the Bankruptcy Code or another available exemption from registration under the Securities Act. If the Litigation Trustee determines, with the advice of counsel, that the Litigation Trust is required to comply with registration or reporting requirements under the Securities Act, the Exchange Act or other applicable law, then the Litigation Trustee shall take any and all actions to comply with such registration and reporting requirements, if any, and to file reports with the Securities and Exchange Commission to the extent required by applicable law.

### b. Litigation Trust Oversight Committee

Under the Plan, the Litigation Trust Oversight Committee is charged with overseeing the Litigation Trust and the Litigation Trustee, and shall be comprised of three members, which will be selected as follows: (i) two members selected by the First Lien Agents and the First Lien Lenders and (ii) one member selected by the Committee. The identity of the members of the Litigation Trust Oversight Committee shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code. The Litigation Trust Oversight Committee shall be authorized to retain and employ Professionals to assist it with and advise it with respect to its duties under the Plan. All fees and expenses of such Professionals shall be satisfied by the Litigation Trust.

The duties and powers of the Litigation Trust Oversight Committee shall terminate upon the final resolution of the Litigation Claims and the final distribution of all proceeds in accordance with the terms of the Litigation Trust Agreement.

### c. Appointment of the Litigation Trustee

The Litigation Trustee will be the exclusive trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The Litigation Trustee shall be selected by the persons identified who will initially comprise the Litigation Trust Oversight Committee. Pursuant to the Litigation Trust Agreement, the selection of the Litigation Trustee will be determined by a majority vote of the Litigation Trust Oversight Committee. The identity of the Litigation Trustee shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code. The Litigation Trustee will be compensated by the Litigation Trust.

On the Effective Date, the Litigation Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Litigation Trust Agreement, including, without limitation, the right to (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Litigation Trust Agreement; (2) administer the Litigation Trust Assets, including prosecuting, settling, abandoning or compromising any actions that are or relate to the Litigation Trust Assets; (3) employ and compensate professionals and other agents consistent with Article VI.A.2 of the Plan, *provided, however*, that any such compensation shall be paid by the Litigation Trust to the extent not inconsistent with the status of the Litigation Trust as a liquidating trust within the meaning of Treasury Regulation § 301.7701-4(d) for federal income tax purposes; and (4) control attorney/client privilege relating to or arising from the Litigation Trust Assets.

### d. Powers of Litigation Trustee

The Litigation Trustee shall be a representative of the Debtors' Estates and shall, subject to the terms of the Litigation Trust Agreement, have the power to make all decisions with respect to the prosecution of the Litigation Claims; *provided, however*, that the following actions will require prior written approval of a majority of the members of the Litigation Trust Oversight Committee: (i) the selection of any successor Litigation Trustee; (ii) any decisions related to the Litigation Trust Facility, including any amendment, replacement or alternative thereto or any determination to draw funds under the Litigation Trust Facility; (iii) the incurrence by the Litigation Trust of additional indebtedness to fund the prosecution of the Litigation Claims in excess of the Litigation Trust Facility; (iv) the retention of counsel and other professionals to assist in prosecution of the Litigation Claims and the terms of each professional's engagement, including any alternative fee arrangements; (v) settlement of all or any portion of the Litigation Claims; and (vi) any arrangement for compensation of the Litigation Trustee or the Plan Administrator.

The Litigation Trustee shall consult with, and obtain approval of, the Litigation Trust Oversight Committee with respect to all material decisions regarding (x) the prosecution of the Causes of Action, including (without limitation) the litigation strategy with respect thereto, and the filing and prosecution of any dispositive or other substantive motion or pleading, and (y) the assertion or waiver of the Debtors' attorney-client privilege (to which the Litigation Trust shall succeed).

### e. *Litigation Trust Facility*

Following the Effective Date, the Litigation Trustee, on behalf of the Litigation Trust, shall enter into a Litigation Trust Facility which will provide financing to the Litigation Trust to fund (a) the prosecution of the Litigation Claims, (b) costs and expenses of administering the Litigation Trust, and (c) costs and expenses relating to the performance by the Litigation Trustee of the duties of the Plan Administrator with respect to the resolution of claims and the making of distributions. The Litigation Trust Facility will be provided by the Reorganized Debtors or such other financing source as may be approved by the Litigation Trust Oversight Committee.

### f. *Litigation Trust Distributions*

Any recovery of Cash by the Litigation Trustee on account of such Litigation Claims will be distributed pursuant to the terms of the Plan and the Litigation Trust Agreement. Specifically, the Cash proceeds from the settlement or successful prosecution of the Litigation Claims shall be distributed pursuant to the Litigation Proceeds Waterfall set forth in Article VI.D of the Plan as follows:

    i.    *first*, to the extent not previously paid from proceeds of the Litigation Trust Facility, all accrued and unpaid Litigation Trust Expenses included in the Litigation Trust Budget;

    ii.    *second*, to the repayment of the aggregate amount of the outstanding obligations under the Litigation Trust Facility;

    iii.    *third*, to the repayment of (a) any indebtedness incurred under the DIP Facility, the Exit Facility or otherwise, or (b) any proceeds of collateral of the First Lien Lenders utilized, in connection with the distributions made to Holders of Allowed Administrative Expense Claims, Priority Tax Claims, and Priority Claims, pursuant to the Plan; and

    iv.    *fourth*, ratably (a) 80% to the Holders of Allowed First Lien Lender Deficiency Claims and (b) 20% to the Holders of Allowed Class 5 General Unsecured Claims. To the extent that the Allowed First Lien Lender Deficiency Claims are fully satisfied, any additional recoveries will be distributed to the Holders of Allowed Class 5 General Unsecured Claims. To the extent that Holders of Allowed Class 5 General Unsecured Claims are fully satisfied, any additional recoveries will be distributed to the Holders of Allowed First Lien Lender Deficiency Claims. For the avoidance of doubt, no holder of an Allowed Claim will receive payment in excess of the Allowed amount of their Claim.

### g. *Closing the Chapter 11 Cases*

The Litigation Trust shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules, *provided, however,* that the Litigation Trust may keep one or more of the Debtors' cases open in order to

resolve any Disputed Claims or to pursue Causes of Action or until the Litigation Trust has been terminated and all remaining Litigation Trust Assets have been distributed. For the avoidance of doubt, the Chapter 11 Cases may be closed prior to termination of the Litigation Trust.

### h. *Dissolution of the Litigation Trust*

The Litigation Trust shall be dissolved as soon as practicable after the date that is the earlier to occur of: (i) the distribution of all proceeds from the Litigation Claims available for distribution pursuant to the Plan, or (ii) the determination of the Litigation Trust Oversight Committee that the continued prosecution of the Litigation Claims is not likely to yield sufficient additional proceeds to justify further pursuit; *provided, however*, that in no event shall the Litigation Trust be dissolved later than five (5) years from the Effective Date, unless the Bankruptcy Court, upon motion within the six (6) months prior to the fifth (5th) anniversary of the Effective Date (or within six (6) months prior to the end of an extension period), determines that a fixed-period extension is necessary to facilitate or complete the recovery and liquidation of the Litigation Claims.

### 5. Plan Administrator

On the Effective Date, the Plan Administrator shall have all the rights and powers to implement the provisions of the Plan pertaining to the Plan Administrator, including, without limitation, the right to (i) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan; (ii) make distributions as contemplated in the Plan, (iii) establish and administer any necessary reserves for Disputed Claims that may be required; and (iv) object to Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such Disputed Claims. For the avoidance of doubt, the Plan Administrator shall have no obligation to object to or dispute (or expend funds to object to or dispute) any Claim where, in the Plan Administrator's sole judgment, the cost of such objection or dispute is not warranted in light of the potential incremental benefit to the remaining Holders of Claims. The Litigation Trustee shall serve as the initial Plan Administrator. The reasonable costs and expenses incurred by the Plan Administrator in performing the duties set forth in the Plan shall be paid by the Litigation Trust, subject to the approval of the Litigation Trust Oversight Committee.

### 6. Corporate Existence

Except as otherwise provided herein (including with respect to the Restructuring Transactions described in Article V.C of the Plan): (i) subject to the Restructuring Transactions, each of the Debtors shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal Person, with all of the powers of such a legal Person under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, conversion, dissolution or otherwise) under applicable law; and (ii) on the Effective Date, all property of each Debtor's Estate and any property acquired by a Debtor or Reorganized Debtor under this Plan (other than any Litigation Trust Assets), shall vest, subject to the Restructuring Transactions, in the applicable Reorganized Debtors, free and clear of all Claims, liens, charges, other encumbrances, Equity Interests and other interests (except for (x) any liens granted to secure the Exit Facility and New Term Loan Facility and any rights of any of the parties under

the documents related thereto, (y) any rights of any of the parties under any of the Reorganized Debtors Governing Documents, or (z) any other rights specifically granted pursuant to the Plan) without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Person.

On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for appropriate Professionals' fees, disbursements, expenses, or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.

In accordance with section 1129(a)(5) of the Bankruptcy Code, to the extent not already disclosed, the Debtors shall disclose the following at, or prior to, the Confirmation Hearing: (i) the identities and affiliations of any Person proposed to serve as a director or officer of the Reorganized Debtors and (ii) the nature of compensation for any officer employed or retained by the Reorganized Debtors who is an "insider" under section 101(31) of the Bankruptcy Code.

7.      **Restructuring Transactions**

On or after the Effective Date, the Reorganized Debtors shall undertake such Restructuring Transactions as may be necessary or appropriate to effect, in accordance with applicable non-bankruptcy law, a restructuring of the Debtors' or Reorganized Debtors' respective business or simplify the overall organizational structure of the Reorganized Debtors, all to the extent not inconsistent with any other terms of the Plan, including any such Restructuring Transactions described in any Restructuring Transactions documents.

Without limiting the foregoing, unless otherwise provided by the terms of a Restructuring Transaction, all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, conversions, or consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate.

The actions taken by the Debtors or the Reorganized Debtors, as applicable, to effect the Restructuring Transactions may include: (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of merger, conversion, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of this Plan, the Restructuring Transactions documents, and any ancillary documents and that satisfy the applicable requirements of applicable state law; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Disclosure Statement, the Restructuring Support Agreement, the Restructuring Transactions documents, and any ancillary documents; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, conversion,

merger, consolidation, dissolution or change in corporate form pursuant to applicable state law; (iv) the cancellation of shares, membership interests and warrants; and (v) all other actions that the Debtors or the Reorganized Debtors, as applicable, determine to be necessary, desirable, or appropriate to implement, effectuate, and consummate this Plan or the Restructuring Transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.

8.      **Preservation of Causes of Action**

Unless any Causes of Action are expressly waived, relinquished, exculpated, released, compromised, settled, transferred, or assigned under the Plan, or otherwise resolved by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Litigation Trust shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date through the Effective Date, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action as a consequence of Confirmation. The Litigation Trust may pursue the Causes of Action, as appropriate, in accordance with the best interests of the Litigation Trust Beneficiaries. Subject to Article VI.A.2 of the Plan, the Litigation Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

No Person may rely on the absence of a specific reference in Plan or this Disclosure Statement to any Cause of Action against such Person as any indication that the Litigation Trust will not pursue any and all available Causes of Action against such Person. The Litigation Trust reserves all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan. For the avoidance of doubt, the Plan does not release any Causes of Action that the Debtors have or may have now or in the future against any Person other than the Released Parties and the Exculpated Parties (and only in their capacity as Released Parties and Exculpated Parties) to the extent set forth in the Plan. The Litigation Trust is deemed the representative of the Estates for the purpose of prosecuting, as applicable, the Litigation Claims and any objections to Claims pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

9.      **Dissolution of Committee**

Upon the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (i) obligations arising under confidentiality agreements which shall remain in full force and effect according to their terms; (ii) applications for Professional Fee Claims filed by or on behalf of the Committee; or (iii) any motions or other actions seeking enforcement or implementation of the provisions of this Plan, the Confirmation Order, or the Litigation Trust Agreement. Professionals retained by the Committee shall (subject to Bankruptcy Court approval) be entitled

to reasonable compensation for services rendered in connection with the matters identified in clauses (ii) and (iii) after the Effective Date.

### 10. Cancellation of Old Equity Interests and Other Agreements

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the Old Equity Interests and all obligations of the Debtors under the DIP Facility, the First Lien Credit Agreement, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that may be reinstated pursuant to the Plan), shall be deemed automatically cancelled and surrendered and shall be of no further force solely as to the Debtors (and any obligation of the Debtors to pay any franchise or similar type taxes on account of such obligations shall be discharged), and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; *provided, however*, that any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for the purposes of allowing such Holders to receive distributions under the Plan; provided, further, that (x) the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors and (y) the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan.

Except as otherwise provided herein or in a Final Order, all Liens securing the Allowed First Lien Lender Claims under the First Lien Credit Agreement and the DIP Liens under the DIP Credit Agreement shall not be released, impaired, impacted, or otherwise affected in any way prior to the payment or satisfaction of all applicable Allowed Secured First Lien Lender Claims and DIP Claims in accordance with the terms of the Plan, at which time such Liens shall be terminated.

### 11. Consummation of Equity Purchase Agreement

On the Effective Date, the transactions contemplated by the Equity Purchase Agreement shall be consummated. For the avoidance of doubt, the Litigation Trust Assets shall not be purchased pursuant to the Equity Purchase Agreement and shall instead vest in the Litigation Trust pursuant to Article VI.B of the Plan.

In the event a third party offers to acquire the New Equity Interests of the Reorganized Debtors and the terms of such offer are acceptable to the First Lien Agents and the

First Lien Lenders, such third party may be substituted for the First Lien Agents and the First Lien Lenders as the acquirer of such New Equity Interests under the Equity Purchase Agreement.

### 12. Corporate Action and Effectuation of Documents

On the Effective Date, all actions contemplated by the Plan shall be authorized and approved in all respects. All matters provided for herein involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders or directors of the Debtors, and shall be fully authorized pursuant to Section 303 of the Delaware General Corporation Law and other applicable law.

Any director, chief restructuring officer, chief executive officer, president, chief financial officer, senior vice president, general counsel or other appropriate officer of the Debtors shall be authorized to execute, deliver, file, or record the documents included in the Plan Supplement and such other contracts, instruments, releases, indentures, and other agreements or documents (including, without limitation, the Equity Purchase Agreement), and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Any director, secretary or assistant secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions. All of the foregoing is authorized without the need for any required approvals, authorizations, or consents except for express consents required under the Plan.

### 13. Exemption from Certain Transfer Taxes

Pursuant to Bankruptcy Code Section 1146(a), any transfers from the Debtors to the Litigation Trust, the Reorganized Debtors, or any other Person pursuant to, in contemplation of, or in connection with the Plan, and the issuance, transfer, or exchange of any debt, equity securities or other interest under or in connection with the Plan, shall not be taxed under any law imposing a stamp tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or government assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement and all documents necessary to evidence and implement any of the transactions and actions described in the Plan or the Plan Supplement.

### 14. Plan Supplement

The Plan Supplement may be filed in parts, provided that the entirety of the Plan Supplement shall be filed no later than fourteen (14) days prior to the deadline established by the Bankruptcy Court for objecting to Confirmation of the Plan. The Plan Supplement will include, without limitation, (a) the Equity Purchase Agreement, (b) the Litigation Trust Agreement; (c) the Assumption Schedule; (d) documentation for the Exit Facility; (e) documentation for the New Term Loan Facility; (f) documentation for the Litigation Trust Facility, and (g) the

Reorganized Debtors Governing Documents, each in substantially final form. After filing, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal business hours. The Plan Supplement also will be available for inspection on the website maintained by the Claims and Noticing Agent: https://cases.primeclerk.com/PatNat. In addition, Holders of Claims or Equity Interests may obtain a copy of any document included in the Plan Supplement upon written request in accordance with Article XI.O of the Plan.

### 15. Substantive Consolidation for Plan Purposes Only

Except as provided for in Section VIII.C of the Plan, nothing in this Plan is intended to substantively consolidate the Estates of the Debtors, and each such entity shall maintain its separate and distinct assets.

## D. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1. Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except for the Executory Contracts and Unexpired Leases listed on the Assumption Schedule, if any, and except to the extent that a Debtor either previously has assumed, assumed and assigned or rejected an Executory Contract or Unexpired Lease by an order of the Bankruptcy Court, or has filed a motion to assume or assume and assign an Executory Contract or Unexpired Lease prior to the Effective Date, each Executory Contract and Unexpired Lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be deemed rejected pursuant to section 365 of the Bankruptcy Code, and written notice will be provided to each such counterparty of such deemed rejected contract or lease (together with a statement of the date by which any Proof of Claim must be filed). Each such contract and lease will be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Debtors, their Estates and all parties in interest in the Chapter 11 Cases.

The Debtors' decision regarding whether to assume or reject Executory Contracts and Unexpired Leases (including the deemed rejection set forth immediately above) shall be in consultation with, and with the consent of the First Lien Lenders, with such consent not to be unreasonably withheld.

### 2. Bar Date for Claims Based on Rejection of Executory Contracts or Unexpired Leases

Claims created by the rejection of Executory Contracts and Unexpired Leases pursuant to Article VII.A of the Plan, or the expiration or termination of any Executory Contract or Unexpired Lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Plan Administrator no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to Article VII.A of the Plan, for which Proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Estates, their successors and

assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article XI.E of the Plan. Unless otherwise ordered by the Bankruptcy Court, all such Allowed Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III of the Plan.

### 3. Assumption and Assignment of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtors shall assume each of the respective Executory Contracts and Unexpired Leases, if any, listed on the Assumption Schedule, which the Debtors shall file with the Bankruptcy Court as part of the Plan Supplement; *provided, however*, that the Debtors reserve the right, at any time prior to the Effective Date, to amend the Assumption Schedule to: (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection pursuant hereto; or (b) add any Executory Contract or Unexpired Lease to the Assumption Schedule, thus providing for its assumption or assumption and assignment pursuant to Article VII.C of the Plan. The Debtors shall provide written notice to each counterparty of a contract on the Assumption Schedule (together with a statement of the date by which any Cure Claims must be filed) and written notice of any amendments to the Assumption Schedule to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 11 Cases. The notices of assumption will describe the procedures by which such parties may object to the proposed assumption of their respective Executory Contract or Unexpired Lease and the proposed Cure Claim amount, and explain how such disputes will be resolved by the Bankruptcy Court at the Confirmation Hearing, or such other date to which the parties may mutually agree or as ordered by the Bankruptcy Court, if the parties are not able to resolve a dispute consensually. Each Executory Contract and Unexpired Lease assumed under the Plan shall include any modifications, amendments, supplements or restatements to such contract or lease.

### a. Objections to Assumption and Assignment of Executory Contracts and Unexpired Leases

Objections, if any, to the proposed assumption and/or Cure Claim amount must be filed with the Bankruptcy Court and served so as to be actually received by the Debtors no later than fourteen (14) days from the date of the service of the assumption notice, which deadline may be extended in the Debtors' sole discretion. Objections, if any, to the proposed assumption and/or Cure Claim amount must be filed with the Bankruptcy Court and served so as to be actually received by the Debtors no later than fourteen (14) days from the date of the service of the assumption notice, which deadline may be extended in the Debtors' sole discretion. Any non-Debtor counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim amount will be deemed to have assented to such assumption and Cure Claim amount.

The Debtors prior to the Effective Date, or the Reorganized Debtors following the Effective Date, may settle any dispute regarding the amount of a Cure Claim without further

notice to any party or action, approval, or order of the Bankruptcy Court. If the Debtors prior to the Effective Date, or the Reorganized Debtors following the Effective Date, object to any request for payment of a Cure Claim, the Bankruptcy Court shall determine the Allowed amount of such Cure Claim and any related issues. Unless the parties to the Executory Contract or Unexpired Lease agree otherwise, all disputed defaults that are required to be cured shall be cured by the later of (a) ten (10) days after entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto and (b) the Effective Date.

If an objection to the Debtors' proposed Cure Claim amount is sustained by the Bankruptcy Court or a Final Order is entered determining a Cure Claim amount greater than that proposed by the Debtors, then within thirty (30) days, the Debtors prior to the Effective Date, or the Reorganized Debtors following the Effective Date, may elect to deem such Executory Contract or Unexpired Lease rejected in lieu of assuming it by filing a rejection notice, and the non-Debtor counterparty shall then be entitled to file a Proof of Claim asserting Claims arising from the rejection thereof, if applicable, in accordance with the terms of the Plan and the Bar Date Order.

**4. Payment Related to Assumption of Executory Contracts and Unexpired Leases**

Any Cure Claims associated with any Executory Contract or Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the Cure Claim in Cash on or after the Effective Date; or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. Pursuant to section 365(b)(2)(D) of the Bankruptcy Code, no Cure Claim shall be allowed for a penalty rate or other form of default rate of interest. If there is an unresolved dispute regarding: (x) the amount of any Cure Claim; (y) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (z) any other matter pertaining to assumption of such contract or lease, the payment of any Cure Claim required by section 365(b)(1) of the Bankruptcy Code shall be made following the resolution of such dispute by the parties or the entry of a Final Order resolving the dispute and approving the assumption.

**ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS AGAINST OR DEFAULTS BY THE DEBTORS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE REORGANIZED DEBTORS ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT.**

The assumption of Executory Contracts and Unexpired Leases under the Plan shall include the assignment to and vesting of such contracts and leases in the Reorganized Debtors. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and vesting.

**5.    Extension of Time to Assume or Reject**

Notwithstanding anything set forth in Article VII of the Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the Debtors' right to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. The deemed rejection provided for in Article VII.A of the Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

**6.    Insurance Policies and Agreements**

*a.    Assumed Insurance Policies and Agreements*

Notwithstanding any other provision of the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code and in accordance with the terms of the Plan, the Insurance Policies shall be assumed by the Debtors and assigned, to the extent permitted by law, to the Reorganized Debtors, unless any Insurance Policy was previously rejected by the Debtors pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date.

*b.    Reservation of Rights*

Nothing contained in the Plan will constitute a waiver of any claim, right or cause of action that a Debtor or the Litigation Trustee, as the case may be, may hold against any entity, including, without limitation, any insurer under any policy of insurance or insurance agreement.

**7.    Reservation of Rights**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such Executory Contract or Unexpired Lease. Notwithstanding any applicable non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a non-Debtor party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors from non-Debtor parties to rejected Executory Contracts or Unexpired Leases. Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contract and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder.

### E. DISTRIBUTIONS ON ALLOWED CLAIMS

#### 1. Distribution on Allowed Claims Generally

Only Holders of Allowed Claims shall be entitled to receive distributions under the Plan. The Plan Administrator shall make distributions to Holders of Allowed Claims, subject to the provisions of Article VIII.A of the Plan, unless a later date is established by order of the Bankruptcy Court upon motion of the Debtors, the Plan Administrator, or any other party, the later of (a) the Effective Date or as soon as practicable thereafter, (b) the date such Claim becomes an Allowed Claim or as soon as practicable thereafter, or (c) as soon as practicable following a determination by the Plan Administrator that that there is sufficient Cash to make a distribution to the Holder of such Claim pursuant to the terms of this Plan. Any Claim that is disallowed by order of the Bankruptcy Court prior to the Effective Date shall be deemed expunged (to the extent not already expunged) as of the Effective Date without the necessity for further Bankruptcy Court approval and the holder of any such Claim shall not be entitled to any distribution under the Plan. The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

#### 2. Procedures for Making Distributions on Allowed Claims

##### a. *Delivery of Distributions in General*

The Plan Administrator shall send distributions to the Holders of the Allowed Claims at the addresses listed for such Holder in the Schedules or on the applicable Proof of Claim or notice of transfer of a Claim filed at least 5 days before the Effective Date. Notwithstanding the foregoing, distributions made on account of the Allowed Secured First Lien Lender Claims and Allowed First Lien Lender Deficiency Claims shall be made to the First Lien Agent for the benefit of the First Lien Lenders.

##### b. *Undeliverable or Unclaimed Distributions*

If any Holder's distribution is returned as undeliverable, no further distributions to such Holder shall be made unless and until the Plan Administrator is notified by the Claims and Noticing Agent or such Holder of such Holder's then current address, at which time all missed distributions shall be made, subject to Article VIII.B.4 of the Plan, to such Holder without interest. If any distribution is made by check and such check is not returned but remains uncashed for three (3) months after the date of such check, the Plan Administrator may cancel and void such check, and the distribution with respect thereto shall be deemed undeliverable. If, pursuant to Article VIII.H of the Plan, any Holder is requested to provide an applicable Internal Revenue Service form or to otherwise satisfy any tax withholding requirements with respect to a distribution and such Holder fails to do so within three (3) months of the date of such request, such Holder's distribution shall be deemed undeliverable.

Amounts in respect of returned or otherwise undeliverable or unclaimed distributions made by the Plan Administrator shall be returned to or deemed to vest in the Litigation Trust until such distributions are claimed. All claims for returned or otherwise undeliverable or unclaimed distributions must be made (a) on or before the first (1st) anniversary

of the Effective Date or (b) with respect to any distribution made later than such date, on or before six (6) months after the date of such later distribution; after which date all undeliverable property shall revert and vest in the Litigation Trust, free of any restrictions thereon and the claims of any Holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. In the event of a timely claim for any returned or otherwise undeliverable or unclaimed distribution, the Plan Administer shall distribute such amount or property pursuant to the Plan.

### c. Minimum Distributions

The Plan Administrator may elect not make a distribution of less than $25.00 to any Holder of an Allowed Claim unless the distribution is a final distribution. If, at any time, the Plan Administrator determines that the remaining Cash and other Assets are not sufficient to make distributions to Holders of Allowed Claims in an amount that would warrant the Plan Administrator incurring the cost of making such a distribution, the Plan Administrator may dispose of such remaining Cash and other Assets in a manner the Plan Administrator deems to be appropriate, including donating it to a charitable organization.

### d. Finality of Distributions

All distributions made under the Plan shall be final, and neither the Estates, the Litigation Trustee, nor any representative of the Debtors' Estates may seek disgorgement of any distributions made under the Plan.

### e. Consolidation for Distribution Purposes Only

Solely for the purposes of determining the Allowed amount of Claims to be used in calculating distributions to be made pursuant to the Plan, any Holder asserting the same Claim against more than one Debtor (based on a guarantee, joint and several liability under contract or applicable law, or any other basis) shall be deemed to have only one Claim and shall only receive a distribution under the Plan on account of such Claim.

### f. Application of Distribution Record Date

As of the Distribution Record Date, the transfer registers for each Class of Claims or Equity Interests, as maintained by the Debtors or their agents, shall be deemed closed and there shall be no further changes made to reflect any new record Holders of any such Claims or Equity Interests without the written consent of the Debtors or the Plan Administrator, as applicable. The Debtors and the Plan Administrator shall have no obligation to recognize any transfer of such Claims or Equity Interests occurring on or after the Distribution Record Date.

### g. Surrender of Old Securities

Each Holder of the Old Equity Interests shall be deemed to have surrendered any stock certificate or other documentation underlying each such Old Equity Interest, and any such stock certificates and other documentation shall be deemed cancelled pursuant to Article V.E of the Plan.

### h. Withholding and Reporting Requirements

In connection with the Plan and all distributions hereunder, the Plan Administrator shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. Any amounts withheld shall be deemed to have been distributed and received by the applicable recipient for purposes of the Plan. The Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a distribution, the Holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each Holder. Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any governmental unit, including income and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the applicable Plan Administrator to allow it to comply with its tax withholding and reporting requirements. Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution to be held by the Plan Administrator, as the case may be, until such time as the Plan Administrator is satisfied with the Holder's arrangements for any withholding tax obligations.

### i. Setoffs

The Plan Administrator may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Litigation Trust may have against the Holder of such Claim; *provided, however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Litigation Trust of any such claim that the Debtors or the Litigation Trust may have against such Holder.

### j. Prepayment

Except as otherwise provided in the Plan, any ancillary documents entered into in connection herewith, or the Confirmation Order, the Plan Administrator shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time; *provided, however*, that any such prepayment shall not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

### k. No Fractional Shares of New Equity Interests

No fractional shares of New Equity Interests shall be distributed and no cash shall be distributed in lieu of such fractional amounts. When any distribution of New Equity Interests pursuant to the Plan would result in the issuance of a number of shares of New Equity Interests that is not a whole number, the actual distribution of shares of New Equity Interests shall be truncated (i.e., rounded down to the nearest whole number).

### l.        No Distribution in Excess of Allowed Amount of Claims

Notwithstanding anything to the contrary contained in the Plan, no Holder of an Allowed Claim shall receive in respect of that Claim any distribution in excess of the Allowed amount of that Claim.

### 3.        Limitation on Amendments to Claims

On or after the Effective Date, a Claim may not be Filed or amended without prior authorization of the Bankruptcy Court or the Litigation Trustee, as applicable, and any such new or amended Claim Filed without such prior authorization shall be deemed disallowed in full and expunged without any further action.

### 4.        Claims Payable by Third Parties

### a.        Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution from the Debtors or Reorganized Debtors on account of  such Claim and also receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim as of the date of any such distribution under the Plan.

If the Debtors become aware of the payment by a third party, the Debtors or Reorganized Debtors, as applicable, will send a notice of wrongful payment to such party requesting return of any excess payments and advising the recipient of the provisions of the Plan requiring turnover of excess estate distributions.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

### b.        Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### c. *Applicability of Insurance Policies*

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any entity may hold against any other entity, including any insurer(s) under any Insurance Policy, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the Insurance Policies.

## F.  RESOLUTION OF CONTINGENT, UNLIQUIDATED, OR DISPUTED CLAIMS

### 1.  No Distribution on Disputed Claims

No distribution shall be made on a Disputed Claim until and unless such Disputed Claim becomes an Allowed Claim. Prior to making any distribution under the Plan to a particular Class, the Plan Administrator, shall establish a Disputed Claims Reserve for Disputed Claims in such Class, each of which Disputed Claims Reserves shall be administered by the Plan Administrator. The Plan Administrator shall reserve in Cash or other property, for distribution on account of each Disputed Claim, the full amount of the estimated distribution on account of such Disputed Claim (or such lesser amount as may be estimated or otherwise ordered by the Bankruptcy Court in accordance with Article VIII.E of the Plan or otherwise) with respect to each Disputed Claim.

### 2.  Disputed Claims Reserve

The Plan Administrator shall hold property in the Disputed Claims Reserves in trust for the benefit of the Holders of Claims ultimately determined to be Allowed. Each Disputed Claims Reserve shall be closed and extinguished by the Plan Administrator when all distributions and other dispositions of Cash or other property required to be made under the Plan will have been made in accordance with the terms of the Plan. Upon closure of a Disputed Claims Reserve, all Cash or other property held in that Disputed Claims Reserve shall revest in and become the property of the Litigation Trust to be distributed in accordance with the Litigation Proceeds Waterfall.

### 3.  Claims Administration Responsibilities

After the Effective Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Plan Administrator shall have the exclusive right to make, file, prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court, objections to Claims. The costs of pursuing the objections to Claims shall be borne by the Litigation Trust. From and after the Effective Date, the Plan Administrator and any claimant may elect to compromise, settle or otherwise resolve any objection to a Disputed Claim without approval of the Bankruptcy Court. Notwithstanding anything in the Plan, the U.S. Trustee's rights to object to Claims, including Professional Fee Claims and Claims asserted under section 503(b)(3) or (b)(4) of the Bankruptcy Code, are fully reserved.

4. **Time to File Objections to Claims**

All objections to Disputed Claims shall be filed and served upon the Holders of each such Claim not later than the Claim Objection Deadline (as extended).

5. **Estimation of Claims**

At any time, (a) prior to the Effective Date, the Debtors, and (b) subsequent to the Effective Date, the Plan Administrator, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Plan Administrator has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Debtors or the Plan Administrator, as applicable, may elect to object to the ultimate allowance of the Claim or seek to reduce and allow the Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

6. **Disallowance of Claims Held by Persons Subject to Avoidance or Recovery Actions**

Any Claim held by any Person from whom property is recoverable under sections 542, 543, or 550 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Person have been settled or a Final Order with respect thereto has been entered and all sums due, if any, by that Person have been turned over or paid by such Person to the Debtors or the Litigation Trust.

7. **Adjustment to Claims Without Objection**

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted on the Claims Register by the Claims and Noticing Agent at the direction of the Debtors or the Plan Administrator, as applicable, upon notice to the Holder of such Claim, but without a Claims Objection having to be Filed. If no objection is received within the time period prescribed in the notice, such Claim shall be adjusted without any further notice to or action, order or approval of the Bankruptcy Court.

### 8. Disallowance of Claims

All Claims filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED BY THE DEBTORS OR THE LITIGATION TRUST, AS APPLICABLE, ANY AND ALL HOLDERS OF PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL NOT BE TREATED AS CREDITORS FOR PURPOSES OF VOTING AND DISTRIBUTION PURSUANT TO BANKRUPTCY RULE 3003(c)(2) UNLESS ON OR BEFORE THE VOTING DEADLINE OR THE CONFIRMATION DATE, AS THE CASE MAY BE, SUCH LATE PROOFS OF CLAIM ARE DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

## G. EFFECT OF CONFIRMATION OF PLAN

### 1. Vesting of Assets

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property (including all interests, rights, and privileges with respect thereto) of each of the Debtors will vest in each of the respective Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as otherwise specifically provided in the Plan. All Liens, Claims, encumbrances, charges, and other interests shall be deemed fully released and discharged as of the Effective Date, except as otherwise provided in the Plan (including, for the avoidance of doubt, Liens, Claims, encumbrances, charges, and other interests in connection with those agreements related to Claims being Reinstated under the Plan). As of the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and settle and compromise Claims and Equity Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code.

### 2. Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and reasonable. In accordance with the

provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

3.    **Binding Effect**

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after entry of the Confirmation Order, the Plan will bind all holders of Claims and Equity Interests and their respective successors and assigns, notwithstanding whether any such holders (a) were Impaired or Unimpaired under the Plan, (b) were deemed to accept or reject the Plan, failed to vote to accept or reject the Plan, (c) voted to reject the Plan, or (d) received any distribution under the Plan.

4.    **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Equity Interest in accordance with any contractual, legal or equitable subordination relating thereto.

5.    **Discharge of Claims and Termination of Equity Interests**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Plan distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands and liabilities that arose before the Effective Date, any liability to the extent such Claims or Equity Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, whether or not (i) a Proof of Claim or proof of Equity Interest based upon such debt, right, or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim or Equity Interest based upon such debt, right, or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim or Equity Interest has accepted the Plan.  The Confirmation

Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

**6.      Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VI of the Plan, all mortgages, deeds of trust, liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

**7.      Debtor Releases**

**As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce this Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed including, without limitation, the Released Parties' services and assistance to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise provided in this Plan, the Plan Documents, or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the Debtors, the Reorganized Debtors, the Plan Administrator, the Litigation Trust, the Litigation Trustee and any Person holding or seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to Bankruptcy Code Section 1123(b)(3), in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other entities that may purport to assert any Cause of Action derivatively, by or through the foregoing Entities (collectively, the "<u>Releasing Parties</u>"), from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, or liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that any of the Releasing Parties would have been legally entitled to assert in her, his or its own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the First Lien Credit Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, the Restructuring Transactions, the Exit Facility, the New Term Loan Facility, the Litigation Trust Facility, the Reorganized Debtor Governing Documents, or the Plan (other than the rights of the Debtors, the Committee, the Litigation Trust, the Litigation Trustee and the First Lien Agents to enforce the Plan and the contracts, instruments, releases,**

indentures, and other agreements or documents delivered thereunder), the solicitation of votes with respect to this Plan, or any other act or omission, transaction, agreement, event, or other occurrence, other than claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

"Released Parties" means (a) the Debtors' and the Reorganized Debtors' professionals that were retained in the Chapter 11 Cases, including the Debtors' chief restructuring officer, attorneys, financial advisors, investment bankers, consultants, representatives and other professionals, (b) the First Lien Agents, (c) the First Lien Lenders, (d) the DIP Agent, (e) the DIP Lenders, (f) any professionals of the DIP Agent or DIP Lenders, (g) the members of the Committee, but only in their capacity as such, (h) Conway MacKenzie Management Services, LLC, (i) the Debtors' independent director, and (j) with respect to the Persons identified in clauses (b) through (f), their respective directors, officers, principals, shareholders, partners, employees, members, participants, agents, representatives, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, management companies, fund advisors, other professionals, advisory board members, subsidiaries, affiliates, managed accounts or funds, other advisors, predecessors, successors or assigns, in each case in their capacity as such.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors or the Reorganized Debtors asserting any claim released by the Debtor Release against any of the Released Parties.

The Committee and other parties in interest have objected to the proposed Debtor Releases contained in Article XI.G.1 of the Plan on the ground that the Debtor Releases inappropriately release claims of the Debtor's estate against various third parties, including Cerberus. The Debtors disagree with these objections to the Debtor Releases and believe the Debtor Releases are appropriate.

8.      Releases by Holders of Claims and Equity Interest

As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise provided in the Plan, the Plan Documents, or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the (a) the holders of all

Claims and Equity Interests who vote to accept this Plan, (b) the holders of Claims or Equity Interests that are Unimpaired under this Plan, (c) the holders of Claims and Equity Interests whose vote to accept or reject this Plan was solicited but who did not vote either to accept or to reject this Plan and did not opt out of granting the releases set forth herein, (d) the holders of Claims and Equity Interests who voted to reject but did not opt out of granting the releases set forth herein; (e) the holders of Claims and Equity Interest whose claims are fully impaired and are deemed to reject the Plan but did not opt out of granting the releases set forth herein, and (f) with respect to the Persons identified in (a)-(e) their predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such holders would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the First Lien Credit Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement, the DIP Facility, the Restructuring Transactions, the Exit Facility, the New Term Loan Facility, the Litigation Trust Facility, the Reorganized Debtor Governing Documents, or the Plan, the solicitation of votes with respect to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence, other than claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Releases by Holders of Claims and Equity Interest, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Releases by Holders of Claims and Equity Interest are: (1) in exchange for good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the Releases by Holders of Claims and Equity Interest against any of the Released Parties.

The Committee and other parties in interest have objected to the proposed Releases by Holders of Claims and Equity Interests contained in Article XI.G.2 of the Plan

on the ground that, among other things, (i) Releases by Holders of Claims and Equity Interests inappropriately require Creditors that accept the Plan, or reject the Plan, or abstain from voting but fail to affirmatively opt out, to directly release all claims against the Released Parties, and (ii) the Release Parties have not provided adequate consideration in return for the Releases by Holders of Claims and Equity Interests. The Debtors disagree with these objections to the Releases by Holders of Claims and Equity Interest and believe they are appropriate.

9.      **Exculpation**

Pursuant to the Plan and to the maximum extent permitted by applicable law, none of the Exculpated Parties shall have or incur any liability to any holder of a Claim, Cause of Action or Equity Interest for any act or omission in connection with, related to or arising out of, the Chapter 11 Cases, the negotiation of any settlement, agreement, contract, instrument, release or document created or entered into in connection with the Plan or in the Chapter 11 Cases (including the DIP Facility, Exit Facility, and Litigation Trust Facility and documents related thereto), the pursuit of confirmation of the Plan, the consummation of the Plan, the preparation and distribution of the Disclosure Statement, the offer, issuance and distribution of any securities issued or to be issued pursuant to the Plan, any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors or the administration of the Plan or the property to be distributed under the Plan, except for any act or omission that is determined in a final order to have constituted willful misconduct or gross negligence (collectively, "**Exculpated Claims**"). Each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan.

**Exculpated Parties**" means (a) the Committee and its members (solely in their capacities as such), (b) the Debtors and their current officers, directors, and employees (c) Conway MacKenzie Management Services, LLC, and its current officers and employees (d) the Debtors' chief restructuring officer, (e) the Debtors' independent director, and (f) with respect to the Persons identified in clauses (a) and (b), to the extent retained in the Chapter 11 Cases, their respective financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and all other retained professionals.

10.      **Injunction**

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Equity Interests, Causes of Action, liabilities, obligations, suits, judgments, damages, demands, debts, or rights, including, but not limited to, those that:  (1) have been released or exculpated pursuant to Article XI.G and Article XI.H of the Plan; (2) are against an Exculpated Party with respect to Exculpated Claims; or (3) are otherwise stayed, settled, compromised or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from (on account of or in connection with or with respect to any released, settled, compromised, or exculpated Claims, Equity Interests, Causes of Action,

liabilities, obligations, suits, judgments, damages, demands, debts, or rights): (a) commencing or continuing in any manner any action or other proceeding of any kind against the Released Parties or , with respect to Exculpated Claims, Exculpated Parties (or the property or estate of any Person, directly or indirectly, so released or exculpated); (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Released Parties or, with respect to Exculpated Claims, Exculpated Parties; (c) creating, perfecting, or enforcing any Lien, Claim, or encumbrance of any kind against the Released Parties or, with respect to Exculpated Claims, Exculpated Parties (or the property or estate of any Person so released or exculpated); (d) asserting any right of setoff or subrogation of any kind against any obligation due from the Released Parties or, with respect to Exculpated Claims, Exculpated Parties (or the property or estates of the debtors or any Person so released or exculpated) unless such Person has timely asserted such setoff or subrogation right prior to Confirmation in a document filed with the Bankruptcy Court explicitly preserving such setoff or subrogation; and (e) commencing or continuing in any manner any action or other proceeding of any kind against the Released Parties or, with respect to Exculpated Claims, Exculpated Parties (or the property or estate of any Person so released or exculpated); provided that nothing contained in the Plan shall preclude any Person from receiving or obtaining benefits directly and expressly provided to such Person pursuant to the terms of the Plan; provided, further, that nothing contained in the Plan shall be construed to prevent any Person from defending against Claims Objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code Sections 105 or 362 or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

11.     **No Release of Any Claims Held by the United States**

**Except as provided for in Section 1141 of the Bankruptcy Code, nothing in the Confirmation Order or the Plan shall effect a release of any Claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any Claim arising under the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), the environmental laws, or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any Claim, suit, action, or other proceedings against the Released Parties for any liability whatever, including, without limitation, any Claim, suit, or action arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against the Released Parties.**

### H. CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE

#### 1. Conditions Precedent to Confirmation of the Plan

The following are conditions precedent to the occurrence of the Confirmation Date, each of which must be satisfied or waived in accordance with Article IX.C of the Plan:

(a)     An order pursuant to Bankruptcy Code Section 1125 shall have been entered finding that the Disclosure Statement contains adequate information;

(b)     The proposed Confirmation Order, in form and substance satisfactory to the Debtors, the First Lien Agents and First Lien Lenders, shall have been submitted to the Bankruptcy Court;

(c)     The Debtors shall have received a commitment from the Exit Lender for the Exit Facility, in form and substance acceptable to the Debtors, the First Lien Agents and First Lien Lenders;

(d)     The Debtors shall have received a commitment from the Litigation Trust Lenders for the Litigation Trust Facility, in form and substance acceptable to the Debtors, the First Lien Agents and First Lien Lenders;

(e)     The Plan Supplement and any related documentation shall be in form and substance acceptable to the Debtors, the First Lien Agents and First Lien Lenders;

(f)     The Equity Purchase Agreement shall have been executed in form and substance acceptable to the Debtors, the First Lien Agents and First Lien Lenders; and

(g)     The Bankruptcy Court shall have determined that the Plan satisfies all requirements for confirmation under the Bankruptcy Code.

#### 2. Conditions Precedent to the Effective Date.

The following conditions precedent must be satisfied or waived on or prior to the Effective Date in accordance with Article IX.C of the Plan:

(a)     The Bankruptcy Court shall have entered the Confirmation Order, which shall have become a Final Order, and which shall grant final approval of the Plan and the injunctions, releases, and exculpations contained therein;

(b)     The Confirmation Order shall, among other things:

i.     provide that the Debtors, the Reorganized Debtors, the Committee, the Plan Administrator, the Litigation Trustee, the Litigation Trust Oversight Committee and the Litigation Trust are authorized and directed to take

all actions necessary or appropriate to enter into, implement, and consummate the transactions contemplated by and the contracts, instruments, releases, indentures, and other agreements or documents created under or in connection with the Plan; and

    ii.    authorize and approve the Equity Purchase Agreement and the Exit Facility;

(c)    The Confirmation Order shall not then be stayed, vacated, or reversed;

(d)    All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed, or will be effected or executed contemporaneously with implementation of the Plan (including, without limitation, the Reorganized Debtor Governing Documents, the Litigation Trust Agreement, the Equity Purchase Agreement, and the documentation for the Exit Facility, New Term Loan Facility and the Litigation Trust Facility), each of which shall be in form and substance acceptable to the Debtors, the First Lien Agents, and the First Lien Lenders;

(e)    The Equity Purchase Agreement shall be in full force and effect and no event or circumstance shall have occurred that would give rise to the ability of any party thereto to terminate the Equity Purchase Agreement;

(f)    The fees and expenses required to be paid on the Effective Date pursuant to Article XI.B of the Plan shall have been paid in full in Cash;

(g)    The aggregate amount of all Allowed Administrative Expense Claims and Priority Tax Claims shall not exceed $[__] million (such cap to be reduced for all administrative expenses and other wind-down costs paid by the Debtors, in the ordinary course, on or after the date of the Disclosure Statement and prior to the Effective Date) and the aggregate amount of all Allowed Priority Claims shall not exceed $[__];

(h)    The Litigation Trust shall have been established, and the Litigation Trust Agreement shall be acceptable to the parties thereto;

(i)    All conditions to the consummation of the Equity Purchase Agreement, the Exit Facility and the Litigation Trust Facility shall have been satisfied or waived as provided therein; and

(j)    The Effective Date shall have occurred by no later than May 31, 2018.

**3.**    **Waiver of Conditions Precedent**

Except as otherwise provided within the terms of the Plan, all actions required to be taken on the Effective Date will take place and will be deemed to have occurred simultaneously and no such action will be deemed to have occurred prior to the taking of any other such action. Each of the conditions precedent in Article IX.A and Article IX.B of the Plan,

with the express exception of the conditions contained in Article IX.A.1, Article IX.B.1, and Article IX.B.3 of the Plan, may be waived in whole or in part by the First Lien Agents and First Lien Lenders (with the consent of the Debtors not be unreasonably withheld), without any notice to parties in interest or the Bankruptcy Court and without a hearing.

The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) will be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order will take effect immediately upon its entry.

### 4. Operations of the Debtors Between the Confirmation Date and the Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate its business as debtor in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all Final Orders.

### 5. Effective Date

On or within three Business Days of the Effective Date, the Debtors shall file and serve a notice of occurrence of the Effective Date.

## I. RETENTION OF JURISDICTION

### 1. Scope of Jurisdiction

Under Bankruptcy Code Sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, without limitation, jurisdiction to:

i. Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Equity Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the Holder), including, without limitation, the resolution of any Request for Payment and the resolution of any objections to the allowance or priority of Claims;

ii. Hear and determine all applications for Professional Fees; *provided, however*, that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Plan Administrator or the Litigation Trust (to the extent different from those of the Plan Administrator) shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

iii. Hear and determine all matters with respect to contracts or leases or the assumption or rejection of any contracts or leases to which a Debtors

were a party or with respect to which the Debtors may be liable, including, if necessary and without limitation, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

iv. Effectuate performance of and payments under the provisions of the Plan;

v. Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Litigation Claims or the Chapter 11 Cases;

vi. Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

vii. Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including, without limitation, disputes arising under agreements, documents, or instruments executed in connection with the Plan;

viii. Consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

ix. Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

x. Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

xi. Hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, the Litigation Trust Agreement, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

xii. Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases or provided for under the Plan;

xiii. Except as otherwise limited herein, recover all assets of the Debtors and

property of the Estates, wherever located;

xiv.    Hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code Sections 346, 505, and 1146;

xv.    Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

xvi.    Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

xvii.    Enter a final decree closing the Chapter 11 Cases.

## 2. Failure to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article X.A of the Plan, the provisions of Article X of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## J. MISCELLANEOUS PROVISIONS

### 1. Payment of Statutory Fees

All quarterly fees payable pursuant to Section 1930 of Title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors on or before the Effective Date. All such fees payable after the Effective Date shall be paid by the Plan Administrator or the Reorganized Debtors as and when due, until such time as the Chapter 11 Cases are closed, dismissed or converted.

### 2. Successors and Assigns and Binding Effect

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such Person, including, but not limited to, the Litigation Trust, and all other parties in interest in the Chapter 11 Cases.

### 3. Modifications and Amendments

The Debtors, with the consent of the First Lien Agents and First Lien Lenders, may alter, amend, or modify the Plan under Bankruptcy Code Section 1127(a) at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Bankruptcy Code Section 1101(2), the Debtors, with the consent of the First Lien Agents and First Lien Lenders, may under Bankruptcy Code Section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any

inconsistencies in the Plan or the Confirmation Order, *provided, however*, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

### 4. Substantial Consummation of the Plan

On the Effective Date, the Plan will be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 5. Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the consent of the First Lien Agents and First Lien Lenders) shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 6. Revocation, Withdrawal, or Non-Consummation

The Debtors, with the consent of the First Lien Agents and First Lien Lenders, reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan in accordance with Article XI.N of the Plan, or if Confirmation or the Effective Date does not occur, then (1) the Plan shall be null and void in all respects, (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (3) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (a) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Equity Interests in, any Debtors or any other Person, (b) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (c) constitute an admission of any sort by any Debtor or any other Person.

### 7. Effectuating Documents and Further Transactions

Each of the officers of the Reorganized Debtor is authorized, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

8. **Governing Law**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof other than section 5-1401 and section 5-1402 of the New York General Obligations Law.

9. **Time**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 will apply.

10. **Dates of Actions to Implement the Plan**

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but will be deemed to have been completed as of the required date.

11. **Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement will be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtor, the holders of Claims and Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), the Released Parties, the Exculpated Parties and each of their respective successors and assigns, including, without limitation, the Reorganized Debtor.

12. **Entire Agreement**

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order will supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

13. **Exhibits to Plan**

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

14. **Notices**

Any notice, request, or demand required or permitted to be made or provided to or upon the Debtors, the Plan Administrator, the Litigation Trust, the Committee or the First Lien

Agents under the Plan shall be (1) in writing, (2) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, (e) electronic mail or (f) facsimile transmission, (3) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, and (4) addressed as follows:

If to the Debtors or the Reorganized Debtors:

HUGHES HUBBARD & REED LLP
Kathryn A. Coleman
Christopher Gartman
Dustin P. Smith
One Battery Park Plaza
New York, New York 10004-1482
Telephone:  (212) 837-6000
Facsimile: (212) 299-6126
E-Mail: katie.coleman@hugheshubbard.com
E-Mail: chris.gartman@hugheshubbard.com
E-Mail: dustin.smith@hugheshubbard.com

- and -

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones
James E. O'Neill
Peter J. Keane
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
E-Mail: ljones@pszjlaw.com
E-Mail: joneill@pszjlaw.com
E-Mail: pkeane@pszjlaw.com

For the Committee:

KILPATRICK TOWNSEND & STOCKTON LLP
David M. Posner
Gianfranco Finizio
Kelly Moynihan
The Grace Building
1114 Avenue of the Americas
New York, NY 10036-7703
Telephone: (212) 775-8700
Facsimile: (212) 775-8800

E-mail: dposner@kilpatricktownsend.com
E-mail: gfinizio@kilpatricktownsend.com
E-mail: kmoynihan@kilpatricktownsend.com

- and –

MORRIS JAMES LLP
Carl N. Kunz, III
Brenna A. Dolphin
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: ckunz@morrisjames.com
E-mail: bdolphin@morrisjames.com


For the First Lien Agents:

SCHULTE ROTH & ZABEL LLP
Adam C. Harris
919 Third Avenue
New York, NY 10022
Telephone No.: (212) 756-2000
Facsimile No.: (212) 593-5955
E-Mail: Adam.Harris@srz.com

- and –

LANDIS RATH & COBB LLP
Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 North Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone No.: (302) 467-4400
Facsimile No.: (302) 467-4450
E-Mail: landis@lrclaw.com
E-Mail: mumford@lrclaw.com

After the Effective Date, the Reorganized Debtor will have the authority to send a notice to all parties in interest providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, it must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002, provided, that the U.S. Trustee need not file such a renewed request and will continue to receive documents without any further action being necessary. After the Effective Date, the Reorganized Debtor will be authorized to limit the list of Entities receiving

documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee, and to those Entities who have filed such renewed requests.

**15.    Conflicts**

To the extent any provision of this Disclosure Statement or any instrument, document or agreement executed in connection with the Plan (or any exhibits, schedules, appendices, supplements or amendments to the foregoing) conflicts with or is in any way inconsistent with the terms of the Plan, the terms and provisions of the Plan shall govern and control.

# V.    PLAN-RELATED RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY EACH OF THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.    WHILE NUMEROUS, THESE RISK FACTORS SHOULD <u>NOT</u> BE CONSTRUED AS THE ONLY RISKS RELATING TO THE DEBTORS' BUSINESSES AND/OR THE PLAN

The following provides a summary of various important considerations and risk factors associated with the Plan. However, it is not exhaustive.  In considering whether to vote for or against the Plan, Holders of Claims in voting Classes should read and carefully consider the factors set forth below and all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

## A.    RISKS RELATING TO CONFIRMATION OF THE PLAN

### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3.    The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of

distributions such Holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or an Allowed Equity Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Equity Interests would receive with respect to their Allowed Claims and Allowed Equity Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan. Changes to the Plan may also delay the confirmation of the Plan and the Debtors' emergence from bankruptcy.

**4.      The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is or may be subject to an objection. Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**5.      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims and Allowed Equity Interests to be subordinated to other Allowed Claims and Allowed Equity Interests. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Equity Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

**6.      Failure to Obtain Exit Financing**

The Debtors will not be able to operate or pay the DIP Claims as contemplated under the Plan without an Exit Facility. If the Debtors cannot procure a New Exit Facility on

market terms prior to the Confirmation Hearing, they will likely be unable to meet the feasibility requirement for confirmation of the Plan.

### 7. The Restructuring Support Agreement May Terminate

The parties to the Restructuring Support Agreement have agreed to support the Plan provided certain conditions are met. To the extent that the terms or conditions of the Restructuring Support Agreement are not satisfied, or to the extent events of termination arise under the Restructuring Support Agreement, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituents. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

### 8. Release, Injunction, and Exculpation Provisions May Not Be Approved

Article XI of the Plan provides for certain releases, injunctions, and exculpations. All of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If they are not approved, the Plan may lose the support of certain parties and likely cannot be confirmed and likely cannot go effective.

## B. RISKS RELATING TO RECOVERIES UNDER THE PLAN

### 1. The Recovery to Holders of Allowed Claims Cannot Be Stated with Absolute Certainty

This Disclosure Statement contains various projections concerning the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates regarding the anticipated future performance of the Reorganized Debtors, including, without limitation, their ability to maintain or increase revenue and gross margins, control future operating expenses, or make necessary capital expenditures, as well as assumptions concerning general business and economic conditions and overall industry performance and trends, which the Debtors are unable to control. Should any or all of these assumptions or estimates ultimately prove to be incorrect or not materialize, the actual future experiences of the Reorganized Debtors may turn out to be materially different from the Financial Projections. Also, because the Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.

Further, because the Claims Bar Date has not yet occurred, the Claims estimates set forth herein are based on various assumptions and the best information available to the Debtors at this time. Accordingly, they are estimates. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the percentage recovery to Holders of such Allowed Claims under the Plan. Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the Debtors' control, including, without limitation, (a) the successful reorganization of the Debtors, (b) an assumed date for the occurrence of the Effective Date, (c) the Debtors' ability to achieve

the operating and financial results included in the Financial Projections, (d) the Debtors' ability to maintain adequate liquidity to fund operations, and (e) the assumption that capital and equity markets remain consistent with current conditions.

The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect, which could affect the percentage recovery to Holders of such Allowed Claims under the Plan, in some instances adversely. Also, the estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities.

### 2. Risk of Non-Occurrence of the Effective Date

The Debtors can provide no assurance as to the timing or as to whether the Effective Date will, in fact, occur. The occurrence of the Effective Date is subject to certain conditions precedent as described in Article IX of the Plan, including, among others, those relating to Consummation of the Plan. Failure to meet any of these conditions could result in the Plan not being consummated or the Confirmation Order being vacated.

## C. RISKS RELATING TO THE DEBTORS' BUSINESSES

### 1. Prolonged Continuation of the Chapter 11 Cases Is Likely to Harm the Debtors' Business

The prolonged continuation of these Chapter 11 Cases is likely to adversely affect the Debtors' business and operations. So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations. Extended Chapter 11 Cases would also impact customer relations. Prolonged continuation of the Chapter 11 Cases will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings. The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing, either under the DIP Facilities or otherwise, in order to service their debt and other obligations. It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all. If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

### 2. Insurance Industry Trends

Patriot derives its revenue from the provision of services to the workers' compensation insurance industry. Given the concentration of its business activities in this industry, it may be particularly exposed to certain economic downturns or other events that impact the labor market. Because a significant portion of the fees that the Debtors receive are based on a percentage of the reference premiums written for policies it produces and services, premium levels directly impact its revenues. Premium level growth is dependent in part upon payroll growth, which, in turn, is affected by underlying economic and labor market conditions.

A poor economic environment and labor market could result in decreases in demand for Patriot's workers' compensation insurance services as employers hire fewer workers, reduce wages or limit wage increases or curtail operations due to challenging market conditions. General business and economic conditions that could affect the Debtors, its carrier partners and other clients include fluctuations in debt and equity capital markets, the availability and cost of credit, and investor and consumer confidence. In addition to the adverse effects caused by a weak labor market on demand for workers' compensation insurance and related services, the Debtors' carrier partners may experience increased losses in weak economic conditions because, among other things, it is more difficult to return injured workers to work when employers are otherwise reducing payrolls. This could cause them to reduce their business levels, which would in turn reduce the level of services Patriot provides for them. In addition, some of Patriot's clients may cease operations completely or be acquired by other companies in the event of a prolonged deterioration in the economy.

In addition, there have been and may continue to be various trends in the insurance industry toward alternative insurance markets including, among other things, greater recourse to self-insurance, reinsurance captive entities, risk retention groups and non-insurance capital markets-based solutions to traditional insurance. While historically Patriot has been able to participate in reinsurance captive entities solutions on behalf of its clients and obtain fee revenue for such services, there can be no assurance that it will continue to do so or that it will adequately adapt to new trends in this area, or that any potential increase in revenues from such activities would compensate for losses in our other primary businesses.

### 3. Premium Rate Trends

A significant portion of the fee revenue Patriot receives from providing services to its carrier partners is based on a percentage of reference premiums written for the policies that it produces and services. If the premium rates assessed by the Debtors' carrier partners were to decrease, Patriot would experience a corresponding decrease in the revenues that it derives from these carrier partners. Patriot does not have any ability to control such premium rates, and in certain states premium rates are established by regulation. In addition, the Debtors' insurance carrier clients may in the future seek to reduce the service fees paid.

### 4. Outsourcing Trends

Patriot's business involves providing outsourcing services within the workers' compensation marketplace for insurance companies and other clients, and it currently does not have plans to focus its efforts on other lines of insurance. As a result, negative developments in the economic, competitive or regulatory conditions affecting the workers' compensation insurance industry could have a greater adverse effect on Patriot's business, financial condition and results of operations than on more diversified companies that also provide outsourced services for other lines of insurance.

### 5. Worker Compensation Claims Decline

The frequency of workers' compensation claims has been declining over the past few decades, but the severity of claims, in terms of both indemnity payment costs and medical

costs, has generally increased.  If, as a result of market conditions, regulatory changes or other factors, claims frequency declines more than anticipated, or if claims severity declines, Patriot's business could be adversely impacted.  In addition, a prolonged economic downturn could lead to fewer workers on a national level and could lead to fewer work-related injuries. Technological innovations and changes in the character of the U.S. labor market over time could also lead to fewer work-related injuries and thus fewer workers' compensation claims.

In addition, the impact of changes in the healthcare industry, as a result of the Patient Protection and Affordable Care Act ("PPACA") or otherwise, is uncertain, but could include impacts on frequency (for example, by increasing healthcare insurance coverage or the prevalence of preventative treatment) and severity (by impacting the medical costs associated with claims) of workers' compensation claims.

If declines in the frequency or the severity of workers' compensation claims occur and persist in states where Patriot conducts significant business, it could result in lower premium rates, which would reduce the fees that the Debtors generate as a percentage of reference premiums written, and lower claims management costs for insurers and employers, which could reduce demand for its claims administration, cost containment and other services.  Any of the foregoing could have a material adverse impact on Patriot's business, financial condition, and results of operations.

### 6.    Geographic Concentration

A majority of Patriot's reference premiums written are concentrated in Florida, California, New Jersey, Georgia, New York, and Pennsylvania, with Florida and California being the largest contributors.

The Debtors' workers' compensation insurance service operations could be particularly adversely affected by an economic downturn in one or more of these states.  In addition to the various other factors that could impact the economic and labor market conditions in these states, conditions could be affected by local or regional events, including natural disasters, such as hurricanes or earthquakes, or other catastrophic events that disrupt the local economy and cause businesses to cease operations or decrease payroll, thus reducing demand for workers' compensation insurance.

Patriot could also be adversely affected by any material change in law, regulation or any court decision affecting the workers' compensation insurance industry generally in these states.  For example, in Florida and New Jersey where a significant portion of the policies that the Debtors service are written, insurance regulators establish the premium rates charged by its carrier partners.  If insurance regulators in these states decrease premium rates or prevent them from increasing, it would directly adversely impact the Debtors' fees that are based on a percentage of reference premiums written.  In addition, if regulators set rates below those that the Debtors' carrier partners require to maintain profitability, its carrier partners may be less willing to write policies in those states or attempt to negotiate lower fees from Patriot, which would adversely impact the revenues it generates through our relationships with our carrier partners.

7. **Relationship with Independent Retail Agents**

Patriot markets and sells the insurance products of its carrier partners primarily through direct contracts with over 3,000 independent, non-exclusive retail agencies, some of which account for a large portion of the Debtors' revenues. Other insurance companies and insurance service companies compete with the Debtors for the services and allegiance of these agencies. These agencies may choose to direct business to the Debtors' competitors, or may direct less desirable business to it. Patriot's business relationships with these agencies are generally governed by our standard form agreements with them that typically provide that the agreement may be terminated on 30 days' notice by either party without cause.

As a result, the Debtors' continued profitability depends, in part, on the marketing efforts of its independent agencies and on its ability to offer workers' compensation insurance products through its carrier partners that meet the requirements and preferences of its independent retail agencies and their clients. A significant decrease in business from, or the loss of, the Debtors' largest agencies or several of its other large agencies would have a material adverse effect on its business, financial condition and results of operations.

8. **Changes in the Healthcare Industry**

The Patriot Care Management Business acquired in 2014 provides healthcare cost containment services in connection with workers' compensation claims, including bill review and telephonic nurse case management, and through Patriot subsidiary CWI, the Debtors provide benefits administration for clients with self-funded health and welfare plans nationwide. As a result of the PPACA and other regulatory and industry initiatives, the healthcare industry has been evolving rapidly in recent years and is expected to continue to do so. While federal agencies have published interim and final regulations with respect to certain requirements, many issues remain uncertain. It is difficult to predict the impact of the PPACA on Patriot's business due to the law's complexity, the political environment, the continuing development of implementing regulations and interpretive guidance, legal challenges and possible future legislative changes, including as the result of initiatives by the new presidential administration. The Senate has recently taken steps towards repealing certain provisions of the PPACA. Further, the Executive Order signed on January 20, 2017, directs federal agencies with authorities and responsibilities under the PPACA to waive, defer, grant exemptions from, or delay the implementation of any provision of the PPACA that would impose a fiscal or regulatory burden on states, individuals, healthcare providers, health insurers, or manufacturers of pharmaceuticals or medical devices. Congress could also consider subsequent legislation to replace elements of the PPACA that are repealed. Patriot is unable to predict how these events will develop and what impact they will have on the PPACA, and in turn, on the Debtors' business including, but not limited to, its relationships with current and future clients, as well as its products, services, processes and technology.

It is possible that changes in the healthcare industry could result in reduced demand for, or effectiveness of, the Debtors' healthcare cost containment services. For example, if the PPACA or replacement legislation is successful in increasing healthcare coverage, improving wellness and/or slowing the growth rate of, or even reducing healthcare costs, it could decrease the frequency and severity of workers' compensation claims. Alternatively, if an

increase in the availability of healthcare insurance coverage resulted in demand for healthcare services outpacing available supply, it could make it more difficult for the Debtors to contain healthcare costs. In addition, healthcare providers have become more active in their efforts to minimize the use of certain cost containment techniques by insurers and are engaging in litigation to avoid application of certain cost containment practices. Recent litigation between healthcare providers and insurers has challenged certain insurers' claims adjudication and reimbursement decisions. Although these lawsuits do not directly involve the Debtors or any services it provide, these cases may affect the use by insurers of certain cost containment services that Patriot provides and may result in a decrease in revenue from its cost containment business.

Further, the PPACA provides various incentives that affect demand for Patriot's services. For example, under the PPACA's employer shared responsibility, or "play or pay," provisions, employers with 50 or more full-time equivalent employees must offer health insurance to certain of their employees and their dependent children, and if coverage meeting certain minimum requirements is not offered the employer may face non-deductible tax penalties. Although employers retain the choice between fully underwritten and self-insured health insurance plans to comply with these requirements, the PPACA creates significant mandate and cost differences between fully underwritten and self-insured plans by exempting self-insured plans from certain requirements that can result in increased costs for fully underwritten plans, such as single risk pool standards and medical loss ratio mandates. Accordingly, these provisions encourage demand for the administration services the Debtors offer for self-insured plans. Any changes to the PPACA and its implementing regulations and guidance, including as a result of legal and legislative challenges, that lower the requirements for employers to provide health insurance or that make self-insured plans less attractive could result in reduced demand for the Debtors' healthcare administration services, and its business could be adversely affected as a result.

9.    **Regulatory Concerns**

Patriot is subject to extensive regulation by the insurance regulatory agencies of the states in which it is licensed and, to a lesser extent, federal regulation. For example, approximately half of the states in the United States have enacted laws that require licensing of businesses which provide medical review services such as ours. Some of these laws apply to medical review of care covered by workers' compensation. These laws typically establish minimum standards for qualifications of personnel, confidentiality, internal quality control and dispute resolution procedures. Patriot is also subject to state insurance fraud provisions, as well as federal fraud-and-abuse, anti-kickback and false claims statutes. Such laws, regulation and supervision could reduce the Debtors' profitability or growth by increasing compliance costs or by restricting the products or services it may sell, the markets it may enter, the methods by which it may sell products and services, the prices it may charge for its services and the form of compensation it may accept from its carrier partners and other clients. Failure to comply with these laws and regulation may result in the suspension or revocation of licenses, censures, and redress to clients and fines.

In addition, changes in legislation or regulations and actions by regulators, including changes in administration and enforcement policies, could from time to time require

operational changes that could result in lost revenues or higher costs or hinder the Debtors' ability to operate their businesses. For example, Patriot offers reinsurance captive entity design and management services, and expects to be able to continue offering such services. The National Association of Insurance Commissioners ("NAIC") has established a subgroup to study the use of reinsurance captive entities and special purpose vehicles to transfer insurance risk in relation to existing state laws and regulations. Any action by federal, state or other regulators that adversely affects the Debtors' ability to offer services in relation to reinsurance captive entities, either retroactively or prospectively, could have an adverse effect on its business, financial condition and results of operations.

### 10. System Concerns

Patriot's business relies on information systems to provide effective and efficient service to its carrier partners and other clients, process claims, and timely and accurately report results to carriers. In particular, the Debtors' "IE system", a web based end-to-end software system that provides all of the functions required by insurance carriers, managing general agents and third-party administrators, plays a pivotal role in all aspects of the services it provides, which can range from the issuance of new policies on behalf of carrier partners, to the administration and adjudication of claims. An interruption of the Debtors' access to, or failure in the performance of, its IE system or its other information technology, telecommunications or other systems, including through loss of stored data, breakdown or malfunctioning of computer equipment and software systems, telecommunications failure, or damage caused by fire, tornadoes, lightning, electrical power outage, or other disruption, could significantly impair the Debtors' ability to perform essential services on a timely basis. If sustained or repeated, such an interruption or failure could result in a deterioration of the Debtors' ability to process new and renewal business, provide customer service, manage and investigate claims in a timely and cost-effective manner or perform other necessary business functions. Any of the foregoing could result in a loss of confidence by Patriot's carrier partners or otherwise adversely affect its relationships with them.

## D. DISCLOSURE STATEMENT DISCLAIMER

### 1. No Representations Made Outside this Disclosure Statement Are Authorized

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes. Except as otherwise provided herein or in the Plan, no representations relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, and the United States Trustee.

## 2. The Debtors Relied on Certain Exemptions from Registration Under the Securities Act

This Disclosure Statement has not been filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful. This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.

The offer of New Equity under the Plan has not been registered under the Securities Act or similar state securities or "blue sky" laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law, the issuance of the New Equity will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, Rule 701 promulgated under the Securities Act, or a "no sale" under the Securities Act as described herein.

## 3. The Information Herein Was Provided by the Debtors and Relied Upon by Their Advisors

The Debtors have used their reasonable business judgment to ensure the accuracy of the information, including financial information, provided in this Disclosure Statement, the Plan and related documents. Nonetheless, the Debtors cannot, and do not, confirm the current accuracy of every statement appearing in this Disclosure Statement.

Statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

4. **No Legal or Tax Advice Is Provided to You by this Disclosure Statement**

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5. **No Admissions Are Made by This Disclosure Statement**

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interest or any other parties in interest. The vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Plan Administrator (or any party in interest, as the case may be) to object to that Holder's Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims and Equity Interest and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

# VI.    FINANCIAL INFORMATION AND PROJECTIONS

## A.    CONDENSED PROJECTED FINANCIAL INFORMATION

In connection with the development of a plan of reorganization and for the purposes of determining whether such plan would satisfy the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  The Debtors prepared financial projections (the "Projections") for 2018 through 2020 (the "Projection Period") attached hereto as Exhibit F.  The Debtors believe that the Plan meets the feasibility requirement, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors under the Plan.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to holders of Claims or other parties in interest after the Confirmation Date.  In connection with the development of the Plan, the Projections were prepared by the Debtors to assess the impact of the anticipated operating results of the Debtors and the transactions contemplated by the Plan on the Debtor's liquidity position.  The Projections assume that the Plan will be implemented in accordance with its stated terms.  The Projections are based on forecasts of key economic variables and may be significantly impacted by, regulatory changes and/or a variety of other factors, including those factors listed in Section V of this Disclosure Statement.

The Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below.

THE DEBTORS PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR ADVISORS. THE DEBTORS DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD- LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN SECTION V OF THIS DISCLOSURE STATEMENT), AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE

FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH PROJECTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, and the Plan in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

# VII.    VOTING PROCEDURES AND REQUIREMENTS

## A.    PROCEDURES FOR VOTING ON THE PLAN

### 1.    Voting Procedures and Requirements

The Disclosure Statement Order, a copy of which is annexed hereto as Exhibit B, sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, and applicable procedures for tabulating ballots.

### 2.    Who May Vote?

Pursuant to the provisions of the Bankruptcy Code, only holders of claims and interests in classes that are impaired and are to receive property or an interest in property under the proposed plan are entitled to vote to accept or reject the plan.  Classes in which the claims and interests are unimpaired are conclusively presumed to have accepted the plan and are not entitled to vote.

### 3.    Impaired Classes Eligible to Vote

Class 1A (Secured First Lien Lender Claims), Class 1B (First Lien Lender Deficiency Claims), Class 4 (Continuing Vendor Claims and Continuing Retail Agent Claims), and Class 5 (General Unsecured Claims), are impaired by the Plan and the holders of Claims in Class 1A Class 1B, Class 4, and Class 5 are entitled to vote to accept or reject the Plan.

### 4.    Unimpaired Classes Presumed to Accept Not Eligible to Vote

Classes 2, and 3 are unimpaired by the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims in these Classes are conclusively presumed to have accepted the Plan and are not entitled to vote.

### 5.    Classes Deemed to Reject or Otherwise Not Eligible to Vote

Classes 6, 7 and 8 will neither receive any distributions nor retain any property or interest in property under the Plan on account of the Claims or interests in such Classes. Pursuant to section 1126(g) of the Bankruptcy Code, the holders of Claims in Classes 6, 7 and 8 are deemed to reject the Plan and are not entitled to vote.

### 6.    How to Vote?

A ballot is enclosed herewith for use in voting on the Plan.  To vote on the Plan, use only the ballot that accompanies this Disclosure Statement.  You should read your ballot and follow the listed instructions carefully.

In order to be counted, ballots must be properly completed, signed, and returned so that they are actually received no later than 4:00 p.m., prevailing Eastern Time, on the Voting Deadline, Friday, April 13, 2018, by Prime Clerk (the "Voting Agent") at the following address:

**BY OVERNIGHT COURIER, HAND DELIVERY or FIRST CLASS MAIL:**

> Patriot National Ballot Processing
> c/o Prime Clerk LLC
> 830 Third Avenue, 3rd Floor
> New York, New York 10022

You may also submit your ballot via the Voting Agent's "E-Ballot" platform by visiting https://cases.primeclerk.com/patnat, clicking on the "Submit E-Ballot" section of the website and following the instructions on the website to submit your ballot.

**UNLESS THE BALLOT IS ACTUALLY RECEIVED BY THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST OF THE BANKRUPTCY COURT THAT ANY SUCH VOTE BE COUNTED.**

To be counted for purposes of voting on the Plan, all of the information requested on the ballot must be provided. **If your ballot is not properly completed, signed, and returned as described, it will not be counted. Unless otherwise ordered by the Bankruptcy Court, ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted for voting purposes.**

**If your ballot is damaged or lost, you may contact the Voting Agent as set forth in the ballot.**

> **IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED A BALLOT OR ADDITIONAL COPIES OF THE DISCLOSURE STATEMENT OR OTHER ENCLOSED MATERIALS, YOU MAY CONTACT THE VOTING AGENT BY TELEPHONE AT (855) 631-5360 (TOLL-FREE) OR (347) 897-3454 (INTERNATIONAL) OR BY EMAIL AT PATNATBALLOTS@PRIMECLERK.COM.**

### 7. Vote Required for Acceptance by a Class

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the claims of that class which cast ballots for acceptance or rejection of the plan. Thus, acceptance by a class of claims occurs only if at least two-thirds (⅔) in dollar amount and a majority in number of the holders of claims voting cast their ballots to accept the plan.

### 8. Withdrawal of Ballot

Any voter that has delivered a valid ballot may withdraw its vote, subject to Bankruptcy Rule 3018, by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline, which notice of withdrawal, to be valid, must be (i) signed by the party who

signed the ballot to be revoked and (ii) received by the Voting Agent before the Voting Deadline. The Debtors may contest the validity of any withdrawals.

Any voter that has delivered a valid ballot may not change its vote, except in accordance with the Approval Order and Bankruptcy Rule 3018. If a holder casts more than one ballot voting the same claim before the Voting Deadline, the latest dated ballot received before the Voting Deadline shall be deemed to reflect the voter's intent and thus to supersede any prior ballots.

### 9. Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of ballots will be determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.

The Debtors reserve the right to reject any and all ballots submitted by any voters not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve their rights to waive any defects or irregularities or conditions of delivery as to any particular ballot by any of the voters. The interpretation (including the ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

Signed ballots that indicate the holder's agreement to waive defaults or forbear from exercising remedies will be treated as a valid waiver or forbearance irrespective of whether such holder votes on the Plan or whether such holder accepts or rejects the Plan.

### 10. Extension of Voting Deadline / Termination of Solicitation

The Debtors reserve the right, at their sole discretion, and without notice except as may be required under applicable law, to extend the solicitation period or terminate their solicitation of votes on the Plan.

## B. CONFIRMATION OF THE PLAN

### 1. The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to conduct a hearing to consider confirmation of a plan (the "Confirmation Hearing"). Notice of the Confirmation Hearing will be provided to creditors, interest holders, and other parties in interest in accordance with the applicable orders of the Bankruptcy Court.

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of the Claims or Equity Interests held, or asserted by, the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel for Cerberus Business Finance, LLC, as the administrative agent for the proposed DIP Lenders and for the prepetition secured lenders; and (iii) those parties listed on the list of creditors holding the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis), as identified in their chapter 11 petitions; and (v) any other party entitled to notice pursuant to Bankruptcy Rule 2002.

Objections to confirmation of the Plan are governed by Federal Rule of Bankruptcy Procedure 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### 2. Requirements for Confirmation of the Plan

The Bankruptcy Court will confirm the Plan only if it meets the requirements of section 1129 of the Bankruptcy Code.

### 3. General Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements for the Plan, as specified in section 1129(a) of the Bankruptcy Code, have been satisfied:

i. The Plan complies with the applicable provisions of the Bankruptcy Code;

ii. The Debtors have complied with the applicable provisions of the Bankruptcy Code;

iii. The Plan has been proposed in good faith and not by any means proscribed by law;

iv. Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

v.      The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

vi.     Except to the extent that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (*see* "Confirmation in the Event a Class Fails to Accept the Plan," below), each Class of Claims or Equity Interests has either accepted the Plan or is unimpaired under the Plan;

vii.    With respect to each Class of Claims or Equity Interests, each Holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan on account of such Holder's Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code (*see* "Best Interests Test," below);

viii.   Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims, and Priority Claims will be paid in full in cash on the Effective Date and that Priority Claims will receive on account of such claims deferred cash payments, over a period not exceeding five years after the Petition Date, of a value as of the Effective Date of the plan, equal to the allowed amount of such claims with interest from the Effective Date;

ix.     At least one class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class;

x.      Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor of the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan (*see* "Feasibility of the Plan," below);

xi.     All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date; and

xii.    The Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

### 4. Confirmation in the Event a Class Fails to Accept the Plan

As noted directly above, for the Bankruptcy Court to approve the Plan, either the Plan must be accepted by all impaired classes of claims and interests entitled to vote or, if rejected by an impaired class, the Plan must meet the requirements of section 1129(b) of the Bankruptcy Code.

### 5. Acceptance of the Plan

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims occurs when holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the allowed claims of that class that cast ballots for acceptance or rejection of the chapter 11 plan vote to accept the plan. Acceptance of a chapter 11 plan by a class of interests occurs when holders of at least two-thirds (2/3) in amount of allowed interests of that class that cast ballots for acceptance or rejection of the chapter 11 plan vote to accept the plan. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### 6. Section 1129(b) Requirements

In the event that any impaired class of claims or equity interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired class of claims or equity interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code.

#### *No Unfair Discrimination Test*

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the plan. The test does not require that the treatment be the same, but only that such treatment not be "unfair."

#### *Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus equity interests) and includes the general requirement that no class of claims receives more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards that must be satisfied in order for the plan to be confirmed, depending on the type of claims or interests in such class:

- Secured Claims. Each holder of an impaired secured claim either (a) retains its liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim or (b) receives the "indubitable equivalent" of its allowed secured claim.

- Unsecured Claims.  Either (a) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

- Equity Interests.  Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest, or (b) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believes the Plan satisfies the "fair and equitable" requirement with respect to any class that is deemed to reject the plan and requests that the Bankruptcy Court confirm the Plan notwithstanding the rejection or deemed rejection of the Plan by any class.  In the event that any other class rejects the Plan, the Debtors will demonstrate at the Confirmation Hearing that the above requirements are satisfied as to such other rejecting class, as well.

**7.      Best Interests Test**

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired claim or impaired equity interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement customarily is referred to as the "best interests" test.

The first step in meeting the "best interests test" is to determine the dollar amount that would be generated from a chapter 7 liquidation of the Debtors' assets and properties.  The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the unencumbered cash held by the Debtors at the time of the commencement of the hypothetical chapter 7 cases.  The next step is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of liquidation, and such additional administrative expense claims and priority claims that may result from the termination of the Debtors' businesses and the use of chapter 7 for the purposes of liquidation.  Finally, the present value of that amount (taking into account the time necessary to accomplish the liquidation) is allocated to creditors and stockholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below) and can then be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that a trustee may engage, plus any unpaid expenses incurred by the Debtors during a chapter 11 case and allowed in the chapter 7 case (such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed).  In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors both prior to, and during

the pendency of, the Chapter 11 Cases. The foregoing types of claims, costs, expenses, and fees and such other claims which may arise in a liquidation case or result from a pending Chapter 11 Case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured claims. For purposes of the best interests test, distributions under a chapter 11 plan that substantively consolidates debtors are compared against distributions in a hypothetical chapter 7 liquidation that also substantively consolidates the debtors.

In applying the "best interests test," it is possible that claims and equity interests in a chapter 7 liquidation may not be classified as in the Plan. In the absence of a contrary determination by the Bankruptcy Court, all prepetition unsecured claims that have the same rights upon liquidation would be treated as one class for purposes of determining the potential distribution of the liquidation proceeds resulting from a hypothetical chapter 7 liquidation. The distributions for the liquidation proceeds would be calculated ratably according to the amount of the claim held by each creditor. Creditors who are or claim to be third party beneficiaries of any contractual subordination provisions might be required to seek or enforce such contractual subordination provisions in the Bankruptcy Court or otherwise. Section 510 of the Bankruptcy Code specifies that such contractual subordination provisions are enforceable in a chapter 7 liquidation case.

The Debtors believe that the most likely outcome of liquidation proceedings under chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full with interest. Consequently, the Debtors believe that in a liquidation, holders of allowed claims in Classes 1A, 1B, 2, 3, 4, 5, 6, 7, and 8 would receive no distributions of property under the Plan.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including, without limitation, (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the claims that would arise from the rejection of executory contracts and unexpired lease that have been assumed in the Chapter 11 Cases, (iii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, (iv) the adverse effects on the salability of new common stock as a result of the departure of key employees, and (v) substantial increases in claims which would be satisfied on a priority basis or on a parity with creditors in a chapter 11 case, the Debtors have determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less that it would receive pursuant to a liquation of the Debtors under chapter 7 of the Bankruptcy Code.

**The Debtors' liquidation analysis, which is attached as Exhibit D hereto, is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the assets of the Debtors. The analysis is based upon a number of significant assumptions which are described therein. The liquidation analysis does not purport to be a**

**valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

The value offered to holders of Claims and Equity Interests in Impaired Classes under the Plan is discussed in the valuation analyses attached to this Disclosure Statement as Exhibit E (the "Valuation Analysis"). The Debtors have been advised by Duff & Phelps Corp. ("Duff & Phelps") with respect to the Valuation Analysis. Based on the financial projections set forth in Exhibit F to this Disclosure Statement, Duff & Phelps developed valuations for the consolidated Reorganized Debtors. As noted in the Valuation Analysis, subject to the assumptions and caveats noted therein, the pro forma consolidated equity value of the Reorganized Debtors plus the New Term Loan is estimated to be $70.827 million to $81.481 million. Based on this, and an estimated aggregate of Allowed First Lien Lender Claims against the consolidated Debtors of $223,304,651, Duff & Phelps estimates the hypothetical recovery to the holders of Allowed First Lien Lender Claims against the Consolidated Debtors to be $70.8 million to $81.5 million on account of their Allowed Secured First Lien Lender Claims.

Notwithstanding the difficulties in quantifying recoveries to holders of Claims and Equity Interests with precision, the Debtors believe that, comparing the Valuation Analysis to the Liquidation Analyses, the Plan meets the best interests test. As the following table indicates, members of each Impaired Class will receive more under the Plan than they would in liquidation in a hypothetical chapter 7 case.

| Class | Recovery Under Liquidation Analyses[13] | Recovery Under Plan |
|---|---|---|
| Class 1A | 0% | 100% |
| Class 1B | 0% | Proceeds from Litigation Trust Interest |
| Class 4 | 0% | 100% |
| Class 5 | 0% | Proceeds from Litigation Trust Interest |
| Class 6 | 0% | 0% |
| Class 7 | 0% | 0% |
| Class 8 | 0% | 0% |

**8.      Feasibility of the Plan**

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that such plan is "feasible." A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared the financial projections set forth in Exhibit F. Based upon such projections, the

---

13  The Liquidation Analysis assumes no recovery value from equity in foreign subsidiaries as the international subsidiaries generate little to negative EBITDA.

Debtors believe that they will have sufficient cash resources to make the payments required pursuant to the Plan, repay and service debt obligations, and maintain operations on a going-forward basis. Accordingly, the Debtors believe that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization of the Debtors and therefore, the Plan complies with section 1129(a)(11) of the Bankruptcy Code.

## C. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the Debtors' alternatives include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the preparation and presentation of an alternative plan or plans under chapter 11.

### 1. Liquidation Under Chapter 7

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors. A discussion of the effect that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests is set forth in Exhibit D, above. The Debtors believe that liquidation under chapter 7 would result in, among other things, (i) smaller distributions being made to creditors and equity interest holders than those provided for in the Plan because of additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of executory contracts and unexpired leases in connection with a cessation of the Debtors' operations, and (iii) the failure to realize the greater, going concern value of the Debtors' estates.

### 2. Alternative Chapter 11 Plan

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different chapter 11 plan. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets. The Debtors have concluded that the Plan represents the best alternative to protect the interests of creditors and other parties in interest.

The Debtors believe that the Plan enables the Debtors to successfully and expeditiously emerge from chapter 11, preserves their business, and allows creditors to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion which could occur over a more extended period of time than in a liquidation under chapter 7 and a trustee would not be appointed. Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because a greater return to creditors is provided for in the Plan.

# VIII.   SECURITIES LAWS MATTERS

## A.   EXEMPTION FROM REGISTRATION REQUIREMENTS

The Debtors believe that the New Equity to be issued pursuant to the Plan constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.  The Debtors believe that the offer and sale of the New Equity pursuant to the Plan will be exempt from federal and state securities registration requirements under various provisions of the Securities Act of 1933 (the "Securities Act") and the Bankruptcy Code.  Section 1145 of the Bankruptcy Code provides that, except with respect to an entity that is an "underwriter" (as defined in section 1145(b)(1) of the Bankruptcy Code), the registration requirements of Section 5 of the Securities Act (and of any state or local securities laws) will not apply to:

  i.      the offer or sale of stock, warrants, or other securities of a debtor if (x) the offer or sale occurs under a plan of reorganization, (y) the recipients of the securities hold a claim against, an interest in, or a claim for administrative expense in the case concerning, the debtor, and (z) the securities are issued in exchange for a claim against or interest in the debtor or are issued principally in such exchange and partly for cash or property, or

  ii.     the offer of a security through any warrant, option, right to subscribe, or conversion privilege that was sold in the manner specified in clause (i), or the sale of a security upon the exercise of such a warrant, option, right, or privilege.

In reliance upon the exemptions described above, the offer and sale of the New Equity will not be registered under the Securities Act or any state securities laws.

Under section 1145 of the Bankruptcy Code any securities contemplated by the Plan, including without limitation, the shares of New Equity, will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act (discussed below), and compliance with any rules and regulations of the U.S. Securities and Exchange Commission (the "SEC"), if any, applicable at the time of any future transfer of such securities or instruments; (ii) the restrictions, if any, on the transferability of such securities and instruments; and (iii) applicable regulatory approval.

To the extent that the issuance of the shares of New Equity is covered by section 1145 of the Bankruptcy Code, the shares of New Equity may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter," as defined in section 1145(b)(1) the Bankruptcy Code, with respect to such securities.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as an entity that, except with respect to "ordinary trading transactions" of an entity that is not an "issuer:"

  i.      purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest;

ii.    offers to sell securities offered or sold under a plan for the holders of such securities;

iii.   offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (x) with a view to distribution of such securities and (y) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or

iv.    is an "issuer," within the meaning of Section 2(a)(11) of the Securities Act, with respect to such securities. Under Section 2(a)(11) of the Securities Act, an "issuer" includes, in addition to an issuer, any person or entity directly or indirectly controlling or controlled by the issuer, or any person or entity under direct or indirect common control with the issuer. In addition, the term "issuer" includes "controlling persons" of the issuer of the securities. The term "controlling person" refers to any person or entity with possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the issuer of the securities.

Any New Equity issued to an "affiliate" of the Debtors within the meaning of the Securities Act or any Person the Debtors reasonably determined to be an "underwriter" within the meaning of the Securities Act, and which does not agree to resell such securities only in "ordinary trading transactions," within the meaning of section 1145(b)(1) of the Bankruptcy Code, shall be subject to such transfer restrictions and bear such legends as shall be appropriate to ensure compliance with the Securities Act.

The shares of New Equity generally may also be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective state securities laws; however, the availability of such exemptions cannot be known unless individual state securities laws are examined.

**Whether any particular Person will fall within any category of "underwriter" with respect to any security, if any, to be issued pursuant to the Plan, of whether any particular Person will be able to resell such security pursuant to an exemption other than provided by section 1145, depends upon various facts and circumstances. Given the complexity and factual nature of such issues, the Debtors make no representations concerning the right of any particular Person to trade in securities, if any, to be distributed pursuant to the Plan.**

**The Debtors have not sought and do not expect to receive any no-action position from the SEC with respect to any securities regulatory matters concerning the Plan, and no assurance can be given that the SEC or "Blue Sky" securities regulatory authorities will not take a position with respect to such matters that is inconsistent with those of the Debtors as described herein. Potential recipients of the securities, if any, distributed pursuant to the Plan are strongly urged to consult their own counsel regarding whether they may freely trade such securities.**

**Neither this Disclosure Statement, nor any portion thereof, has been submitted for approval under the Securities Act or applicable state securities laws.  Neither the SEC not any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or any portion thereof.  Creditors and interest holders should consult their own legal counsel and advisors as to any securities law related matters.**

Nothing in the Plan is intended to preclude the SEC or any other governmental agency from exercising its police and regulatory powers relating to the Debtors or any other entity.

## IX.    CERTAIN FEDERAL TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain Holders of Impaired Claims and Equity Interests. This summary is based on the Internal Revenue Code, Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of the Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to Holders of Claims or Equity Interests that are not United States persons (as such term is defined in the Internal Revenue Code), that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, partnerships or entities treated as partnerships for U.S. federal income tax purposes; persons whose functional currency is not the U.S. dollar; banks; insurance companies; S corporations; real estate investment trusts; persons subject to the alternative minimum tax or the net investment income tax; persons whose claims are part of a straddle, hedge or conversion transaction; governmental authorities or agencies; financial institutions; insurance companies; tax-exempt organizations; brokers and dealers in securities, currencies or commodities; small business investment companies; persons whose claims arose in connection with providing services to the Debtors, including in an employment capacity; persons whose Claims arose as the result of the rejection of a burdensome contract; and regulated investment companies) or that do not hold their Claims and Equity Interests in Patriot as "capital assets" within the meaning of section 1221 of the Internal Revenue Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and Holders of Impaired Claims and Equity Interests in Patriot based upon their particular circumstances. In addition, this discussion assumes that the Claims constitute debt for U.S. federal income tax purposes. Holders of Claims should consult with their tax advisors about the possibility of recognizing a loss as a result of the Plan.

This summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under U.S. federal estate tax law or any state, local, or foreign tax law.

The following summary is not a substitute for careful tax planning and advice based on the particular circumstances of each Holder of a Claim or Equity Interest. Each Holder of a Claim or Equity Interest is urged to consult his, her, or its own tax advisors as to the U.S. federal income tax consequences, as well as other tax consequences, including under U.S. federal estate tax law or any applicable state, local, and foreign law, of the restructuring described in the Plan in light of such Holders' particular circumstances.

## A. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE HOLDERS OF CERTAIN CLAIMS AND EQUITY INTERESTS

### 1. Consequences to Holders of Certain Claims

#### a. General Tax Consequences

Pursuant to the Plan, (i) the First Lien Lender Claims will be exchanged for the New Term Loan Facility, the New Equity Interests, and the Litigation Trust Interests and (ii) the General Unsecured Claims will be exchanged for Litigation Trust Interests.

The U.S. federal income tax consequences to any Holder of the First Lien Lender Claims depend on whether such Claims are treated as "securities" of Reorganized Debtors for purposes of the reorganization provisions of the Internal Revenue Code. Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that term-length of a debt instrument at issuance is an important factor in determining whether such an instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including, among others: the security for payment; the creditworthiness of the obligor; the subordination or lack thereof to other creditors; the right to vote or otherwise participate in the management of the obligor; convertibility of the instrument into an equity interest of the obligor; whether payments of interest are fixed, variable, or contingent; and whether such payments are made on a current basis, or accrued. The following discussion assumes that the First Lien Lender Claims do not constitute securities for U.S. federal income tax purposes. Each Holder of a First Lien Lender Claim should consult with his, her or its own tax advisor regarding whether the Claim in question constitutes a "security" for U.S. federal income tax purposes.

The exchange of First Lien Lender Claims that do not constitute securities for the New Term Loan Facility, the New Equity Interests and Litigation Trust Interests pursuant to the Plan generally should constitute a taxable transaction for U.S. federal income tax purposes. Subject to the "market discount" rules (discussed below), a Holder of First Lien Lender Claims that do not constitute securities that exchanges such Claims for the New Term Loan Facility, the New Equity Interests, and the Litigation Trust Interests generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of (a) the adjusted principal amount of the loans made by such Holder under the New Term Loan Facility and (b) the fair market value of the New Equity Interests and Litigation Trust Interests received and (ii) such Holder's adjusted tax basis in the Claims exchanged therefor (other than any tax basis attributable to accrued but unpaid interest or accrued original issue discount ("OID"), as discussed below). A Holder's tax basis in its New Equity Interests received generally should equal the fair market value of such New Equity Interest on the Effective Date and its holding period in such New Equity Interest should begin the day following the Effective Date. In addition, such Holder of such Claim generally will recognize interest income to the extent of any consideration allocable to accrued OID or accrued but unpaid interest not previously included in such Holder's taxable

income, as discussed below. A Holder's tax basis in its share of the loans made under the New Term Loan Facility should equal the adjusted principal amount of such loans.

Similarly, the exchange of a General Unsecured Claim for a Litigation Trust Interest generally should constitute a taxable transaction for U.S. federal income tax purposes. Subject to the OID and market discount discussions below, a Holder that exchanges such Claims for Litigation Trust Interests generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of the Litigation Trust Interests received and (ii) such Holder's adjusted tax basis in the Claims exchanged therefor. The tax consequences of receiving Litigation Trust Interests are described in more detail below.

### b.     Tax Treatment of Litigation Trust

The Litigation Trust is intended to qualify as a liquidating trust pursuant to Treasury Regulation § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a disregarded entity). However, merely establishing a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Litigation Trust has been structured with the intention of complying with such general criteria. The Litigation Trust Agreement will limit the investment powers of the Litigation Trustee in accordance with Rev. Proc. 94-45 and will require the Litigation Trust to distribute at least annually to the Litigation Trust Beneficiaries (as such may have been determined at such time) its net income (net of any payment of or provision for Taxes), except for amounts retained as reasonably necessary to maintain the value of the Litigation Trust Assets. Also, all parties (including the Litigation Trustee and Litigation Trust Beneficiaries) are required to treat, for U.S. federal income tax purposes, the Litigation Trust as a grantor trust of which the Litigation Trust Beneficiaries are the owners and grantors. The following discussion assumes that the Litigation Trust will be so treated for federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS to successfully challenge such classification, the federal income tax consequences to the Litigation Trust and the Litigation Trust Beneficiaries could vary from those discussed herein.

The Litigation Trust Beneficiaries will be treated as receiving an amount equal to the fair market value of their interests in the Litigation Trust in exchange for their Claims. The Litigation Trust Beneficiaries will be treated for federal income tax purposes as owning their shares of the Litigation Trust Assets, including the Litigation Claims, and will be required to include their allocable shares of each item of income, gain, deduction, loss and credit of the Litigation Trust in determining their taxable income. The Litigation Trust Agreement will require consistent valuation of the Litigation Trust Assets by the Reorganized Debtors, the Litigation Trustee and the Litigation Trust Beneficiaries for all federal income tax and reporting purposes. The Litigation Trustee will send to each Litigation Trust Beneficiary a statement setting forth the information necessary for such Litigation Trust Beneficiary to determine its

share of items of income, gain, loss, deduction, or credit of the Litigation Trust for federal income tax purposes.

### c.    *Accrued but Unpaid Interest or OID*

A portion of the consideration received by a Holder of a Claim pursuant to the Plan, including any interest in the New Term Loan Facility, any New Equity Interests, and any Litigation Trust Interests, may be attributable to accrued but unpaid interest or OID on such Claim.  Such amount should be taxable to that Holder as interest income if such accrued interest or OID has not been previously included in the Holder's gross income for U.S. federal income tax purposes.

A Holder generally will recognize a deductible loss to the extent that any accrued interest was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current loss with respect to any accrued unpaid OID.  Accordingly, it is also unclear whether, by analogy, a Holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.  Each Claim Holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for U.S. federal income tax purposes.

If the fair market value of the consideration received by a Holder is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued but unpaid interest or OID is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such Holders and any remaining consideration will be treated as satisfying accrued but unpaid interest or OID, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, but it is unclear whether this extends to OID. There can be no assurance that the IRS will not take the position that the consideration received by a Holder should be allocated in some way other than as provided in the Plan.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### d.    *Market Discount*

Certain Holders who exchange Claims for interest in the New Term Loan Facility, New Equity Interests, Litigation Trust Interests or cash may be affected by the "market discount" provisions of sections 1276 through 1278 of the Internal Revenue Code.  Under these rules, some or all of the gain recognized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) generally is considered to be acquired with "market discount" as to that holder if the

debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Internal Revenue Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition.  However, a debt obligation is not a "market discount bond" if such excess is less than a statutory de minimis amount (equal to 0.25 percent of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with OID, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Gain recognized by a Holder on the taxable disposition of a Claim (determined as described above) that was acquired with market discount may be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was held by the Holder (unless the Holder elected to include market discount in income as it accrued).  Holders who purchased their Claims with market discount are advised to consult their tax advisors regarding the tax consequences to them under the market discount rules.

### e.	Bad Debt Deduction

A Holder who, under the Plan, receives in respect of a Claim an amount less than the Holder's tax basis in the Claim in a taxable transaction may be entitled to a bad debt deduction in some amount under section 166(a) of the Internal Revenue Code.  The rules governing character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor, and the instrument with respect to which a deduction is claimed.  Each Holder of a Claim, therefore, is urged to consult its tax advisors with respect to its ability to take such a deduction.

### f.	Limitation on Use of Capital Losses

Holders of Claims are subject to limits on their use of capital losses.  For non-corporate Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains for the year.  Non-corporate Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income as described above for an unlimited number of years.  Corporate Holders cannot use capital losses to offset ordinary income and may carry over unused capital losses only to the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 2.	Consequences to Holders of Class 4 Claims

Generally, an exchange of Class 4 Claims for cash will be a taxable event regardless of whether such Claims constitute securities and the Holders of such Claims would generally recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of cash received and (ii) such Holder's adjusted tax basis in its exchanged Class 4 Claims.  Each Holder of a Class 4 Claims is urged to consult his, her, or its own tax advisors as to the U.S. federal income tax consequences of the exchange.

### 3. Consequences to Holders of Old Equity Interests in Patriot

Holders of Old Equity Interests, which are being cancelled under the Plan, will be entitled to claim a worthless stock deduction (assuming that the taxable year that includes the Effective Date of the Plan is the same taxable year in which such stock first became worthless and only if such Holder had not previously claimed a worthless stock deduction with respect to any Old Equity Interest in Patriot) in an amount equal to the Holder's adjusted basis in the Old Equity Interests. If the Holder held its Old Equity Interest in Patriot as a capital asset, the loss will be treated as a capital loss.

### 4. Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments or accruals of interest or OID under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) falls within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the Internal Revenue Code.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

### B. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO REORGANIZED DEBTORS

### 1. Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income so recognized, in

general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid and (y) the fair market value of any non-cash consideration (including stock of the debtor) given, or, in some cases, the adjusted principal amount of any debt issued, in satisfaction of such indebtedness at the time of the exchange. The payment of certain claims will not give rise to COD Income to the extent that the claim payment would have been deductible.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce certain of its tax attributes by the amount of COD Income that it excluded from gross income under section 108 of the Internal Revenue Code. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) general business tax credit carryovers, (c) minimum tax credits, (d) capital loss carryovers; (e) tax basis in assets; and (f) foreign tax credit carryovers. A chapter 11 debtor with COD Income may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the Internal Revenue Code.

Because the Plan provides that certain Holders of Allowed Claims will receive New Equity Interests and/or Litigation Trust Interests, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Equity Interests and Litigation Trust Interests exchanged therefor. This value cannot be known with certainty until after the Effective Date.

2.     **Limitation of New Operating Loss Carry Forwards and Other Tax Attributes**

The precise amount of NOL carryovers that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time. As of December 31, 2017, Debtor had consolidated NOL carryforwards, for U.S. federal income tax purposes, of approximately $70,000,000-$100,000,000. Some of the factors that will impact the amount of available NOLs include: the amount of taxable income or loss recognized by the Debtors in 2018; the value of the New Equity Interests and Litigation Trust Interests; and the amount of COD Income incurred by the Debtors in connection with consummation of the Plan.

Following consummation of the Plan, the Debtors anticipate that any remaining NOLs and tax credit and certain disallowed interest carryovers and, possibly, certain other tax attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") will be subject to limitation under section 382 of the Internal Revenue Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions contemplated by the Plan. Under section 382 of the Internal Revenue Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation.

### a.    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (currently 1.96%, as of January 2018).  However, the annual limitation is reduced to zero if the corporation fails to continue its business enterprise for the two years following the ownership change.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

If the Debtors' assets in the aggregate have a fair market value less than the Debtors' tax basis therein (a "<u>Net Unrealized Built-in Loss</u>"), any built-in losses recognized during the following five years (up to the amount of the original Net Unrealized Built-in Loss), including loss on disposition of assets and depreciation and amortization deductions attributable to the excess of the tax basis of the assets of the Debtors over their fair market value as of the date of the ownership change, generally will be treated as Pre-Change Losses subject to the annual limitation.  If the Debtors' assets in the aggregate have a fair market value greater than the Debtors' tax basis therein (such excess, a "<u>Net Unrealized Built-in Gain</u>"), any Net Unrealized Built-in Gain recognized by the Debtors in the five years immediately after the ownership change will generally increase the section 382 limitation in the year recognized, such that the Debtors would be permitted to use their pre-change NOLs against such gain in addition to their regular allowance.  For these purposes, the Debtors would be permitted to increase their annual section 382 limitation during the five years immediately after the ownership change by an amount determined by reference to the depreciation and amortization deductions that a hypothetical purchaser of the Debtors' assets would have been permitted to claim if it had acquired the Debtors' assets for their fair market value in a taxable transaction as compared to the actual depreciation and amortization deductions of the Debtors.

### b.    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "<u>382(l)(5) Exception</u>").  A "qualified creditor" generally is a creditor who has held (i) its claim continuously for at least 18 months prior to the petition date or (ii) a claim incurred in the ordinary course of the debtor's business since the claim was incurred.  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Debtors undergo another "ownership change" within two years after consummation of the Plan, then the Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  When the 382(l)(6) Exception applies, the general section 382 limitation applies, but a debtor corporation that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock for the purposes of calculation the section 382 limitation after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of the stock of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its NOLs.

The Debtors may emerge from chapter 11 with valuable tax attributes, including NOLs.  Regardless of whether the Debtors elect to utilize the 382(l)(5) Exception (if such election is available), the Reorganized Debtors' ability to utilize these NOLs could be subject to further limitation if an "ownership change" with respect to the New Equity Interest were to occur after emergence.

**3.      Section 269 of the Internal Revenue Code**

Aside from the objective limitations of sections 172 and 382 of the Internal Revenue Code, the IRS may disallow the subsequent use of a corporation's losses pursuant to section 269 of the Internal Revenue Code.  Under section 269, if the IRS determines that the "principal purpose" of an acquisition was to evade or avoid U.S. federal income tax by allowing the taxpayer to secure the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, the IRS may disallow such deduction, credit, or other allowance.  Section 269 applies to direct or indirect acquisition of 50% or more (by vote or value) of a corporation's stock, including such acquisition pursuant to a plan of reorganization in chapter 11.  The Debtors do not believe that securing a tax benefit is the principal purpose of the acquisition of control of the Reorganized Debtors by the creditors pursuant to the Plan.  However, no assurance can be given in this regard.

# X.    CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because the Plan will provide the greatest recoveries to creditors.   Other alternatives would involve significant delay, uncertainty, and substantial additional administrative costs.   The Debtors urge holders of impaired Claims entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than 4:00 p.m., prevailing Eastern Time, on Friday, April 13, 2018.

[SIGNATURE PAGE FOLLOWS]

Dated:  March 9, 2018

**PATRIOT NATIONAL, INC.**
for itself and its Debtor affiliates

By: */s/ James S. Feltman*
Name: James S. Feltman
Title: Chief Restructuring Officer